IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**APPEAL No. 24-13762-D and 24-13807-D**

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**
**v.**

**JORGE PEREZ and RICARDO PEREZ,**
**Defendants-Appellants.**

---

On Appeal from the United States District Court
For the Middle District of Florida
District Court No. 3-20-cr-00086-TJC-SJH-1

---

**OPENING BRIEF OF APPELLANTS**

---

THIS IS A DIRECT APPEAL FROM A FINAL JUDGMENT IN A CRIMINAL
CASE PURSUANT TO 28 U.S.C. §1291

---

DONALD F. SAMUEL
GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Ph: (404) 262-2225
Fax: (404) 365-5041

RONALD D. MARNEY II
MARNEY LAW, L.L.C.
920 W. 47th Street
Kansas City, Missouri 64112
Ph: (816) 221-6464
Fax: (816) 896-0633

ATTORNEYS FOR APPELLANTS
JORGE PEREZ AND RICARDO PEREZ

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,          )
                                   )
    Plaintiff -Appellee,           )
                                   )
    v.                             )          Appeal No. 24-13762-D
                                   )
JORGE PEREZ,                       )          Appeal No. 24-13807-D
and                                )
RICARDO PEREZ                      )
                                   )
    Defendants-Appellants.         )

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 26.1-1, the undersigned Attorney for Appellant hereby certifies that the following is a list of persons and entities who may have an interest in the outcome of this case:

1.    Michael A. Abel; Attorney for Movant Blue Cross Blue Shield of Florida, Inc., and for Movant Blue Shield of Georgia, Inc.

2.    Aetna, Inc; Movant

3.    Aaron Alonzo; Defendant

4.    Thomas M. Bell; Attorney for Defendant Jorge Perez

5.    Mark T. Blake; Interested Party

6.    Anita M. Cream; Attorney for Plaintiff U.S.A.

7.    Blue Cross Blue Shield of Florida, Inc.; Movant

8.    Blue Cross Blue Shield of Georgia, Inc.; Movant

C-1

9.     Andrew Michael Bonderud; Attorney for Defendant Neisha Zaffuto

10.    Jared Joseph Burns; Attorney for Movant Blue Cross Blue Shield of Florida, Inc.

11.    Vincent Albert Citro; Attorney for Defendant Christian Fletcher

12.    Aaron Durall, Defendant

13.    Andrew Tysen Duva; Attorney for Plaintiff U.S.A.

14.    Robert J. Fogarty; Attorney for Movant Aetna, Inc.

15.    Irene Bassel Frick; Attorney for Movant United HealthCare, Inc.

16.    Darcy D. Galnor; Attorney for Defendant Neisha Zaffuto

17.    Seth Guterman; Defendant

18.    David L. Haas; Attorney for Defendant Neisha Zaffuto

19.    Jennifer Michele Harrington; Attorney for Plaintiff U.S.A.

20.    James V. Hayes; Attorney for Plaintiff U.S.A.

21.    Brendan I. Herbert; Attorney for Defendant Aaron Durall

22.    Arturo V. Hernandez; Attorney for Defendant Ricardo Perez

23.    Philip Robert Horowitz; Attorney for Defendant Nester Rojas

24.    Lindy Kathryn Keown; Attorney for Defendant Aaron Durall

25.    Richard Christian Komando; Attorney for Defendant Jorge Perez

26.    Richard J Landes; Attorney for Defendant Ricardo Perez

27.    Joshua Sabert Lowther; Attorney for Defendant Neisha Zaffuto

28. Eugene Sean Medina; Attorney for Movant Aetna, Inc.

29. Mario O. Marin; Attorney for Movant United HealthCare, Inc.

30. Ronald D. Marney, II; Attorney for Defendant Jorge and Ricardo Perez

31. Brian F. McEvoy; Attorney for Defendant Aaron Durall

32. James A. Muench; Attorney for Plaintiff U.S.A.

33. Carmen M. Ortega-Rivero; Attorney for Movant United HealthCare, Inc.

34. Jorge Perez, Defendant

35. Ricardo Perez; Defendant

36. Gera R. Peoples; Attorney for Movant United HealthCare, Inc.

37. James F. Porter, Jr.; Defendant

38. Sean Porter, Defendant

39. Putnam General Hospital, Victim

40. Brian T. Rafferty; Attorney for Defendant Aaron Durall

41. RightCHOICE Managed Care, Inc.; Movant

42. Victor E. Rocha; Attorney for Defendant Neisha Zaffuto

43. John Rockwell; Attorney for Defendant Ricardo Perez

44. Nestor Rojas; Defendant, Pro Se

45. Caleb D. Rowland; Attorney for Defendant Sean Porter

C-3

46.    Steven H. Sadow; Attorney for Defendant Christian Fletcher

47.    Donald Franklin Samuel; Attorney for Defendant Jorge Perez and Aaron Durall

48.    Seth Schwartz; Attorney for Defendant James F. Porter, Jr.

49.    Frank Martin Smith; Attorney for Defendant Jorge Perez

50.    Andrew Joshua Steif, Attorney for Movant Blue Cross Blue Shield of Florida, Inc.

51.    Ferdose al-Taie; Attorney for Movant United HealthCare, Inc.

52.    Albert Joseph Tasker, IV; Attorney for Defendant James F. Porter, Jr.

53.    Mai Tran; Attorney for Plaintiff U.S.A.

54.    United HealthCare, Inc., Movant

55.    U.S.A., Plaintiff

56.    Adam Walters; Interested Party

57.    Lee Dilly Wedekind, III; Attorney for Movant Blue Shield of Georgia, Inc., and for Movant RightCHOICE Managed Care, Inc.

58.    Gary A. Winters; Attorney for Plaintiff U.S.A.

59.    Chantel Christine Wonder; Attorney for Interested Party Adam Walters

60.    Neisha Zaffuto; Defendant

61.    Grace W. Zoller; Attorney for Defendant Aaron Durall

C-4

This, the 12th day of March, 2025.

RESPECTFULLY SUBMITTED

*/s/ Ronald D. Marney II*
RONALD D. MARNEY, II
Missouri Bar No. 47141

Marney Law LLC
920 W 47th Street
Kansas City, MO 64112
Phone: (816) 221-6464
Phone: (816) 896-0633
marneyron2@gmail.com

*Counsel for Ricardo Perez*

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| Certificate of Interested Persons | C-1 |
| Table of Contents | i |
| Table of Authorities | ii |
| Jurisdictional Statement | v |
| Statement of the Issues | v |
| Statement Regarding Oral Argument | vi |
| Statement of the Case | 1 |
| Summary of The Argument | 5 |
| Argument | 6 |
| Conclusion | 54 |
| Certificate of Compliance | 55 |
| Certificate of Service | 56 |

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Bell v. Thompson*, 545 U.S. 794, 805, 125 S.Ct. 2825, 2832 (2005)........................36

*Dennis v. United States*, 339 U.S. 162, 167, 171-2, 70 S.Ct. 519, 521, 523 (1950)34

*Glasser v. United States,* 315 U.S. 60 (1942) ...............................................26

*Jackson v. Virginia,* 443 U.S. 307 (1979)...............................................26

*Jordan v. Binns*, 712 F.3d 1123, 1135-1136 (7th Cir. 2013)...................................40

*Kelly v. United States*, 140 S.Ct. 1565 (2020) ...........................................21

*Mattox v. United States*, 146 U.S. 140, 149-50, 13 S.Ct. 50, 53 (1892)..................34

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.
    1990) .....................................................................................27

*Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 321-22 (2009)..............................40

*Palmer v. Hoffman*, 318 U.S. 109, 113-4 (1943)......................................................40

*Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451 (1954).................34

*Ruan v. United States,* 597 U.S. 450, 457-459 (2022)..............................................15

*Skilling v. United States*, 561 U.S, 358 (2010) ........................................................20

*United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980)................................27

*United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F.Supp.3d 155,
    163 (D.D.C. 2017) ...............................................................................19

*United States v. Arias-Izquierdo*, 449 F.3d 1168, 1183-4 (11th Cir. 2006) ...........40

*United States v. Barton*, 909 F.3d 1323 (11th Cir. 2018)........................................37

*United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005) ...............................27

*United States v. Blankenship*, 382 F.3d 1110, 1132 (11th Cir. 2004) .....................27

*United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) ...................................46

*United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985) ..............................34

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004)......................................29

*United States v. Cooper* 203 F.3d 1279 (11th Cir. 2000)........................................26

*United States v. Culliver,* 17 F.3d 349, 351 (11th Cir. 1994).................................46

*United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) ..............................34

*United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir. 1983)...................................30

*United States v. Gates,* 10 F.3d 765 (11th Cir. 1993)..............................................46

*United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991) .........................................30

*United States v. Howard*, 506 F.2d 865, 867 (5th Cir. 1975)..................................35

*United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013)........................................26

*United States v. Kim*, 595 F.2d 755, 760-1 & n.24 (D.C.C. 1979).........................40

*United States v. Kyle*, 257 F.2d 559, 564 (2d Cir. 1958), *cert. denied*, 1959, 358

   U.S. 927, 79 S.Ct. 312 .......................................................................................27

*United States v. Majors,* 196 F.3d 1206 (11th Cir. 1999) .......................................26

*United States v. Mallas,* 762 F.2d 361 (4th Cir. 1985)............................................30

*United States v. Manapat,* 928 F.2d 1097 (11th Cir. 1991).....................................29

*United States v. McCarrick,* 294 F.3d 1286 (11th Cir. 2002) ..................................28

*United States v. Nora*, 988 F.3d 823 (5th Cir.2021)....................................27

*United States v. Payne,* 750 F.2d 844 (11th Cir. 1985)................................29

*United States v. Pessefall*, 27 F.3d 511, 516 (11th Cir. 1994) ...............................36

*United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) ...............................31

*United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997) .................46

*United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013) ...........................45

*United States v. Sosa,* 777 F.3d 1279 (11th Cir. 2015) ...........................................26

*United States v. Thompson,* 422 F.3d 1285, 1294 (11th Cir. 2005) ........................45

*United States v. Whiteside,* 285 F.3d 1345 (11th Cir. 2002) ..................................29

*United States v. Williams*, 613 F.2d 573, 575 (5th Cir. 1980)................................46

Statutes

18 U.S.C. § 1001 ......................................................................................................28

18 U.S.C. § 1344 ......................................................................................................28

28 U.S.C. §1291 ....................................................................................................1, v

Rules

FRE 606(b).................................................................................................................32

FRE 803(6)................................................................................................. v, 6, 39, 41

iv

## JURISDICTIONAL STATEMENT

This is a direct appeal from a final judgment in a criminal case pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

I.   Whether there was sufficient evidence introduced at trial to support the conviction of Appellants?

II.  Whether the trial court erred in failing to conduct an evidentiary hearing and then to grant a new trial, when it was learned that jurors had received and apparently discussed information learned from an extra-judicial source prior to the time deliberations commenced?

III. Whether the trial court erred in admitting into evidence spreadsheets (Gov.Exh. 1) that contained false information, were prepared in anticipation of litigation, and were otherwise unreliable, and therefore were not admissible as business records pursuant to FRE 803(6).

IV.  Whether the trial court erred in failing to conduct an evidentiary hearing and then to grant a new trial based on the presentation of newly discovered evidence that cast overwhelming doubt on the integrity of the verdict in Appellants' case.

v

## STATEMENT REGARDING ORAL ARGUMENT

Appellants urge the court to set this matter down for oral argument; the issues regarding the sufficiency of the evidence are complex in this unique health care fraud prosecution; the trial was lengthy and there are over 1,000 entries in the docket. Oral argument would assist the court in synthesizing the issues presented in this appeal.

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No. 24-13762-D |
| | ) | |
| JORGE PEREZ, | ) | Appeal No. 24-13807-D |
| and | ) | |
| RICARDO PEREZ | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## STATEMENT OF THE CASE

Nine defendants were charged with wire fraud, health care fraud and money laundering based on an alleged conspiratorial scheme to defraud several private health care insurance companies (United Health Care, Aetna, and various Blue Cross entities) (Superseding Indictment, Dkt.180). Appellants Jorge and Ricardo Perez are brothers. Jorge Perez was the owner of a medical billing and software company ("Empower") and his brother Ricardo Perez was an employee of Empower. (*Id*.,¶¶1,2). The scheme, as explained in the indictment, was designed to exploit the Congressionally mandated higher rate of reimbursement for urine testing at some rural hospitals, as opposed to the lower rate of reimbursement for testing at private laboratories (*Id*.¶¶21, 34). Congress intended to provide financial assistance to the small rural hospitals to enable the hospitals to survive and serve

1

rural communities. If a small rural hospital runs a urine sample, for example, the insurance company contract may provide that the reimbursement rate may be $3,000.00. If Labcorps (a private laboratory) tested the sample, the insurance contract might set the reimburse far lower.

Several of the defendants were involved in purchasing or managing four rural hospitals (in Missouri, Georgia, and two in Florida) (*Id*.,¶1–9). The hospitals had laboratories in the facility that could perform a "screening test" of urine (detecting either the presence or absence of alcohol or a controlled substance). If a more definite test was required – to detect the amount of the controlled substance – the urine sample would be tested at a better-equipped laboratory (*Id.,*¶27). All urine testing was performed at the request of a treating physician (*Id*.,¶25).

The defendants' alleged crime involved locating "sober homes" where addicts or alcoholics were required to have their urine tested on a regular basis to determine if they were abiding by their treatment. The conspirator would have the specimen tested at a private laboratory owned and operated by co-conspirators, but a claim was then submitted to the insurance company for reimbursement (as if the urine had been tested at the hospital for a patient) at the far higher rate. The resident in the sober home would not go to the hospital, and would be neither an inpatient nor outpatient at the hospital. (*Id*.,¶¶37(f),(g),(j),(k),(l)).

Whether *any* testing was actually performed at the hospital (as opposed to

2

the laboratory) was contested at trial and was the subject of repeated requests for a Bill of Particulars. The defendants maintained that the sober home residents' urine samples would be received by the hospital and a screening test of the specimen was conducted at the hospital's laboratory and the results would be sent back to the doctor who ordered the test. The hospital's claim would then be paid at the far higher rate by Aetna, United Health Care, Anthem, and Blue Cross.

If a more detailed analysis of the positive screening test result was needed, the urine would be retested at a private laboratory owned by another defendant. Those laboratories would then be paid by the hospital for the testing pursuant a lab-to-lab agreement with the hospital.

When a confirmation test was performed by the private laboratory, the billing to the insurance company was conducted pursuant to the industry standard "reference laboratory" billing procedure: The laboratory would *not* submit any bill to the insurance company. Rather, the hospital, pursuant to Medicare regulations would submit the bill.

What was the crime? The government alleged the insurance companies were defrauded, because the patients were never at the hospital. They lived hundreds or thousands of miles away and had "no connection" to the hospital, other than the fact their urine sample was tested at the hospital's laboratory.

The indictment alleged that the defendants conceived and implemented this

3

"scheme" by submitting claims for reimbursement that contained misrepresentations: either explicitly or implicitly representing that the urine sample was from a "patient" of the hospital. The indictment also alleged that virtually *all* testing was actually performed at the co-conspirators' private laboratories and virtually *none* of the testing was performed at the hospitals (Dkt.180,¶37; Dkt.660-22-23 (the trial court's statement regardding the allegation two weeks prior to the start of trial). The government never explicitly claimed that "all" testing was done at the private laboraties but the entire focus of the government's case was that the fraud was the misrepresentation that the hospital was performing the tests when actually the private laboratories were doing the tests and using the hospitals only as a "billing shell."

The government also argued at trial that there was "no necessity" to have the samples tested at the rural hospitals and that even if some of the testing was done at the hospital, this was only for the purpose of increasing the reimbursement rate and the private laboratories should have done the testing. The government argued at trial that too many of the samples were unnecessarily tested twice (once for the screening test, and once for the confirmatory test), or that some of the samples were tested at the more expensive confirmatory cost (at the private laboratory) and *never* subjected to a preliminary screening test.

Eight defendants were tried in the Spring of 2012 (one of the indicted

4

defendants is a fugitive). The Appellants were convicted. A mistrial was granted to the other defendants because the jury could not reach a verdict. The remaining defendants whose cases were mistried in 2022 were tried again in 2023 (two entered guilty pleas in the interim): the jury in the second trial found the remaining four defendants not guilty on all counts.

Thereafter, Appellants were sentenced: Jorge Perez was sentenced to 100 months (Dkt.1185); Ricardo Perez was sentenced to 75 months (Dkt.1187). Both Appellants are free on bond pending appeal (Dkt.1207).

### SUMMARY OF THE ARGUMENT

I.   The evidence was insufficient to support a conviction. No false statement was made on any claim form. While the insurance companies claim that they did not envision that "non-patients" would have their urine tested at the hospital, this was not a matter of "fraud" and, at most, a contractual dispute.  In fact, the vast majority of the tests were screening tests that were performed at the hospital. Tests that were performed at the private laboratories were properly billed by the hospital pursuant to CMS Guidelines.

II.  The trial court erred in failing to conduct an evidentiary hearing based on the information learned by the parties and the court, that a juror learned prejudicial information from an outside source and then shared the

5

information with other jurors during the course of trial. A hearing to determine the scope of the prejudice should have been held.

III.   The trial court erred in admitting into evidence the various exhibits listed as Exhibit 1, which were spreadsheets that did not qualify as business records under FRE 803(6), because there were numerous errors in the documents, they were partially prepared in anticipation of litigation, and they had other indicia of unreliability.

IV.   The trial court erred in refusing to conduct an evidentiary hearing on Appellant's Motion for New Trial based on Newly Discovered Evidence, where the proffer and affidavits established that three witnesses at Appellant's trial testified falsely and two of the witnesses' expert testimony was based entirely on the inaccurate testimony of the third witness who incorrectly concluded that the vast majority of tests on the spreadsheets were for confirmatory urine tests, though they were screening tests performed at the hospital.

## ARGUMENT

## I.
## THE GOVERNMENT FAILED TO INTRODUCE EVIDENCE THAT APPELLANTS WERE GUILTY OF THE CRIMES CHARGED IN THE INDICTMENT

Appellants were convicted of conspiracy to commit health care fraud and

6

wire fraud (count 1), health care fraud (counts 2-6), and conspiracy to commit money laundering (count 8). However, the evidence presented did not prove that there were any false statements or material omissions that defrauded the insurance companies and therefore there was insufficient proof of health care fraud, or the commission of any "specified unlawful activity" to support the money laundering charges.

Throughout the course of the pretrial proceedings, Appellants urged the trial court to require the government to prepare a Bill of Particulars that meaningfully explained the theory of the prosecution. Dkt.213,223; Dkt.315 (Transcript of Hearing), 92-100). Even at the time of sentencing after Appellants were convicted, the trial court pondered whether this was actually a fraud case, as opposed to a more pedestrian breach of contract, a "legal loophole" legally exploited by the defendants.[1]

What was the fraud? That should not be a question left open until the end of trial. It should be crystal clear from the indictment and the theory of the

---

[1] Though holding that there was sufficient evidence to support the conviction, the trial court made the following observations at the sentencing hearing:

> I also want it to be said that this case was more nuanced and less black and white than the government's sentencing argument admits. And there's a lot of reasons for this, in my view, but I think it's demonstrated by the fact that the first jury in the case was hung on some counts against the Perezes and all counts against the other defendants, and the jury in the second trial, hearing essentially the same evidence, found all the defendants not guilty. If I were to take an educated guess, that result might at least be in part attributable to the conundrum of whether the defendants exploited a legal loophole or committed a crime. (Dkt.1113-5-6).

7

prosecution at trial. Yet, throughout the course of the pretrial proceedings, the government was rarely consistent in announcing what exactly the defendants, and in particular Appellants, did that was fraudulent. What false statement did the defendants utter and to whom? What omissions on the reimbursement claim forms were fraudulent?

In the "Manner and Means" section, the indictment alleged that the fraud was submitting claim forms to the insurance companies that misrepresented who the patients were (and where they were located) and where (and by whom) the urine samples were tested. But as the pretrial proceedings progressed, the government repeatedly shifted its position concerning why and how the claim forms were inaccurate. In fact, the government could not clearly identify even what part of the insurance companies' contracts with the hospitals were breached. The Gatling machine gun approach that the government pursued required the defense to guess what would be the next pivot in the government's theory of the crime.

At the outset of the case, the focus was on the claim form that the hospitals submitted to the private insurers to trigger a reimbursement. This certainly seemed like a likely place for the crime to occur: file a claim with false information (e.g., imaginary patients; imaginary services; medically unnecessary testing). But the government was ultimately incapable of identifying *any* false statement in the claims filed by the hospitals.

8

The claim forms were filed electronically on a CMS form known as an 837i (same as the paper UB04 form) that the insurance companies required. *See* transcript of the motions hearing, Dkt.315-52, 67-68. The patient's demographic information was properly filled out and then was identified with a "Type of Service" Code-141 which meant that the urine specimen was from a "non-patient." This was accurate. The urine specimen did not come from an inpatient or an outpatient, but from a non-patient.(Dkt.739-10).

The claim form was electronically sent to a clearinghouse, which "scrubbed" the form and converted it into a form that was then forwarded to each of the private insurers. The insurance companies themselves modified the form after it was received and changed the "141-Code" to a "22-Code" which identified the specimen as being from an outpatient (Dkt.739-23, 25-27) (Dkt.688-240: witness thought "141" meant outpatient). That was not accurate but it was not a false statement that any defendant generated. The defendants did not know the insurance companies had created this incorrect electronic data after receiving the claim from the clearinghouse. See generally Tobin testimony (Dkt.684-102–105; cross-ex page 27, 28).

At the beginning of this case – before the trial began – the "22" code was *the crime* – the defendants were accused of misleading the insurance companies to believe that the patient was either "at the hospital" or at least an outpatient

9

customer of the hospital. That, according to the government, was the false statement. The private insurers were led to believe that the urine specimens all came from patients of the hospitals.

When the defendants learned through investigation that it was the insurance companies that inserted the "22" code into the claim forms before they were received by the private insurers, the government's theory had to change: the government then claimed that the fraud was actually the failure of the hospitals to actually perform the vast majority of the tests. In other words, the specimens were not tested at the hospital, but rather by the private laboratories, so whether the claim form included the "22" code or the accurate "141" code was irrelevant because, according to the government, the specimens were not tested at the hospital at all.  Indictment Para 37a.  *See also* Dkt.276-477; Dkt.660-9, 10.[2]

"The laboratory tests were billed through the rural hospitals even though very little of the testing took place at the hospitals, and, more critically, despite the fact that none of the individuals whose specimens were tested had any connection to the hospitals." (Dkt.227-1-2). The government then argued that the defendants

---

[2] This argument was based on the exhibits at trial that prompted several witnesses to testify that *most* of the tests for which reimbursement was sought were confirmation tests, not screening tests. At the Perez trial, the witnesses testified that the "spreadsheets" created by the insurance company demonstrate that the tests were primarily confirmation tests (testimony of Tobin and Jackson).  At the second trial, these same witnesses acknowledged that most of the testing was screening tests and Tobin acknowledged that she was wrong when she previously testified otherwise. This change in testimony is reviewed in detail in the Motion for New Trial based on Newly Discovered Evidence and discussed below.

"falsely represented that the testing had some connection to the hospital when it did not." (*Id.*).

The defense also sought to dismiss the indictment based on the failure to specifically identify the fraudulent conduct, to which the government then, again, responded that the underlying fraud was the submission of claims for reimbursement of testing that was *not* done at the hospital and insisted that the indictment clearly alleged that "The Defendants' lies [were] that the testing was connected to the rural hospitals …. The defendants falsely represented that the testing had some connection to the hospital when it did not." Dkt.224-2-3.

It was then learned that this, too, was not true. The vast majority of tests were "screening" tests and those tests *were* performed in the hospital laboratories and the specimens were sent to the private laboratories where confirmatory tests were done.  As discussed below it is proper – *in fact required* – that when a hospital "refers out" a specific test to a private laboratory, it is the hospital's obligation to make sure the laboratory does *not* submit a claim to the insurance company; the hospital is required to submit one claim for all testing even if the confirmatory test occurred at a reference/private laboratory.[3]

---

[3] This is the accepted practice in accordance with the guidance issued by the Medicare Claims Processing Manual (Dkt.809, #5, Exh.23, p.13). Chapter 16, sec. 40.1 allows a referring laboratory located in a rural hospital to bill for clinical lab diagnostic tests performed by an outside reference lab.  It *prohibits* the reference lab from billing separately if the hospital submits a bill.

The health care industry "typically default[s] to the CMS guidelines" even though private

11

Matters did not improve when the trial court conducted oral argument on the Motion for Bill of Particulars and the Motion to Dismiss, where the trial court confirmed with the government that the alleged fraud was billing for tests that had "no connection" with the hospital (Dkt.315-94).

Eight months later, shortly before the trial began, the same dialogue was renewed. The defendants again requested a Bill of Particulars because of the vague allegations of fraud, and the government responded, again, "[Defendants] conspired to submit claims to insurance companies that falsely and fraudulently represented that laboratory testing was performed at rural hospitals — and that the hospitals were therefore entitled to reimbursement at rates set out in the hospitals' in-network insurance contracts — when in fact most of the testing was performed at outside laboratories that lacked contracts and that would have received little or no reimbursement had the claims been truthfully submitted as laboratory claims." Dkt.477-1). The government then repeated what it had said in April, earlier in the year: "The lie is in submitting these claims day after day, week after week, month after month to these insurance companies asking for reimbursement for tests that were not done at the hospital, but that were represented as if they were somehow

---

insurance companies are not bound by them, as government expert Kongstvedt testified on direct examination (Dkt.746-96). UHC uses them (*id*. Dkt.684-98-101, 103). Kongstvedt added that "It's very common for private payers to default to CMS guidelines," at least to begin with and as a base (*id.*,134). The evidence established that the contracts UHC, Aetna, Anthem and Florida Blue imposed on these hospitals did not prohibit the billing procedure described in Ch. 16 sec.40.1 of the CMS manual during the period at issue in the trial. The contracts were silent about this billing practice and about billing for tests on non-patients.

connected to the hospital." (Dkt.477-3).

At trial  (and even later at the second trial at which the same witnesses testified, and again at Appellants' sentencing), it was shown that the screening tests *were* performed at the hospital laboratories. The patients were not at the hospital, but their specimens were tested at the hospital and if, and only if, there was a positive result, the specimen was retested at a private laboratory. Sending specimens to a private laboratory is common in the medical industry. Countless hospitals throughout the country send specimens to the large laboratories (Labcorp or Quest Diagnostics). As the CMS Manual dictates (see footnote 3, *supra*), the laboratories do not bill the patient's insurance company. The laboratories bill the hospital which sends the patient's specimen to the laboratory and the hospital then bills the patient's insurance company for the "referral" testing performed by Labcorp or Quest Diagnostics.

The government finally claimed that the entire process was fraudulent because the private insurers did not envision that they would reimburse hospitals for testing non-patients' urine. (Dkt.211). Perhaps this was the private insurers' "vision," but it is difficult to defend a charge of fraud based on the victim's "vision." If there is no fraudulent misrepresentation, there is no fraud.

Not surprisingly, by the time Jorge Perez and Ricardo Perez were sentenced (after the second trial that included essentially the same allegations and which

resulted in the acquittal of all defendants), the trial court expressed concern that this case may have involved nothing more than a contract dispute (*see* footnote 1, *supra*).

Dissecting the government's case and addressing the various theories that were advanced before and during trial, the result is a series of arguments, none of which were sufficiently proven and all of which, even taken together, should have resulted in a judgment of acquittal.

(1) *The defendants falsely represented that the laboratory testing of urine samples was performed at the rural hospitals when they were not* (*see* Dkt.180, Count 1, ¶¶26,27, 37(a),37(g),37(l); pp. 7, 11, 13*).*

Defendants never made any representation in the claims about where testing was done. The mandatory UB04/837i claim form has no place on it to identify the location of testing (Dkt.741-239; Dkt.746-195; *see also* sample UB04, Dkt.809-3). CMS does not require nor want this information when a lab bill is submitted by a hospital. In the hospital lab setting, the hospital is neither required, nor able to identify on the form the outside lab that performs the test. Every lab bill pertinent to this case and accepted in evidence reflects the fact that no misrepresentation occurred concerning the "place of service." Although some tests were performed at independent labs, those claims were lawfully billed in accordance with the provisions in Chapter 16, sec. 40.1 of the CMS Manual, as defendants contended.

Neither the government nor the court cited any statute, regulation, court decision, common law principle, or language in any insurance contract overriding or inconsistent with sec. 40.1 that gives fair notice to defendants that their conduct in facilitating tests and billing for them -- activities not inherently illegitimate -- was illegal. *Ruan v. United States,* 597 U.S. 450, 457-459 (2022).

Furthermore, the evidence established beyond dispute that hundreds of thousands of the lab tests <u>were</u>, in fact, done at the rural hospitals' labs. Those that were done at independent labs were properly billed by the rural hospitals, according to the CMS Manual (Dkt.809, #5, Fletcher Exh.23). Chapter 16, sec. 40.1 thereof reads:

> Sec. 1833(h)(5)(A) of the Act provides that *a referring laboratory may bill for clinical laboratory diagnostic tests* on the clinical laboratory fee schedule for Medicare beneficiaries *performed by a reference laboratory* only if the referring laboratory meets certain conditions. *Payment may be made to the referring laboratory* [i.e., the hospital] *but only if one of the following conditions is met*:
>
> 3. *The referring laboratory is located in or is part of a rural hospital*;
>
> Only one laboratory may bill for a referred laboratory service. It is the responsibility of the referring laboratory (in this case, the hospital) to ensure that the reference laboratory does not bill Medicare for the referred service. In the event

the reference laboratory bills or intends to bill Medicare, the referring laboratory may not do so.

One government witness for Anthem, Kelley Grayson, stated that CMS guidelines trump Anthem's policies (Dkt.741-183). Moreover, Bobbitt admitted that Anthem was able to discern from claim forms the exact identity of the outside lab (Dkt.741-236), and Tobin (of UHC) had learned to identify the outside lab through an abbreviation included on the claim forms (Dkt.684-117-18).

Jorge and Ricardo Perez relied on the provisions in the CMS Manual when billing the private insurers for reference lab services not done at the hospital. Because all the bills were submitted in compliance with CMS guidelines, no unlawful conduct occurred.

(2) *The defendants falsely represented that the persons supplying urine for testing were in-patients or out-patients of the Rural Hospitals* (*see* Dkt.180, Count 1, ¶¶32, 33, 37(a), 37(g), 37(j), 37(k), 37(l)).

This theory was squarely and completely refuted by the evidence. The uncontroverted evidence showed every claim submitted in this case contained a "141" code in the "Type of Bill" section of the UB04 (Bobbit, Dkt.741-246; Kongstvedt, Dkt.746-142; *see also* sample UB04/837i, Dkt.809-3). The "141" entry signifies a *non-patient*. All of the UB04/837i forms received into evidence at trial had the "141" entry. The government never produced any claims data that

16

contained any type of bill code except the "141" entry. *See* Tobin (UHC), Dkt.684-172, 175-7; Grayson, Dkt.741-182; Bobbitt, Dkt.741-244. Insurers "couldn't possibly be confused" about whether a person had actually been to the hospital for testing. Bobbitt, Dkt.741-240-2.

Some witnesses testified about a "Place of Service" code reflecting a "22" entry, but the government conceded that a "22" code was *never* submitted by any defendant. After the independent billing company submitted the claims for testing to various clearinghouses, a "22" code was added by the insurance companies themselves (Tobin, Dkt.684-177-8, 208; Bobbitt, Dkt.741-240-2, 246; Kongstvedt, Dkt.746-156-7, 195). Neither Jorge nor Ricardo Perez ever created or submitted one single claim. The claims that were prepared by the independent billing company for electronic submission to the clearinghouses for later submission to the private insurers all were coded as "141" non-patients (Bobbitt, Dkt.741-246; Kongstvedt, Dkt.746-137, 142).

Furthermore, the government never presented as evidence the original versions of the documents and/or raw data the billing company and the hospitals actually sent to the clearinghouses, or even the next versions of the documents and/or data the clearinghouses sent on to the insurers, so that additions and alterations made after they were sent out by the billing company or hospital could be tracked, noted and compared. The spreadsheets presented by the government

17

reflect the changes that the clearinghouse(s) and the private insurers themselves made along the course of handling claims. *See* Tobin, Dkt.684-208-11; Bobbitt, Dkt.741-222; Kongstvedt, Dkt.746-156-7, 195. Anthem's fraud investigator made no effort to compare the original claim information from the billing companies with the spreadsheets (Gov. Exh.1) that were introduced in evidence (*see* Argument III, *below)*. Balcom, Dkt.742-84.

(3) *The defendants knowingly and falsely represented that the urine testing was "medically necessary"* (*see* Dkt.180, Count 1, ¶¶34, 37(j), 37(k); Counts 2-6, ¶4).

All testing was ordered by various physicians around the country. Physicians are best positioned to make a determination about the necessity of urine testing. Neither Jorge nor Ricardo Perez is a physician. Each lacks the education, training, experience, expertise, and licensure to order any testing. Neither one was shown to have ordered any of the testing discussed by witnesses for the government at any time, nor to have communicated with any physician or other authorized health care provider regarding testing, nor to have encouraged or persuaded them in any way. The defendants were not shown to have any control or influence over those who ordered testing for their patients. In short, no evidence exists that Jorge or Ricardo Perez (or employees of the billing company used) *knew*, at any point in time, that any testing was, *in fact*, not medically necessary.

Similarly, the laboratory owners and operators had no authority or basis to conclude that the tests were not medically necessary. If a laboratory employee or owner refused to perform a test based on his/her assessment of what is "medically necessary," that owner would be guilty in many jurisdictions of practicing medicine without a license. Thus Appellants could not have been convicted of conspiring with other defendants who were equally incapable of making "medically necessary" decisions and second-guessing physicians about their patients who are strangers to the defendants.

Neither Jorge nor Ricardo Perez had any legal or contractual right or authority to determine whether screening or confirmatory testing is medically necessary to diagnose or treat a patient he has never seen or met, nor do the laboratories involved. The Office of Inspector General for the Department of Health and Human Services published OIG Compliance Program Guidance for Clinical Laboratories on August 24, 1998 (63 F.R. 45076), which in the section entitled "Medical Necessity" reads:

> *We recognize that laboratories do not and cannot treat patients or make medical necessity determinations.*

*Id*. at 45079. *See United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F.Supp.3d 155, 163 (D.D.C. 2017).

The medical necessity evidence was elicited from the testimony of government witness Dr. Corey Waller (Dkt.742-128-330), but that was largely

19

irrelevant, lacked a pertinent factual basis, utilized a flawed analysis, and lacked probative value. The thrust was a criticism, based on a purely statistical analysis, of physicians who, in his view, ordered too many urine tests, and re-ordered them before the first results were available. Whether, in his opinion, those doctors were either negligent or reckless in failing to meet the standard of care of other physicians under similar circumstances does not tend to prove that either defendant knew that the testing the doctors had ordered was medically unnecessary. If the physician orders the test, the lab must perform it. The trial court's limiting instruction -- that a violation by ordering physicians of the standard of care applicable to them "in and of itself does not mean that a crime has been committed" (*id*., 175) -- stripped Waller's testimony of any probative value in the absence of evidence of either defendant's actual knowledge regarding the necessity for the tests or involvement in soliciting or arranging needless or excessive orders for testing.

No *reasonable* jury could find that Jorge or Ricardo Perez knew that any testing ordered by a physician was not medically necessary, nor that they knew that any claim submitted was false.

## A. THE INDICTMENT IDENTIFIES NO PROSECUTABLE FRAUD

For the 150 years since the enactment of the mail fraud statute, the government has routinely gerrymandered the boundaries of what is outlawed to

20

criminalize behavior that the government condemns, even if the conduct (worthy of condemnation, or not), does not fit within the concept of fraud by any reasonable definition. Whether an attempt to outlaw "dishonest services,"[4] or pursuing public corruption conduct that shocks the conscience but is not fraud,[5] the appellate courts, including several Supreme Court decisions,[6] have repeatedly declined the government's invitation to employ the fraud statutes to prosecute behavior that is unethical, "shoddy business," or otherwise distasteful – but not fraudulent.

This case presents the Court with a novel theory of prosecution which on its face sought to expand the healthcare and wire fraud federal criminal statutes to reach and encompass insurance contract disputes between payors (non-government insurance companies) and payees (hospital providers). The essence of the prosecution was that the defendants (hospital owners, billing company employees, and private laboratory owners) filed claims for payments electronically on forms provided by the insurance companies *without any false statements or material omission*s, but because the insurance companies did not envision paying for the claims (but did so), the defendants should be held criminally responsible for defrauding the companies. There was no deceit, no false statement, no material

---

[4] *Skilling v. United States*, 561 U.S. 358 (2010).
[5] *E.g., Kelly v. United States*, 140 S.Ct. 1565 (2020).
[6] *Ciminelli v. United States*, 598 U.S. 306 (2023).

21

omission, yet because the insurance companies did not contemplate that their contracts with the providers would cover the services for which reimbursement was sought, the government contended defendants should be found guilty of criminal fraud. In fact, the evidence revealed that the claim forms that the hospitals submitted to the insurers expressly revealed the pertinent facts, but the insurance companies simply did not review that portion of the claim form when deciding whether to pay a claim, or actually altered the claim forms and then relied on the inaccurate altered form to allege they were defrauded by the entry on the form that the insurance companies wrote.

At most, this case involved a matter of contract interpretation. And that is giving the benefit of the doubt to the insurance companies that drafted the contracts and which now claim those contracts did not cover the services that were submitted by the defendants for reimbursement. A contract dispute cannot morph into a federal crime absent fraud; and a fraud offense requires an intent to defraud, coupled with deceit, either through a false statement or an actionable material omission.

The indictment alleged a scheme to defraud in the abstract but not any facts to provide notice to the defense what conduct, representation, or omission was the alleged *corpus delicti* of the offense. A vague contract, even if it is breached (and Appellants do not concede that there was any breach) does not constitute fraud.

22

Just as a vague criminal statute may not be the foundation for a criminal prosecution, and just as a vague tax provision may not be the foundation for a tax evasion prosecution, a vague contractual obligation may not be the foundation for a criminal prosecution. If a contract is subject to varying interpretations, the government may not prosecute conduct that may violate one provision of the contract.

If filing a claim that is not reimbursable (according to the insurance company) amounts to fraud – with no allegation of any false statement in the claim – there would be tens of thousands of crimes committed throughout the country on a daily basis. Insurance claims often include requests for reimbursement by people or institutions seeking insurance payments for costs that are not reimbursable under the insured's insurance contract. This applies to health insurance claims, property insurance claims, and car insurance claims. Every day, thousands of claims for insurance benefits are rejected by insurance companies on the basis that the claims are not covered by the insured's insurance contract. Yet, absent a false statement in the reimbursement claim, no court would ever entertain a criminal case in which the insurance company (or a prosecutor) alleged that the claim was fraudulent based solely on the fact that the claim was for a non-covered event.

And for reasons noted above, the indictment also failed to identify any specific false statement or deceptive practice concerning medically unnecessary

23

testing for which defendants are actually, practically or legally responsible.

Despite both formal and informal requests by the defense for a Bill of Particulars to isolate and identify the specific false statement that was the foundation for the fraud charges, the government declined to provide any information revealing the specific false statements made by any of the defendants in any claim that was filed.

There was no deceit in this case. The indictment did not allege the utterance or writing of a false statement. There was no allegation of a material omission.

No crime was committed.

The indictment further alleged that the tests were not medically necessary, despite the fact that they were ordered by a physician and the laboratory owners and operators had no authority or basis to conclude that the tests were not medically necessary. In fact, if a laboratory employee or owner were to refuse to perform a test based on the laboratory owner's assessment of what is "medically necessary," the laboratory owner would be guilty in many jurisdictions of practicing medicine without a license.

## B. A PARTY'S BREACH OF CONTRACT DOES NOT AMOUNT TO FRAUD

There are two basic legal questions presented by this prosecution:

(1) Did it matter if the person whose urine was tested never entered the hospital and never occupied a bed there? Did that fact (which is alleged in the

indictment, and proven at trial) render the claim fraudulent?

(2) Did it matter that the confirmatory test was analyzed at an outside laboratory that received payment for performing the test at the request of the hospital and the doctor who submitted the sample?  Did that fact render the claim for reimbursement by the hospital fraudulent?

Nothing in the insurance contracts dictated that only screening tests performed for inpatient or outpatient people are eligible for reimbursement. Nothing in the insurance contract provided that when the hospital seeks and pays for a confirmatory test at a larger laboratory, the hospital cannot seek reimbursement for this expense that the hospital incurs.  In fact, the claims for reimbursement filed by the hospitals specifically identified the people whose urine was tested as "non-patients." It bears repeating: The insurance companies provide a code to the hospitals to identify the status of the person who contributed the specimen and one of the codes ("141") identified the person as a non-patient.  That was the code that the hospitals placed on the insurance claim form.

If the government and the insurance companies think these claims were not reimbursable, then there is a flaw in the contract and in the reimbursement forms, because neither the insurance contract nor the claim forms stated that non-patients may not utilize the hospital's laboratory services, or that the confirmatory tests may not be performed at an off-site reference laboratory. And if there is a flaw in

the contracts and the claim forms – both of which are drafted by the insurance companies – there may be a civil dispute that requires the parties to repair to another court or to arbitration. But a criminal prosecution is not appropriate. And that is for the simple, undeniable and facially apparent fact that Appellants never filed any claim that lied about who the donor of the specimen was (i.e., that the specimen came from a non-patient). There was no deceit that occurred and, more to the point, *no deceit that was even alleged in the indictment* with regard to the identity of the specimen donor.

The government's proof ultimately amounted to nothing more than the insurance contracts did not "contemplate" reimbursement for these services: the essence of the supposed crime that the government was prosecuting was a breach of contract. The insurance companies, the government claimed, did not want to reimburse the claims that were submitted by Appellants for either the screening test or the confirmatory test. Yet, the government did not identify what paragraph, or sentence, or clause in any insurance company contract specifically exempted these claims from being paid.

When analyzing challenges to the sufficiency of evidence, the appellate court views the evidence in a light most favorable to the verdict. Whether the evidence is sufficient to sustain a defendant's conviction is a question of law which the appellate court reviews *de novo*. *United States v. Joseph*, 709 F.3d 1082 (11th

26

Cir. 2013). In passing on this argument the court must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60 (1942), and the court is required to affirm the defendant's conviction unless under no reasonable construction of the evidence could the jury have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 (1979). In a health care fraud case, the defendant must be shown to have known that the claims submitted were false. *United States v. Sosa,* 777 F.3d 1279 (11th Cir. 2015); *United States v. Medina,* 485 F.3d 1291 (11th Cir.2007); *United States v. Nora*, 988 F.3d 823 (5th Cir.2021).

A breach of contract does not constitute evidence of a materially false or fraudulent representation designed to defraud. *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786 (1st Cir.1990) (interpreting the mail fraud provision of Section 1341 as a predicate act in a civil RICO action and stating "[n]or does a breach of contract in itself constitute a scheme to defraud."); *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980), where the court wrote:

> [T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract. Its condemnation of a "scheme or artifice to defraud" implicates only plans calculated to deceive. The government must prove not only that there was fraudulent activity but also that the defendant had a "conscious knowing intent to defraud," *United States v. Kyle*, 257 F.2d 559, 564 (2d Cir. 1958).

*See also United States v. Blankenship*, 382 F.3d 1110, 1132 (11th Cir.2004) ("It is

not illegal for a party to breach a contract; a contract gives a party two equally viable options (perform or pay compensation), between which it is generally at liberty to choose."); *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir.2005) ("breach of contract is not a crime").

In *Blankenship* this Court reversed a false statement conviction. The defendants submitted contracts and equipment leases to the government to demonstrate the bona fides of the defendants' relationship (to qualify for a government contract). Actually, the parties did not intend to have that relationship, but submitted the documents in order to win the contract. This Court concluded that this conduct did not amount to a false statement under §1001. A contract is not a "false statement" unless it is fraudulent, or actually contains false statements of fact. A contract like the one at issue in that case is not like a guarantee that a party never intended to honor (which could constitute a false statement). A contract can be breached without any criminal culpability. The existence of the contract was not actually disputed, even if the parties never intended to comply with its terms or to sue the other party for breaching the contract.  The Court went on to hold, "Based on our analysis of both the text of §1001 and the caselaw, it appears there are only two ways in which a contract can possibly be considered 'false.' First, a contract is false if a person forges or alters it. Like a forged birth certificate or counterfeit currency, the document itself would be, quite literally, false. … The only other way

28

in which a contract can be 'false' is if it contains *factual misrepresentations*."

*United States v. McCarrick,* 294 F.3d 1286 (11th Cir.2002), elaborates on the principles that differentiate a civil claim for breach of contract and a criminal charge of fraud. The defendant was charged with making a false statement to the government (SBA) in violation of 18 U.S.C. §1001, as well as bank fraud, in violation of 18 U.S.C. §1344. The defendant applied for a bank loan which was guaranteed by the SBA. The application indicated that the proceeds were intended to be used, in part, to buy certain equipment for his garage. He used the money for a different (though business-related) purpose. The question was whether he had the intent to defraud the bank at the time he signed the loan documents. The Eleventh Circuit reversed the conviction: there was insufficient evidence that he had the intent to deceive the bank or the SBA at the time he applied for the loan.

## C. CONTRACTUAL TERMS THAT ARE AMBIGUOUS DO NOT FORM THE BASIS FOR FRAUD OR A FALSE STATEMENT CHARGE

A prosecution based on an uncertain law or contract violates due process. *United States v. Manapat,* 928 F.2d 1097 (11th Cir.1991); *United States v. Payne,* 750 F.2d 844 (11th Cir.1985). *See also United States v. Chandler*, 388 F.3d 796 (11th Cir.2004) (mail fraud conviction reversed where there was no clarity in the "rules" established by the victim that were supposedly violated by the defendants).

29

In *United States v. Whiteside,* 285 F.3d 1345 (11th Cir.2002), the defendants' convictions were reversed on sufficiency grounds. They were charged with making false statements in connection with Medicare reimbursement cost reports and conspiracy to defraud the government. In the reimbursement cost reports, the defendants reported that part of their hospital's annual costs included certain interest payments on a note that represented a capital expenditure. According to the government, these interest payments should not have been reported as a capital expenditure. This Court held that it was far from clear what the appropriate definition of a "capital expenditure" is in the context of interest payments for the note. Consequently, as a matter of law, the defendants could not be found guilty of making a false statement. The Court held that, "In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law." *Id.* 285 F.3d at 1351.  *See also United States v. Mitchell*, 165 Fed.Appx. 821, 826 (11th Cir. 2006) (*"*It was … incumbent on the government to introduce evidence of what the Medicare laws and regulations permitted and forbad during the period alleged in the indictment in order to establish both that the claims were deceptive and that Mitchell acted with scienter. In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the

30

burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.")

In the context of tax evasion prosecutions, these same principles have been recognized: if the tax obligation of a tax payor is not certain, then the person *cannot be prosecuted* for tax evasion *See, e.g., United States v. Mallas*, 762 F.2d 361 (4th Cir.1985); *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir.1983); *United States v. Harris*, 942 F.2d 1125 (7th Cir.1991). It violates due process to criminalize conduct where the unlawfulness of the conduct is not clearly defined.

The principles reflected in the *Mallas*, *Dahlstrom* and *Harris* cases – decisions that condemned prosecutions based on ambiguous tax obligations – are equally applicable here. The issue of ambiguity is not reserved exclusively for the jury's decision: if the law is unclear (and by analogy, if a contract is ambiguous – such as a claim form or an insurance contract), the conviction must be reversed.

In addition, if the theory of the prosecution was that the claims filed by Appellants contained a material omission, the proof at trial failed to identify what was omitted and what law required the information to be included:

> The indictment failed to sufficiently allege the second element of a section 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood. In this case, the allegation is that Pirro omitted something from a tax return. An omission cannot amount to a false statement, which is an essential element of a section 7206(1) violation, without the crucial background fact that gives rise to the duty to disclose the fact that was omitted. *Only the omission of facts required to be reported constitutes a material falsehood. The*

31

*indictment must therefore allege what made the omission in this case criminal.*

*United States v. Pirro*, 212 F.3d 86, 93 (2d Cir.2000) (emphasis supplied).

## II.

### THE TRIAL COURT ERRED IN FAILING TO CONDUCT AN EVIDENTIARY HEARING TO DETERMINE THE EXTENT OF PREJUDICE THAT WAS CAUSED BY A JUROR'S ACQUISITION OF EVIDENCE, WHICH WAS SHARED WITH OTHER JURORS

Not long after the trial concluded, a juror contacted the AUSA to discuss his views about the verdict and the "hung jury" that resulted in the mistrial for several defendants. The AUSA, initially neglecting (not intentionally) the local rule that forbids communications between an attorney and a juror without permission from the court, talked to the juror at some length, and then (appropriately) alerted the court to what had occurred.

Defendants complained and requested permission to talk to all the jurors. This included both the defendants who at that point were destined to start a new trial, as well as the Perez brothers who had been convicted. The trial court conducted a hearing and eventually permitted the lawyers to engage in a limited inquiry with the jurors (Dkt.777 (request for permission to talk to jurors) and Dkt.855 (hearing)).

It was learned that during the ensuing interviews with jurors, according to

32

two separate jurors' accounts (Bell/Landes affidavit, Dkt.842), a third juror was overheard telling a fourth prior to deliberations, that his wife had googled Jorge Perez, had learned he had been associated with 16 or 17 other hospitals (trial evidence linked him only to CGH, RGH and Putnam), and she had clearly informed the juror about her research. Either of those two jurors may have informed others as well. Thus, the third juror had private communications about this matter with a third party (his wife), who brought extraneous, prejudicial information to his attention, which he then shared with at least one other juror. All this occurred *before deliberations began* and thus were expressly exempted from the "no-impeachment" prohibition in FRE 606(b).

When this was discovered, Appellants requested an evidentiary hearing to explore the jury misconduct that violated the court's repeated instructions and long-standing Supreme Court precedent and determine the extent to which the information was prejudicial to both Jorge and Ricardo Perez (Dkt.824,842). Press coverage was prominent on the Internet and included various articles relating to the indicted offenses, and also information about Jorge Perez and other hospitals.

*The prosecutor agreed* that an evidentiary hearing was necessary to learn the full scope of the violation and the prejudice that Jorge Perez and possibly others including Ricardo Perez endured based on the juror's misbehavior (Dkt.864-5). But the court denied the request (Dkt.879) and refused to conduct a hearing or

33

inquire further into the misconduct and the jurors' consideration of extraneous (to say nothing of inaccurate) information that undeniably prejudiced both Appellants (Ricardo Perez was equally harmed by Jorge's connection with other hospitals by application of conspiracy law; Dkt.767, Jury Inst. No.10).

Neither the parties nor the court can determine the full scope of what the juror learned from his wife's internet search, and the breadth of the jurors' disclosures to other jurors (not to mention the number of other jurors who learned about this extra-judicial information, but failed to alert the court, or a Court Security Officer who was available to the jurors). Given the mistrial for all other defendants, it is reasonable to assume that this prejudicial information that more than one juror considered was information that resulted in these defendants' convictions.[7]

"Private communications, possibly prejudicial between jurors and third persons ... are absolutely forbidden and invalidate the verdict unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 149-50 (1892); *Remmer v. United States*, 347 U.S. 227, 229 (1954) ("any private communication [or] contact ... directly or indirectly, with the juror during a trial about the matter

---

[7] During the prosecutor's communication with the juror, the AUSA learned that during deliberations two jurors said that they would not convict a black defendant. (Dkt.804). In fact, no black defendant was convicted at that trial, nor was any defendant who was a co-defendant in a substsantive count of the indictment that charged a black defendant convicted. Only the two Cuban-American defendants were convicted. If this matter is remanded for a hearing to address improper jury contacts, this Court should also authorize an inquiry on this subject. *See Pena-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017).

pending before the jury is, for obvious reasons, deemed presumptively prejudicial"). The government did not rebut that presumption by showing that consideration of extrinsic evidence was harmless. In fact, the AUSA affirmatively joined in defendants' request for a hearing (Dkt.864-4-5). Apart from the *Remmer* presumption, defendants were entitled to a post-trial hearing to establish the existence of actual bias. *Dennis v. United States*, 339 U.S. 162, 167 (1950). Moreover, the Court itself had a duty to investigate. *United States v. Cuthel*, 903 F.2d 1381 (11th Cir.1990) (where defendant shows "clear, strong, substantial and incontrovertible evidence … that a specific, nonspeculative impropriety has occurred"); *United States v. Caldwell*, 776 F.2d 989 (11th Cir.1985).

The compelling evidence defense counsel discovered during two interviews meets the *Cuthel* standard. They both described how another juror violated the Court's oft-repeated admonition to avoid contacts and discussions with third parties by (a) talking about the parties and the case with his wife, (b) accepting from her the results of a google search about a connection with other hospitals, (c) telling one or more jurors about that prior to any deliberations, and (d) informing others during deliberations of that extraneous information. That these amount to multiple instances of juror misconduct is irrefutable. Both F.R.E.606(b)(2)(A) and pertinent court decisions exempt evidence of such misconduct from the no-impeachment rule, although the Court appears to have misstated and misapplied

35

the correct principles.[8]

Defense counsel did not violate this Court's order (or the local rule) in obtaining the evidence of this misconduct from the jurors. The written order (Dkt. 800) incorporated the record of the earlier hearing, but explicitly contained only one limitation: "defense counsel may **not** speak with any juror about the jury's deliberation process or internal discussions, and should caution any juror not to talk about the deliberation process or any internal discussions." Notably the written order unambiguously does not proscribe interviews seeking evidence of "extraneous influences" that might undermine a verdict. That written order supersedes any oral opinions, observations or intentions of the court made before, during or after trial, or during oral argument. Those statements must be disregarded because "a court speaks through its judgments and orders." *Bell v. Thompson*, 545 U.S. 794, 805 (2005).

Defense counsel complied with the explicit language of the Court's written order in conducting the interviews. As a result, information was revealed sufficient to demonstrate juror misconduct prior to any deliberations as well as during the

---

[8] These private third-party contacts and communications occurred before deliberations began. F.R.E.606(b)(2)(A) expressly permits a juror to "testify about *whether* extraneous prejudicial information was improperly brought to the jury's attention." "[A] *juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." Mattox v. United States, supra*. Evidence of such "overt acts" involves "communication from one juror to another of objective extrinsic facts regarding the criminal defendant or his alleged crimes," not the jury's mental processes. *United States v. Howard*, 506 F.2d 865, 867 (5th Cir.1975).

deliberations, all within the ambit of *Mattox* and Rule 606(b)(2)(A), giving rise to a very "reasonable possibility of prejudice" to the defendants. *United States v. Pessefall*, 27 F.3d 511 (11th Cir.1994). The heavy burden of establishing lack of prejudice shifted to the government. Based on the juror interviews a hearing was essential to flesh out the facts and to serve the interests of justice.

Instead, the court erroneously denied the hearing request (Dkt.879) on the ground that counsel obtained juror statements "in violation of Local Rule 5.02(d) and the Court's Order (Dkt.800)," thereby preventing a full examination, investigation and uncovering of the truth.

### III.

### THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF THE SPREADSHEETS WHICH PURPORTED TO SHOW HOW MANY SAMPLES WERE TESTED AT THE HOSPITALS  AND WHETHER THE TEST WAS A "SCREEN" OR A "CONFIRMATION"

The court erred in admitting the Private Insurers' claims spreadsheets (DKT. 817; GExhs. 1A-1F & 1H)[9] and the individual "call-outs" drawn from them, over pretrial objection (Dkt.567 and 617 adopting the motion; Dkt.649 [all adoptions permitted]. The spreadsheets were exhibits culled from the insurance companies' massive database warehouses. However, neither "the original or duplicates" of the massive databases "were made available for examination or copying, or both at a

---

[9] These spreadsheets are on discs that are in the record – see Dkt.817.

37

reasonable time and place" prior to trial. Consequently, the court's ruling that allowed the government to use any "summary, chart or calculation to prove the content of the voluminous writings" violated F.R.E. 1006. Moreover, the spreadsheets were prepared and curated in anticipation of the litigation.

Evidentiary rulings are reviewed for abuse of discretion. *United States v. Barton*, 909 F.3d 1323 (11th Cir.2018).

The massive databases themselves included information not originating with defendants or their billing company, but rather added by one or more clearinghouses that initially processed the claims submitted by the hospitals during the claims adjudication process. The spreadsheets also included information that had been altered by the clearinghouses and also by the insurance companies themselves that distorted the claims that were submitted by the hospitals through the billing company that furnished the claims information.

For example, when JVS Billing entered a "141" code to denote "nonpatient," on the claims form for reimbursement (the "141" code was accurate), the insurance companies altered that to Code "22," denoting "outpatient" (which is inaccurate). A nonpatient is not an outpatient. Yet, as explained above, the "22" code was the basis for the insurance companies initially to assert the claims were fraudulent, an assertion that gained traction with the FBI and other law enforcement officers and was then the basis, at the outset, for the DOJ decision to

prosecute the defendants. In short, the "22" code on the claims form was false and was the smoking gun – but a false gun – that spawned this prosecution.

Similarly, in two separate places on the UBO4/837i form (the "Patient ID" field and the "Submitter ID" field) JVS Billing entered an abbreviation identifying the outside lab involved in the claim. However, one of those entries was altered by the clearinghouse by changing the name of the lab to the name of that clearinghouse (*e.g.*, "Zirmed"), while the other entry was ignored by the insurance companies. That happened with every patient claim submitted.

Thus, the spreadsheets used at trial were created from data selectively drawn from the massive databases but also contained erroneous and substantially misleading information that was entirely traceable to the adjudication process, not to defendants. The "call-outs" (excerpts from the spreadsheets that were displayed to the jury) reflected the same false information.

The spreadsheets also had a column for the type of service provided (a "screen" test or a "confirmation" test, which continues to beguile the parties to this day). The government contends that portions of the spreadsheets that state that a test was a "screen" are actually inaccurate (a concession that they belatedly made long after the trial of the Perez brothers). The defense believes that the description "screen" is accurate and is monumentally important, because that designation proves beyond peradventure that the test could have been performed at the

39

hospital, not at the private laboratory. After all, the foundation of the government's argument was that the "confirmation" tests *could not* have been performed at the hospital, because the hospitals did not have the equipment to perform confirmation tests, but the hospital did have the tools to perform a screen test.

In sum, the spreadsheets were flawed, unreliable, and for that reason, inadmissible. Yet, over objection, the trial court admitted the spreadsheets not just as a rhetorical device, but as substantive evidence that was admitted pursuant to FRE 803(6).

Even if the spreadsheets and "call-outs" had been truly accurate and admissible, they were hearsay and the foundational requirements of F.R.E. 803(6) were not met:

(a) The spreadsheets were not "made at or near the time by -- or from information transmitted by -- someone with knowledge." Rule 803(6)(A). They were created several years after the lab claim information was submitted to the insurers in 2016 and 2017. *See United States v. Kim*, 595 F.2d 755 (D.D.C. 1979) (summary of bank records created two years after act or event were inadmissible).

(b) The spreadsheets were not "kept in the course of a regularly conducted activity of a business." Rule 803(6)(B). It was not the insurers' regularly conducted activity to create or keep such spreadsheets.

(c) Making the spreadsheets was not "a regular practice of" the

insurers' regularly conducted activity." Rule 803(6)(C). Business records made in anticipation of litigation are not admissible under Rule 803(6). *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009). The spreadsheets were created (even some by outside counsel) at the request of government officials for the special and limited purpose of the government's investigation and prosecution. (Dkt.738-21-22). Their primary utility was in litigating, not in health insurance. *Palmer v. Hoffman*, 318 U.S. 109 (1943); *United States v. Arias-Izquierdo*, 449 F.3d 1168 (11th Cir. 2006); *United States v. Kim*, 595 F.2d at 761-2.

(d)  In *Jordan v. Binns*, 712 F.3d 1123, 1135-36 (7th Cir.2013), the Seventh Circuit explained that business records of regularly conducted activity are presumed reliable because businesses depend on them to conduct their own affairs, so there is little if any incentive to be deceitful, and because the regularity of creating such records leads to habits of accuracy. However, the antithesis of such reliability are records that are prepared in anticipation and in preparation for litigation. "It is well established … that documents prepared in anticipation of litigation are not admissible under FRE 803(6). Litigation generally is not a regularly conducted business activity. And documents prepared with an eye toward litigation raise serious trustworthiness concerns because there is a strong incentive to deceive (namely, avoiding liability)." *See also United States v. Harper*, 118 F.4th 1288 (10th Cir.2024).

(e) The spreadsheets were shown to lack trustworthiness. Rule 803(6)(E). "Absence of routineness raises lack of motivation to be accurate." Advisory Comm. Note to that Rule. Defense counsel elicited on cross-examination of insurance company employees that the spreadsheets were filled with erroneous information and entries. The government has admitted that; in fact, the government *insists* that the designation on the spreadsheets that the vast majority of tests were screening tests, was *inaccurate*.[10] The spreadsheets had data fields reflecting information that was never provided by the defendants or the hospitals because the UB04/837i forms they used have no place for extraneous information to be added. Other fields appearing on the spreadsheets that could not be entered on the UB04/837i forms were "Place of Service," "Service Provider Name," "Rendering Provider" and "Performing Provider." Where information in those fields appears on the spreadsheets, it was added by the insurance companies or others after the claim forms left defendants' control. Each of these extraneous data fields drew considerable examination and cross-examination, wasted precious court time, and invited juror confusion. The jury may well have relied on plainly false, misleading and undependable information in reaching its verdicts.

The spreadsheets were the bedrock on which the entire prosecution was built

---

[10] As noted below, the government's expert at sentencing also explained that after reviewing several documents, she acknowledged that the spreadsheets were inaccurate in documenting what test was a screen and what test was a confirmation. (Dkt.1111-64-75; Dkt.1091). And the expert's concession was not based on a review of randomly chosen documents by the defense: her concession related to three of the substantive counts of conviction.

and formed the underpinning for all inculpatory testimony. No wonder they were labeled: "Government Exhibit #1." The government used them to argue that the vast majority of testing was done at outside labs and that every bill submitted by the defendants falsely indicated the tests were done at the hospitals. Rather than assisting the jurors, the spreadsheets inundated them with a mountain of information that was false and misleading and prejudicial to the defendants. It was located in fields placed there not by any defendants but by the insurance companies or clearinghouses in the claims adjudication process, and later manipulated in preparation for trial. The inclusion of multiple extraneous fields strongly encouraged the jurors to accept the falsehood that the defendants perpetrated the alleged fraud on a massive scale. The insurance companies did not remove any of that delusive information, when they furnished it to the government to assist with the prosecution. The sheer volume of entries, lines, and pages alone was overwhelming, but the government and its witnesses promised that even more such evidence existed in several massive databanks too large to haul into the courtroom.

Taking all the spreadsheets into consideration, they reflect millions of deceptive but seemingly incriminating entries, none of which defendants had ever placed on the UB04/837i forms.

## IV
## THE TRIAL COURT ERRED IN DENYING APPELLANTS' REQUEST FOR A HEARING AND TO GRANT A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

43

Since the date that the jury returned the guilty verdicts in 2022, Appellants discovered new evidence that was not available or known at the time of their trial. Appellants filed a timely Motion for New Trial Based on Newly Discovered Evidence (Dkt.1149). Some of the newly discovered evidence was revealed at the second trial at which the Perez brothers were not participants, but many of the same witnesses who testified at their trial, testified at the second trial. But there were significant, material differences in the testimony at the second trial on critical issues that would alter any jury's view of the guilt of the Perez brothers. Indeed, the jurors who deliberated after hearing the evidence at the second trial unanimously found all defendants not guilty on all counts.

● *first*, one government witness in the Perez trial (Tobin) in effect recanted critical portions of her testimony during cross-examination in the second trial ("the Durall trial");

● *second*, testimony from a second government witness in the Perez trial (Parks) was proven in the Durall trial to be false and inaccurate; and

● *third*, certain testimony by a government expert at the Perez trial (Waller) was based on unfounded and inaccurate assumptions and thus was false, as revealed at the second trial.

Evidence proving the falsity of the earlier testimony in these three instances was not in existence in May and June 2022 and was only discoverable months later

44

and confirmed during the Durall trial nearly a year later in February-March 2023.

The government described its theory of guilt in Dkt.831, its post-trial opposition to defendants' motions for judgment of acquittal and for new trial, where it contended that "the core" of its case was defendants' false representation that lab testing was performed at the rural hospitals (*id.,* page 2); that "[t]he lie did not have to do with the identity or location of the patient, but rather the identity of the entity that tested the sample" (*id.*, at 8); that "billing through the hospitals for work they did not perform was a materially false and fraudulent representation" (*id.*, at 9); and that "a representation to an insurer that a service was provided at the hospital and was therefore reimbursable at the contract rate -- when in fact the service was provided elsewhere and would not have been reimbursable under the contract had accurate information been provided to the insurer -- is false and fraudulent" (*id.*, at 10). The factual basis for that theory was based on false and inaccurate testimony and documents in the Perez trial. In the Durall trial, it was not simply unsupported, it was shown to be false by the government's own witnesses and exhibits.

The newly discovered evidence satisfies the five part test under Rule 33: (1) the evidence was in fact discovered after the Perez trial; (2) defendants did not fail to exercise due care to discover the new evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; (5) the evidence is of such

45

a nature that a new trial would probably produce a different result. *United States v. Thompson,* 422 F.3d 1285, 1294 (11th Cir. 2005). All the factors were documented in Appellant's post-trial pleading (Dkt.1149). Because the trial court's Order denying the motion (Dkt.1163) set forth not a single fact that was inaccurate, or legal principle that was not meritorious, Appellants rely on the same unrefuted proffer and argument that appear in the Motion.

All the evidence (testimony and data) that has been newly discovered relates directly to the issue of guilt or innocence and meets the standard for requiring a new trial. Evidence "that would afford reasonable grounds to question ... the integrity of the verdict" may be raised in a Motion for New Trial based on newly discovered evidence. *United States v. Scrushy*, 721 F.3d 1288 (11th Cir.2013) (citing *United States v. Williams*, 613 F.2d 573 (5th Cir.1980)).

A new trial motion based on newly discovered evidence must be considered under the "overarching principle" in Rule 33(a) -- "the interest of justice." *United States v. Bowen*, 799 F.3d 336 (5th Cir.2015). The *Bowen* Court added, "If a court finds 'that a miscarriage of justice may have occurred at trial, ... this is classified as such an "exceptional case" as to warrant granting a new trial in the interest of justice.'" 799 F.3d at 349. "A miscarriage of justice harms the substantial rights of a defendant, and it may consist of errors and omissions considered for their cumulative effect on the trial proceedings." *Bowen*, 799 F.3d at 349. In this matter,

46

the abandonment by government witnesses of pivotal testimony relating to the tests that were performed at the hospitals in the Perez trial and the unfounded testimony of the government experts have exposed the miscarriage of justice.

Based on the showing below regarding the newly discovered evidence, the trial court was required to conduct an evidentiary hearing. *United States v. Culliver,* 17 F.3d 349 (11th Cir.1994). This is true regardless of whether the trial court was inclined to deny the motion, *United States v. Gates,* 10 F.3d 765 (11th Cir. 1993), or to grant the motion, *United States v. Culliver, supra.* The failure to even conduct a hearing – as with the jury misconduct issue argued above – provides grounds enough to remand this case to the lower court for a full evidentiary hearing.

After all, the trial court's lack of a reason for denying the Motion (Dkt.1163) leaves this Court with only two options: (1) Review the evidence recited below and decide based on the proffer (and assuming all facts are true as proffered) whether a New Trial must be granted; or (2) remand the case to the trial court to review the newly discovered evidence in the first instance and decide whether the evidence is, in fact, newly discovered, and whether the new evidence meets the standard for granting a new trial.

**Testimony of Kelly Tobin**

Kelly Tobin, the government's first witness, was Director of Special

47

Investigations Unit ("SIU") for UHC for the majority of her 20 years there. In that capacity she supervised approximately 200 individuals who investigate health care fraud by members, providers, billing companies, hospitals, laboratories and others alleged to have committed fraud.

When Tobin's investigation into this matter began, she pulled together data as to claims submitted by CGH, RGH, and Putnam hospitals for lab testing on electronic forms 837i UHC then provided that data to the government in four Excel spreadsheets (GExh. 1A, 1B, 1C, 1D). Tobin herself did not create these spreadsheets, but testified that she verified the accuracy of the data appearing in them (Dkt.684-69), and reiterated that the information in the spreadsheets was "a true and accurate representation of the claims data that we have" (*Id*. at 71). It may be true that the data itself was accurately shown on GExh. 1A(1), 1B(1), 1C(1) and 1D(1), but her interpretation of them was fundamentally flawed and false, and thus her testimony misled the jury.

Tobin stated that if CGH, RGH or Putnam submitted claims for drug confirmation tests that were performed at independent labs that had no contracts with UHC, the insurer would not have paid those claims had it known (*id.* at 115-6), according to her understanding of the contracts with the hospitals.

Tobin said that during the course of her work in the UHC SIU, she became "familiar with some of the laboratory CPT codes" for lab testing (*id*. at 88), but is

48

not a trained or certified coder. Referring to GExh. 1A, she stated that in column J (the procedure codes) she noted that codes 80320 and 80324 were for quantitative or confirmation testing (*id.* at 90). Most significantly, after reviewing the full CGH spreadsheet, she was asked whether she saw other claims of confirmation testing. Tobin said, "Most of them. Many of them" (*id.* at 90-1). She added that, although the exhibit showed some claims for screening tests, "the majority of them were for confirmatory testing" (*id.* at 91). This testimony was undeniably damning for the defendants. According to her testimony, "the majority of tests" were not conducted at the hospitals and were confirmatory tests, not screening tests. (It is hard to understand, in fact, why any specimen would be "confirmed" if it had not initially revealed a positive result when it was screened, which means there should be far more screens than confirmations).

In the Durall trial, Tobin reversed her testimony. She again explained in her direct examination that only two lines of CGH billing on GExh. 1A(1) were described in column K as "quantitative" (Dkt.984-173-5). Nevertheless, she reiterated that, after looking over the spreadsheet call-outs, she determined that the billing by CGH, RGH and Putnam reflected "significantly more" claims for confirmatory testing than screening (*id.* at 193).

On cross-examination, though, Tobin recanted her earlier testimony that the majority of tests were confirmations based on the CPT codes themselves. Utilizing

49

GExh. 1A(1), defense counsel pointed out that the majority of the numerical entries in column J *were for drug screens alone*, according to the UHC's own descriptors in column K, while a few were confirmations, and some were for both (Dkt.985-25-8). At one point, Tobin admitted that *"there's a whole lot of descriptors on the 1A(1) that are listed as a drug screen" and that "the majority ... listed on here are screening"* (*id*. at 29). The RGH exhibit 1B(1) was shown to her and a similar inquiry made (*id*. at 30-3). Even though the same five-digit codes were used by the hospitals, the UHC descriptor sometimes differed between them (*id*. at 32-6, 37-8). In view of her confusion, Tobin could have requested the actual test results from the labs before 2022 but never did that (*id*. at 40-3). Asked if her earlier testimony that the majority of tests done at Chestatee were confirmations was inaccurate, Tobin stated, *"I had made a mistake"* (*id*. at 34-5). Finally, asked to agree that "the vast majority of the descriptors" on the CGH spreadsheet were drug screens, Tobin conceded that "a large number" were screens, that *"the vast majority ... of the descriptors on RGH are also drug screens," and that "all of the descriptors"* on the Chestatee spreadsheet *"were drug screens"* (id.at 43-4).[11]

In addition, testimony from Theresa Jackson (for Aetna) on cross-examination in the Durall trial mirrored the concession Tobin made and confirmed

---

[11] As noted below, the government's expert at sentencing also explained that after reviewing several documents, she acknowledged that the spreadsheets were inaccurate in documenting what test was a screen and what test was a confirmation. (Dkt.1111, page 64-75; Dkt.1091). And the expert's concession was not based on a review of randomly chosen documents by the defense: her concession related to three of the substantive counts of conviction.

the falsity of Tobin's version in the Perez trial. Jackson agreed that, according to the CPT code descriptors added by Aetna to the spreadsheets and appearing on the call-outs, nearly every line reflected claims by all four hospitals for drug screening tests, not for confirmations (Dkt.990-69-74).

The fact that the vast majority of the tests were screening tests was damning to the government's case. The entire edifice of the prosecution theory crumbled. The jury acquitted all defendants on all counts when Tobin (and Jackson) revealed that the tests were mostly screening tests. And that was the exact opposite of what Tobin testified in the Perez trial, which led to their convictions.

**Expert Witness Dr. Waller**

At the Perez trial Dr. Corey Waller injected the same false evidence: that the hospitals billed for vastly more confirmatory tests than screens (Dkt.742-153, 284-6). This not only was a serious violation of the full disclosure duty mandated by Fed.R.Crim.P. 16(a)(1)(G)(*iii*), it was also factually inaccurate, as proven at the second trial when Tobin and Jackson revealed just the opposite.

The new testimony at the Durall trial was not cumulative of any evidence from the Perez trial, but altogether different and contradictory. The new -- and accurate -- evidence proves that the Perez defendants were actually innocent of the crimes and that the incriminating evidence offered by the government at the first trial that led to their conviction was positively (and indisputably) false.

51

Dr. Waller's reliance on the same false information that led to the inaccurate testimony from Tobin was exponentially more damaging to the defense coming from an "expert" witness.

Waller was specially retained to evaluate the data provided by the insurance companies to the government to look for patterns of testing that would relate to whether that testing was medically necessary, or whether it met a "standard of care" in the sense of whether the testing was appropriate or does not "seem right." (Dkt.742-139).

Waller estimated there were five million claims in the insurers' billing data (*id*. at 148). He never looked at any individual pages or portions of the claims data compilation on the various discs or the call-outs from that data so that he could visually examine and ascertain the number of billing entries for screen tests and for confirmatory tests for each hospital (*id.* at 148-9, 283). Instead, he had all the data entered into an SQL Server database to facilitate and expedite searches in order to look for patterns among the data.

He then fashioned search terms ("queries") to find such patterns. All his opinions and his charts depended upon a computer analysis of just parts of the data useful to his calculations rather than a visual inspection of the actual data (*id*. at 150-1, 282-4). He never looked at doctors' requisitions or testing results to verify the accuracy of his opinions.

Aspects of his testimony were materially inaccurate, as defendants learned after the trial when the SQL database and his queries were first made available to them.

Waller testified that the number of definitive or confirmatory tests was far greater than the presumptive or screening tests and concluded that the confirmation tests lacked medical justification (*id.* at 221-2, 256, 285). He determined that 98% of the testing billed by or for CGH, RGH and Putnam was for confirmations, while at Chestatee only 8% were for confirmations (*id*. at 285-6).

Waller's conclusions in the Perez trial as to CGH, RGH and Putnam were directly contradicted by the testimony of Kelly Tobin and Theresa Jackson in the Durall trial that drug screens comprised "the vast majority" of the testing at all four hospitals. Tobin's and Jackson's conclusions were based on actually examining those portions of the spreadsheets and the call-outs showing both the five-digit CPT codes and the descriptors correlating with those codes -- an approach Waller did not take.

Notably, when the actual test results from CGH regarding a handful of non-patients were shown to government expert Kara McVey at the sentencing hearing for the Perez brothers, she conceded that the actual test results previously described as confirmations (that could not have been performed at CGH) were actually screens that were undeniably performed there (Dkt.1111-64-75; Dkt.1091). These

53

particular examples were not cherry-picked by the defendants but had been selected by the government at the Perez trial and used to form the basis for the convictions on several of the substantive counts. The trial court, apparently recognizing the uncertainty regarding which tests were screens and which tests were confirmations, decided not to use the higher amount of loss in the restitution order that had been advocated by the government (Dkt.1183).

### The Opinion of Melissa Parks

Another expert whose testimony was used at the Perez trial was Ms. Parks who, relying on the Tobin testimony, announced the same false conclusion about the ratio of screening to confirmatory tests. When Tobin abandoned this testimony at the Durall trial, Ms. Parks did not testify. What is "newly discovered" is the fact that Ms. Parks, like Dr. Waller, and Ms. Tobin, all testified to erroneous facts at the Perez trial.

### CONCLUSION

For the foregoing reasons, Appellants Jorge and Ricardo Perez urge the Court to reverse their convictions.

This, the 12th day of March, 2025.

54

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

/S/ Donald F. Samuel

DONALD F. SAMUEL, ESQ.
Georgia State Bar Number 624475
Attorney for Appellant Jorge Perez

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Tel.: 404-262-2225
Fax: 404-365-5041
Email: dfs@gsllaw.com

MARNEY LAW, L.L.C.

/S/ Ronald D. Marney II

RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Fax: (816) 896-0633
Email: marneyron2@gmail.com

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No. 24-13762-D |
| | ) | |
| JORGE PEREZ, | ) | Appeal No. 24-13807-D |
| and | ) | |
| RICARDO PEREZ | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this **OPENING BRIEF OF APPELLANTS** is in 14-

point Times New Roman type and contains 12,992 words.

This, the 12th day of March, 2025.

RESPECTFULLY SUBMITTED,

MARNEY LAW, L.L.C.

/s/ Ronald D. Marney II

RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Fax: (816) 896-0633
Email: marneyron2@gmail.com

56

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No. 24-13762-D |
| | ) | |
| JORGE PEREZ, | ) | Appeal No. 24-13807-D |
| and | ) | |
| RICARDO PEREZ | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this date served the within and foregoing **OPENING BRIEF OF APPELLANTS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

This, the 12th day of March, 2025.

RESPECTFULLY SUBMITTED,

MARNEY LAW, L.L.C.

/S/ Ronald D. Marney II

RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Email: marneyron2@gmail.com