Nos. 24-13762-D, 24-13807-D

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JORGE PEREZ and RICARDO PEREZ,
Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(No. 3:20-CR-00086-TJC-SJH-1)
(The Honorable Timothy J. Corrigan, Senior United States District Judge)

_____

**ANSWERING BRIEF FOR THE UNITED STATES**

_____

GREGORY W. KEHOE
 Acting United States Attorney

ANDREW TYSEN DUVA
 Assistant United States Attorney
 Middle District of Florida

GARY A. WINTERS
 Deputy Chief, Fraud Section

JAMES V. HAYES
 Trial Attorney, Fraud Section
 Criminal Division
 U.S. Department of Justice

MATTHEW R. GALEOTTI
 Acting Assistant Attorney General

SANGITA K. RAO
 Attorney, Appellate Section,
 Criminal Division
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W., Rm. 1248
 Washington, D.C. 20530
 (202) 305-3607
 Sangita.Rao@usdoj.gov

*United States v. Perez, et al.*, Nos. 24-13762-DD

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Cir. Rule 26.1-4, the undersigned certifies that the list set forth below is a complete list of the persons and entities who have an interest in the outcome of this case:

Abel, Michael A.

Aetna, Inc. ("AET"), a subsidiary of CVS Health ("CVS")

Alonzo, Aaron

al-Taie, Ferdose

Argentieri, Nicole M.

Barksdale, Hon. Patricia D., United States Magistrate Judge

Bell, Thomas M.

Berryman IV, Jesse Benton

Blake, Mark T.

Blue Cross Blue Shield of Florida, Inc.

Blue Cross Blue Shield of Georgia, Inc., a subsidiary of Elevance Health, Inc. ("ELV")

Bonderud, Andrew Michael

Burns, Jared Joseph

Citro, Vincent Albert

Cream, Anita M.

Corrigan, Hon. Timothy J., United States District Judge

*United States v. Perez, et al.*, Nos. 24-13762-DD

CVS Health ("CVS")

Durall, Aaron

Duva, Andrew Tysen

Elevance Health, Inc. ("ELV")

Fletcher, Christian

Fogarty, Robert J.

Frick, Irene Bassel

Galnor, Darcy D.

Guterman, Seth

Haas, David L.

Harrington, Jennifer Michele

Hayes, James V.

Herbert, Brendan I.

Hernandez, Arturo V.

Horovitz, Hon. Samuel J., United States Magistrate Judge

Horowitz, Philip Robert

Howard, Hon. Marcia Morales, United States District Judge

Keown, Lindy Kathryn

Komando, Richard Christian

Landes, Richard J.

Lowther, Joshua Sabert

C-2 of 5

*United States v. Perez, et al.*, Nos. 24-13762-DD

Marin, Mario O.

Marney II, Ronald D.

McEvoy, Brian F.

Medina, Eugene Sean

Miller, Lisa H.

Muench, James A.

Ortega-Rivero, Carmen M.

Peoples, Gera R.

Perez, Jorge

Perez, Ricardo

Porter, Jr., James F.

Porter, Sean

Rao, Sangita K.

Rafferty, Brian T.

Richardson, Hon. Monte C., United States Magistrate Judge

RightCHOICE Managed Care, Inc., a subsidiary of Elevance Health, Inc. ("ELV")

Rocha, Victor E.

Rockwell, John

Rojas, Nestor

Rowland, Caleb D.

*United States v. Perez, et al.*, Nos. 24-13762-DD

Sadow, Steven H.

Samuel, Donald F.

Sanders, Jeremy R.

Schwartz, Seth

Smith, Frank Martin

Steif, Andrew Joshua

Tasker IV, Albert Joseph

Toomey, Hon. Joel B., United States Magistrate Judge

Tran, Mai

United HealthCare, Inc., a subsidiary of UnitedHealth Group Incorporated ("UNH")

UnitedHealth Group Incorporated ("UNH")

Walters, Adam

Wedekind III, Lee Dilly

Winters, Gary A.

Wonder, Chantel Christine

Zaffuto, Neisha

Zoller, Grace W.

The following publicly-traded companies and corporations have an interest in the outcome of this case or appeal:

*United States v. Perez, et al.*, Nos. 24-13762-DD

Aetna, Inc. ("AET")

CVS Health ("CVS")

Elevance Health, Inc. ("ELV")

UnitedHealth Group Incorporated ("UNH")

In compliance with Fed. R. App. P. 26.1(b), the organizational victims of the offense in this case are:

Aetna, Inc. ("AET"), a subsidiary of CVS Health ("CVS")

Putnam County Memorial Hospital

RightCHOICE Managed Care, Inc., a subsidiary of Elevance Health, Inc. ("ELV")

United HealthCare, Inc., a subsidiary of UnitedHealth Group Incorporated ("UNH")

By:    /s/ Sangita K. Rao
SANGITA K. RAO
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave., NW, Rm. 1248
Washington, DC 20530
TEL 202.305.3607/FAX 202.305.2121
sangita.rao@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that the facts and legal arguments are adequately discussed in the briefs and that oral argument would not significantly aid the Court's decisional process, Fed. R. App. P. 34(a)(2)(C), but the United States does not oppose defendants' request for oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................................ v

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF THE ISSUES ........................................................................... 2

STATEMENT OF THE CASE ............................................................................. 2

    I.    Statement of Facts ......................................................................... 3

        A.    Background on urine testing ............................................. 4

        B.    Background on the rural hospitals and their insurer
            contracts .................................................................... 4

        C.    Defendants launched an expansive urine-testing billing
            scheme through CGH. ..................................................... 7

        D.    Defendants launched a similar urine-testing billing
            scheme through RGH. ................................................... 11

        E.    Defendants launched a third urine-testing billing scheme
            through Putnam. .......................................................... 11

        F.    Defendants' scheme involved medically unnecessary
            testing. .................................................................... 13

        G.    Defendants made inaccurate statements in the insurance
            claims. .................................................................... 15

        H.    Defendants impeded investigations. ................................. 17

        I.    Defendants obtained large sums from the insurance
            companies. ................................................................ 18

    II.    Course of Proceedings .................................................................. 18

SUMMARY OF ARGUMENT ............................................................................ 19

ARGUMENT ..................................................................................................... 21

    I.    The Evidence Was Sufficient. ................................................................. 21

        A.    Standard of Review ................................................................. 21

        B.    Legal Principles .................................................................... 22

        C.    Evidence sufficiently proved defendants' offenses. ...................... 23

            1.    Defendants fraudulently claimed that certain testing occurred at the hospitals. .......................................... 25

                a.    The claims submissions were false and misleading. ................................................................. 25

                b.    The evidence proved defendants' fraudulent intent. ............................................................ 31

            2.    Defendants knowingly submitted medically unnecessary claims. ................................................. 32

    II.    The District Court Did Not Abuse Its Discretion in Admitting the Claims Spreadsheets. ............................................................... 35

        A.    Background ........................................................................... 36

        B.    Standard of Review ................................................................. 36

        C.    The claims spreadsheets were admissible business records. ................................................................................. 36

    III.    The District Court Did Not Abuse Its Discretion in Denying Defendants' New Trial Motion. ..................................................... 40

        A.    Background ........................................................................... 40

        B.    Standard of Review ................................................................. 42

        C.    Defendants did not establish newly discovered evidence warranting a new trial. .................................................. 43

    IV.    The District Court Did Not Abuse Its Discretion in Declining to Further Investigate the Claim of Juror Exposure to Extrinsic Information. ........................................................................... 46

A.    Background.................................................................................. 47

B.    Standard of Review........................................................................ 51

C.    The district court did not clearly err in finding that
       defense counsel violated its order and the local rule..................... 51

CONCLUSION ....................................................................................................... 56

CERTIFICATE OF COMPLIANCE AND SERVICE................................................ 57

# TABLE OF AUTHORITIES

## Cases

*Associacion de Empleados del Area Canalera v. Panama Canal Comm'n,*
  453 F.3d 1309 (11th Cir. 2006) ....................................................... 56

*Pena-Rodriguez v. Colorado,*
  580 U.S. 206 (2017) ....................................................... 52

*Remmer v. United States,*
  347 U.S. 227 (1954) ....................................................... 51

*Stansell v. Revolutionary Armed Forces of Colombia,*
  120 F.4th 754 (11th Cir. 2024) ....................................................... 53

*Tanner v. United States,*
  483 U.S. 107 (1987) ....................................................... 52

\*   *United States v. Bradley,*
  644 F.3d 1213 (11th Cir. 2011) ....................................................... 22, 31

*United States v. Browne,*
  505 F.3d 1229 (11th Cir. 2007) ....................................................... 25

\*   *United States v. Cavallo,*
  790 F.3d 1202 (11th Cir. 2015) ....................................................... 51, 52, 55

*United States v. Chalker,*
  966 F.3d 1177 (11th Cir. 2020) ....................................................... 33

\*   *United States v. Clotaire,*
  963 F.3d 1288 (11th Cir. 2020) ....................................................... 36, 37, 38

*United States v. Conde,*
  134 F.4th 82 (2d Cir. 2025) ....................................................... 37, 38

*United States v. Gonzalez,*
  834 F.3d 1206 (11th Cir. 2016) ....................................................... 32, 34

\*   Authorities upon which the government primarily relies are marked with an asterisk.

\* *United States v. Grow*,
  977 F.3d 1310 (11th Cir. 2020) ........................................ 35

*United States v. Ifediba*,
  46 F.4th 1225 (11th Cir. 2022) ........................................ 51

*United States v. Irele*,
  977 F.3d 1155 (11th Cir. 2020) ........................................ 23

*United States v. Joseph*,
  709 F.3d 1082 (11th Cir. 2013) ....................................22, 26

*United States v. Levy*,
  379 F.3d 1241 (11th Cir. 2004) ........................................ 55

*United States v. Lewis*,
  40 F.4th 1229 (11th Cir. 2022) ........................................ 39

*United States v. Martinez*,
  921 F.3d 452 (5th Cir. 2019) ........................................ 35

*United States v. Medina*,
  485 F.3d 1291 (11th Cir. 2007) ........................................ 22

*United States v. Moran*,
  778 F.3d 942 (11th Cir. 2015) ....................................22, 23

*United States v. Olano*,
  507 U.S. 725 (1993) ........................................ 56

\* *United States v. Palin*,
  874 F.3d 418 (4th Cir. 2017) ........................................ 33

*United States v. Ross*,
  131 F.3d 970 (11th Cir. 1997) ........................................ 22

*United States v. Scrushy*,
  721 F.3d 1288 (11th Cir. 2013) ........................................ 46

*United States v. Siegelman*,
  640 F.3d 1159 (11th Cir. 2011) ........................................ 51

*United States v. Thompson*,
  422 F.3d 1285 (11th Cir. 2005) ....................................42, 43

\*  *United States v. Venske,*
     296 F.3d 1284 (11th Cir. 2002) .................................................52, 55

*United States v. Warner,*
     638 F. App'x 961 (11th Cir. 2016) ................................................ 38

*United States v. Whiteside,*
     285 F.3d 1345 (11th Cir. 2002) ..................................................... 30

## Statutes and Rules

18 U.S.C. § 2.................................................................................2, 18

18 U.S.C. § 1343 .............................................................................. 22

18 U.S.C. § 1347 ....................................................................2, 18, 22

18 U.S.C. § 1349 ....................................................................2, 18, 22

18 U.S.C. § 1956 .............................................................................3, 18

18 U.S.C. § 1957 ...........................................................................18, 23

18 U.S.C. § 3231 ................................................................................ 1

28 U.S.C. § 1291 ................................................................................ 2

Fed. R. App. P. 4 .............................................................................. 2

Fed. R. App. P. 34 ............................................................................. i

Fed. R. Crim. P. 33........................................................................... 43

Fed. R. Evid. 606............................................................................. 52

Fed. R. Evid. 803............................................................................. 37

Fed. R. Evid. 1006........................................................................... 37

M.D. Fla. L.R. 5.02..........................................................................47, 53

## Other Authorities

63 Fed. Reg. 45076-3 (Aug. 24, 1998)............................................ 35

Nos. 24-13762-D, 24-13807-D

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JORGE PEREZ and RICARDO PEREZ,
Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(No. 3:20-CR-00086-TJC-SJH-1)
(The Honorable Timothy J. Corrigan, Senior United States District Judge)

_____

**ANSWERING BRIEF FOR THE UNITED STATES**

_____

**STATEMENT OF JURISDICTION**

Defendants-Appellants Jorge Perez and Ricardo Perez[1] appeal from their final

judgments of conviction in a criminal case.  The district court (Corrigan, S.J.) had

subject-matter jurisdiction under 18 U.S.C. § 3231.  Both judgments were entered on

November 7, 2024.  Dkt.1185 (Jorge); Dkt.1187 (Ricardo).[2]  Jorge and Ricardo filed

---

[1] To distinguish the defendants, who are brothers, we refer to them by their first names.

[2] "Dkt." refers to a district court docket entry, followed by the page number(s)
generated by the district court's electronic filing system; "GX." refers to a government

1

timely notices of appeal on November 18 and 19, 2024, respectively.  Dkt.1189, 1191; Fed. R. App. P. 4(b)(1)(A)(i).  This Court has jurisdiction under 28 U.S.C. § 1291. Defendants are not currently in custody.

## STATEMENT OF THE ISSUES

1.      Whether the evidence sufficiently supported defendants' convictions.

2.      Whether the district court abused its discretion in admitting the insurers' claims spreadsheets as business records.

3.      Whether the district court abused its discretion in denying defendants' new trial motion based on purportedly newly discovered evidence.

4.      Whether the district court clearly erred in concluding that defendants had violated its order regarding post-trial juror communication and therefore excluding evidence derived from that violation.

## STATEMENT OF THE CASE

Following a jury trial in the United States District Court for the Middle District of Florida, co-defendants Jorge and Ricardo Perez were convicted of conspiring to commit health-care fraud and wire fraud, 18 U.S.C. § 1349 (Count 1); five counts of health-care fraud, 18 U.S.C. §§ 1347 & 2 (Counts 2-6); and conspiring to commit money

---

exhibit; "DX." refers to a defense exhibit; and "Br." refers to defendants' almost identical briefs, followed by the page numbers used in Jorge's brief.

laundering, 18 U.S.C. § 1956(h) (Count 8).[3]  The court sentenced Jorge to 100 months' imprisonment and Ricardo to five months' imprisonment.  Dkt.1185:2; Dkt.1187:2.

## I.    Statement of Facts

From 2015 to 2018, Jorge, his brother Ricardo, and their coconspirators engaged in a multi-state scheme to use rural hospitals to fraudulently bill private health insurance companies for urine drug testing, characterized by Jorge as "liquid gold" (Dkt.744:178 (Byrns)).  The hospitals had in-network contracts with major health insurers giving them high reimbursement rates for lab testing compared to equivalent claims by independent labs without contracts.  To capture those reimbursements, Jorge assumed control over three rural hospitals in Florida and Missouri.  Jorge and Ricardo then used their billing company to falsely bill claims for urine drug testing to insurance companies as if the hospitals had performed the tests.  Although the hospital labs performed some of the less sophisticated "presumptive" testing, nearly all of the higher-reimbursing "definitive" testing took place at out-of-network independent labs, including those controlled by coconspirators.  Other coconspirators ensured a steady supply of urine specimens by paying kickbacks to providers to encourage excessive testing of patients, making much of the testing medically unnecessary.

At defendants' five-week trial, the evidence included the testimony of over 40 witnesses—including coconspirators, hospital and lab employees, billing company

---

[3]  The jury failed to reach agreement on substantive money-laundering charges against the Perez defendants.

employees, insurer representatives, medical providers, patients, investigators, medical and forensic experts—and voluminous documentary evidence.

### A.    Background on urine testing

Urine testing is used to monitor patients for drugs for addiction treatment and pain management.  Dkt.742:160-168 (Waller).  Presumptive tests (often referred to as qualitative or screening) are relatively inexpensive tests that quickly specify whether a patient is positive or negative for the presence of a class of drugs.  Dkt.746:83 (Kongstvedt).  Definitive tests (often referred to as confirmation or quantitative) are complex tests capable of giving quantitative results as well as identification of the presence of a specific drug (or drugs) and its metabolites.  Dkt.742:219 (Waller); Dkt.736:172-173 (Solomon).  Definitive tests, which are run on sophisticated lab machines often employing liquid chromatography-mass spectrometry technology, are substantially more expensive to conduct and therefore insurers provide reimbursement at higher rates than presumptive tests.  Dkt.742:187-188, 219-220, 252 (Waller: presumptive lab test costs "$400-plus"; definitive test costs $1200-$4000; definitive test generally 5-10 times more expensive).

### B.    Background on the rural hospitals and their insurer contracts

The rural hospitals at issue here are (1) Campbellton-Graceville Hospital ("CGH"), a 25-bed critical access hospital in Graceville, Florida, Dkt.688:276-279 (Jordan); Regional General Hospital ("RGH"), a 45-bed critical access hospital in Williston, Florida, Dkt.738:202-203 (Encienzo); and Putnam County Memorial

Hospital, a 20-bed hospital in Unionville, Missouri, Dkt.743:42 (Tague).[4]    These hospitals were "in network" providers for various insurers, such as Blue Cross Blue Shield ("BCBS") entities, Aetna, and United Healthcare ("UHC"), meaning they provided defined services to the insurers' policyholders pursuant to an agreement. Dkt.746:40-42 (Kongstvedt).

Rural hospitals in general and critical access hospitals more particularly receive "significantly" higher reimbursement rates from insurers to promote their financial health, thus ensuring that the insurers' policy holders have access to care in remote communities.  Dkt.684:40 (Tobin); Dkt.746:50-51 (Kongstvedt); Dkt.688:279 (Jordan). While the insurers were contractually obligated to pay claims submitted by in-network hospitals' labs as provided in the contracts, insurers paid claims by out-of-network labs at lower rates or not at all.  Dkt.746:42-43 (Kongstvedt); Dkt.688:137-141 (Rochay).

The hospital-insurer contracts provided that the insurers agreed to reimburse the hospitals for lab tests performed at the hospitals.  For example, all three hospitals' contracts with UHC (GX.1Y, 1Z, 1BB) provided that "Facility will provide Covered Services to Customers" (Art. 4.1) and "Payers will pay Facility for rendering Covered Services to Customers (Art. 5.1); set out rates "[f]or Covered Services rendered by Facility to Customers" (Appendix); but specified that if the Facility begins "providing

---

[4]  Another coconspirator assumed control over a fourth rural hospital, Chestatee Regional in Georgia.  Dkt.739:192-193 (Smallwood).  Because defendants had minor involvement with Chestatee, we confine our discussion to the other three hospitals.

services at other locations," including through affiliates, the agreement would not apply to the "additional services or locations" (Art. 3.1). Dkt.684.36-56 (Tobin).

Similarly, Florida Blue contracts with CGH and RGH (GX.1II-1JJ) defined "Hospital Services" as "medical, surgical, and ancillary services normally performed on an inpatient or outpatient basis at HOSPITAL" (Art. 2.6); provided that "HOSPITAL shall provide Hospital Services to Policyholders, insofar as its facilities and services permit" (Art. 5.1); provided for "Payments to HOSPITAL" for various "Hospital services" (Art. 8.1-8.2); and specified that "Hospital" could not assign or subcontract its rights or duties (Art. 14.1-14.2). Dkt.688:146-151 (Rochay); *see* GX.1LL (BCBS contract with Putnam: "Hospital shall bill only for Hospital Services performed by, or under the direction and personal supervision of Hospital" (Art. 4.1(b))).

The Aetna contracts likewise provided that "Hospital will make available and provide to Members Hospital services" at the rates in the contract (GX.1CC-1DD, § 2.1; GX.1GG, § 1.1), and two contracts prohibited the hospital from billing for outside professional services on the standard hospital billing form, Dkt.739:8-9 (Jackson); GX.1CC-1DD, p.56. Moreover, the RGH contract specified that the hospital could not bill for a lab service that an outside provider, specifically "a reference lab," performed. GX.1DD, p.118.

**C.    Defendants launched an expansive urine-testing billing scheme through CGH.**

In May 2015, Jorge and coconspirator Seth Guterman obtained control over CGH, convincing the CGH Board to allow them to manage the hospital through Guterman's hospital management company after promising to help the financially struggling hospital.  Dkt.688:21-22, 282-286 (Jordan); Dkt.736:212-214 (Ayres).  Jorge became CGH's Chief Executive Officer, overseeing its daily operations.  Dkt.693:24 (Jordan); Dkt.693:222-223 (Rhodes).

Jorge also owned Empower HIS, a Miami-based billing company that he led with his brother Ricardo.  Dkt.743:69 (Aguilar).  After gaining control of CGH to exploit its favorable insurance reimbursement rate, Jorge and Ricardo used Empower to control the billing of urine tests to insurance companies and then distribute the proceeds amongst coconspirators.  Dkt.743:85-88 (Aguilar: Ricardo managed Empower's billing and daily operations); Dkt.737:156, 167-168, 191-201 (Mears: Ricardo or his assistant sent weekly emails about how to disburse the money); Dkt.693:180-181 (Jordan); Dkt.738:91-99 (Rojas); Dkt.743:120-121 (Hidalgo); *e.g.*, GX.28C-28F.

Jorge caused CGH to enter into contracts with independent labs including LifeBrite Laboratories, Reliance Laboratory Testing, and Pinnacle Laboratory Services—owned by coconspirators Christian Fletcher, Aaron Durall, and James Porter, respectively—to use the hospital to bill for tests performed by the independent labs.  Dkt.737:169-183 (Mears); GX.26B-D; GX.28L.  The independent labs were out-

7

of-network with the hospitals' insurers and therefore testing billed by them would have been reimbursed at lower rates or not at all.  Dkt.746:52 (Kongstvedt); GX.25E(7) (summary chart); *e.g.*, GX.1O(1) (UHC paid zero on LifeBrite claim).  Jorge also engaged other coconspirators, including Nestor Rojas and Aaron Alonzo, to recruit more independent labs to send their specimens to CGH and other rural hospitals in order "to bill the insurance companies at a higher rate."  Dkt.738:91-99 (Rojas); Dkt.737:187 (Mears).

To ensure a large supply of specimens, the conspirators also used recruiters to solicit requisitions for urine testing from providers such as drug treatment facilities. Dkt.740:126-130 (Skeffington).  Jorge and the independent lab owners paid commissions to the recruiters, who in turn paid representatives at those facilities to obtain urine specimens for testing.  Dkt.740:133, 144-168 (Skeffington).  The conspirators also paid kickbacks directly to providers or facilities to obtain urine specimens.  Dkt.740:276, 296 (Marcotte).

The independent labs received the urine specimens directly from providers around the country.  Dkt.740:60-62 (Polanco).  The independent labs had the equipment and capacity to perform both presumptive and definitive testing on the specimens received, but instead split the specimen, sending a portion (aliquot) to CGH and keeping a portion to run its own tests.  Dkt.743:14-16 (Sullivan); *see* Dkt.738:103-106, 170-171 (Rojas: Jorge "outlined" the plan for the independent lab to "split" the specimen, retain half to run the definitive test, and send the other half to CGH).

8

CGH did not have the sophisticated machines required for definitive tests. Dkt.736:102-103 (Julaton). But Jorge had CGH acquire equipment to run presumptive urine tests, Dkt.736:98-102 (Julaton), and he hired data entry clerks and lab technicians to process the specimens. Dkt.736:219-220 (Ayres).

While CGH conducted a substantial number of presumptive tests, it could not keep up with the numerous specimens received. Dkt.693:225-226, 246-247 (Rhodes). CGH sometimes received multiple FedEx boxes totaling 1000-2000 specimens in a single day, but could test no more than 400 daily at its peak. Dkt.736:229-230, 249 (Ayres); *e.g.*, GX.41B-41C (daily logs).

CGH generally ran presumptive tests on specimens received from a few labs, including Reliance and LifeBrite, but for many other labs simply performed "accessioning," meaning it entered the patient and insurance information into its system for billing purposes, and then—without running tests—shipped the specimens back to the lab. Dkt.693:225-232 (Rhodes); Dkt.736:225-226, 237 (Ayres); GX.52A (dozens of outside labs sent specimens). Moreover, the quantity was so large on some days that CGH could not run tests even on all the Reliance and LifeBrite specimens. Dkt.693:246-247 (Rhodes). After they were accessioned, Jorge or his assistant sometimes took specimens away in large trash bags. Dkt.693:260 (Rhodes); Dkt.736:260 (Ayres). On other occasions, Jorge had CGH employees enter information into the billing system based on requisition forms, even without accompanying specimens. Dkt.693:261-262 (Rhodes).

Jorge and Ricardo had CGH use its own credentials to bill the urine tests to the insurers—those conducted at the hospital lab and those conducted at the independent labs—and then disbursed most of the insurance reimbursements among the various coconspirators. Dkt.737:160-165, 191-201 (Mears); Dkt.738:99-102 (Rojas: describing lab recruiter commissions); GX.24B; *e.g.*, GX.26C, § 2.1. Empower took a 5% billing fee. GX.28L.

Despite CGH's inability to conduct any definitive testing in its own lab, it submitted reimbursement claims for a staggering number of definitive tests.[5] Over two years, defendants billed through CGH $448.6 million for definitive tests, and insurance reimbursed $99.1 million; they billed $16.9 million for presumptive tests, and insurance reimbursed $4.4 million. GX.25K.

By 2016, insurers began investigating the huge spike in CGH's urine-testing claims. Dkt.684:126-137 (Tobin). In July 2016, some insurers put CGH under pre-payment review, requiring medical records before reimbursing claims. Dkt.737:226-231 (Mears); GX.30N-30O. In September 2016, Florida Blue issued an alert warning that the practice of hospitals billing for lab tests for specimens first submitted to out-of-network labs was "inappropriate" and not covered by its contract terms, which Jorge and Ricardo both received. GX.30E; Dkt.737:236-239 (Mears). The CGH Board shut

---

[5] Counts 2-6 are based on definitive tests that CGH billed to Florida Blue. GX.2-6.

down the lab testing arrangements, and by May 2017 CGH declared bankruptcy. Dkt.693:54-58, 154 (Jordan).

### D. Defendants launched a similar urine-testing billing scheme through RGH.

To supplement and then replace CGH as a billing opportunity, in Feb 2016, Jorge purchased RGJ, another Florida rural hospital, and, along with Ricardo through Empower, initiated a similar urine-testing scheme. Dkt.738:205-207 (Encienzo); Dkt.743:120-121 (Hidalgo); GX.28I; *see* Dkt.740:147 (Skeffington: Jorge said the urine specimens would go to RGH while CGH was under review). RGH received FedEx boxes of large quantities of urine specimens from independent labs including Reliance, LifeBrite, and Pinnacle, and ran presumptive tests on the specimens. Dkt.738:209-218 (Encienzo); GX.26G-26H. Like CGH, RGH did not have operational equipment for definitive testing, yet defendants used RGH to bill $286.8 million for definitive tests, and insurance reimbursed $39.2 million; they billed $11.9 million for presumptive tests, and insurance reimbursed over $1.7 million. Dkt.738:218-219 (Encienzo); GX.25K. RGH came under investigation and later closed. Dkt.684:134-136 (Tobin); Dkt.738:228 (Encienzo).

### E. Defendants launched a third urine-testing billing scheme through Putnam.

The Perezes also used a third financially struggling rural hospital, Putnam in Missouri, as part of the scheme. Jorge and coconspirator David Byrns obtained control over Putnam in September 2016 by entering into a management agreement with

11

Putnam's Board. Dkt.743:43-44 (Tague); Dkt.746:240-242 (Henderson). Jorge and Ricardo used Empower to handle the billing in furtherance of the scheme, just as at CGH and RGH. Dkt.744:216-217, 239 (Byrns); *e.g.*, GX.27O. Jorge also partly controlled a company that acted as an intermediary between Putnam and the independent labs, enabling him and Empower to secure a bigger portion of any insurance reimbursement. Dkt.746:241-242, 261-265 (Henderson).

From September 2016 until February 10, 2017, Putnam had no operational equipment to perform urine testing of any kind, and, until February 2017, did not receive any physical urine specimens for processing. Dkt.743:48-49, 54-55 (Tague); Dkt.745:62 (Byrns). Yet, for dates of service prior to February 10, 2017, defendants used Putnam's credentials to bill insurers for $68.7 million for presumptive and definitive testing, and insurers reimbursed $37.6 million. GX.25G(10); *e.g.*, GX.27S (email forwarded by Ricardo showing Putnam billing for November 2016 testing performed by LifeBrite). As before, the conspirators used Putnam to stay one step ahead of investigators: when billing through CGH and RGH stopped because they were under prepayment review, the lab recruiters had their clients send specimens to Pinnacle for testing and reporting of results, and then months later when Putnam's lab was functioning, Putnam back billed for those tests. Dkt.740:169-171 (Skeffington); GX.1D(1) (sample Putnam-UHC claims from 10/13/2016).

Starting in February 2017, Putnam had some equipment to run both presumptive and definitive tests and so also started billing for tests it ran on site. Dkt.743:48-50

(Tague). As at CGH and RGH, Putnam was not testing its own patient population but instead receiving specimens in shipping boxes from around the country. Dkt.743:49-52 (Tague). From November 2016 to February 2018, defendants used Putnam to bill insurers $197.5 million for definitive testing, and insurance reimbursed $79.6 million; they billed $12.3 million for presumptive testing, and insurance reimbursed $4.1 million. GX.25K.

### F.    Defendants' scheme involved medically unnecessary testing.

Excessive testing, incentivized by the conspirators' commission payments to providers, *supra* p. 8, undergirded the urine-testing billing scheme. Reviewing all the claims from all the hospitals, addiction expert Dr. Robert Waller concluded that urine tests were ordered at such high frequency, both presumptive and definitive, "that it made no medical sense at all." Dkt.742:151-152, 185, 194-195, 200 (for example, test ordered "six times in a day, rather than six times annually" or 200-300 times per year rather than 8-12); Dkt.742:180, 194 (patients given 2-4 definitive tests per week, which is "way too high"; appropriate would be "a few times" a year). In particular, the disproportionate number of definitive compared to presumptive tests was a red flag indicating excessive testing. GX.48A (summary chart of definitive and presumptive tests: CGH alone billed 1,676,631 definitive/35,274 presumptive); Dkt.742:194, 215-216 (Waller: under Dr. Wang's name, 30,000 definitive tests ordered and only one screening test).

13

Dr. Waller also identified a number of other "red flag[s]" (Dkt.742:179) demonstrating excessive testing. Definitive urine testing was performed as a matter of course, at the same frequency across patients, without consideration of whether a patient's individualized circumstances made testing for the concentration of a specific drug necessary. Dkt.742:153, 179-180. Definitive tests were run for a long list of drugs, even though most addicts tend to stick to a drug of choice. Dkt.742:197-198. And specimens were collected so frequently that the doctor would not have time to review the results before another test was ordered. Dkt.742:180-183, 239-241; *e.g.*, GX.25N (CGH billed both presumptive and definitive tests for patient M.J. (Count 3) every few days for 5 weeks).

Many of the urine-test requisitions were based on standing orders that were not individually signed by doctors, inviting abuse. Dkt.740:141 (Skeffington); Dkt.742:201-203, 213-214, 244-251 (Waller); *e.g.*, Dkt.740:300 (Marcotte: Reliance provided recruiters with standing orders to give to treatment facilities); GX.48L at 1. Furthermore, some of the doctors at facilities that sent specimens to the independent labs stated that they had not authorized the amount of definitive testing for which they were shown as the referring providers. *E.g.*, Dkt.737:114-124 (Dr. Wang: did not order any urine lab tests, even though Reliance requisition forms processed by CGH bear her name); Dkt.736:176-182 (Dr. Solomon: did not recognize his signature on LifeBrite-CGH requisition forms bearing his name, GX.41C at 19-24).

14

Also, to be effective for monitoring and making treatment decisions, medical providers need timely returns on urine-test results.  Dkt.736:185-186 (Dr. Solomon).  The scheme, which required shipping the specimens all around the country, inherently caused a multiple-day delay, largely defeating any valid testing purpose.  Dkt.742:154-155, 189-190, 223-224, 247-251 (Waller).  Indeed, because of the backlog at CGH, some specimens were not tested at all or not tested for more than 30 days, depriving medical providers of the treatment information needed.  Dkt.737:60, 86-87 (Ayres).

**G.     Defendants made inaccurate statements in the insurance claims.**

The reimbursement claims that defendants submitted through the hospitals to the private insurers contained falsities.  Health insurers employ a trust-based system to quickly auto-adjudicate most of the millions of claims received annually from in-network providers.  Dkt.688:212-213 (Rochay).  As industry expert Peter Kongstvedt stated, the industry standard is that "you only bill for what you do."  Dkt.746:56.

The hospitals electronically submitted the claim through a standard "837I" format (paper version is a "UB-04" form) to a clearinghouse, which then transmitted the claim directly to an insurer or, in some instances, to another clearinghouse that then submitted the claim to an insurer.  Dkt.684:24-26 (Tobin); Dkt.688:119-122 (Rochay).  The information submitted through the 837I format included the hospital's National Provider Identification Number ("NPI") and Tax Identification Number ("Tax ID"), patient name, patient diagnosis, provider demographic information, service(s) rendered using a standardized five-digit code known as a "CPT" code (for "current procedural

15

terminology"), date the services were rendered, amount claimed for payment, and type of bill being submitted. Dkt.684:26-29, 95-96 (Tobin).

The insurers' claims spreadsheets, which captured the claims information transmitted by the billing company on behalf of the hospitals, showed that every claim was submitted using the hospitals' NPI and Tax ID numbers. GX.1A, 1B, 1D, 1E, 1F, 1I, 1J, 1K, 1M; Dkt.684:61 (Tobin). The industry standard is that the NPI and Tax ID on the claim form identifies the provider who performed the service. Dkt.746:46 (Kongstvedt); *e.g.*, Dkt.684:28-29, 70 (Tobin). If the hospitals used their credentials to bill for urine tests performed at the independent labs, the insurers stated that claim would be false and the insurers would not have paid it. Dkt.:684:115-116 (Tobin); Dkt.688:151 (Rochay).

Other features of the claims reinforced the notion that the hospital had done the testing. The claims were submitted using the "141" code for "type of bill." Dkt.741:219 (Bobbitt); *e.g.*, GX.1A(1) (CGH-UHC claims excerpt, column R). Under codes established by the Centers for Medicare and Medicaid Services (CMS) that private insurers also use for billing, the first digit refers to the type of facility where the service was provided, with "1" meaning a hospital; "4" means a non-patient of the hospital; and the third digit is not relevant here. Dkt.684:98-99 (Tobin); Dkt.688:232 (Kagay). Thus, per CMS's long-standing definition, type of bill "141" is used for a non-patient lab specimen, and a "non-patient is defined as a beneficiary that is neither an inpatient nor an outpatient of a hospital, but that has a specimen that is submitted for analysis to

16

a hospital and the beneficiary is not physically present." GX.57 at 11. The industry standard is that using the 141 code requires that "the specimen be submitted to the hospital and the hospital performs the test." Dkt.746:97-98 (Kongstvedt). Insurer representatives therefore considered "false" a claim classifying a bill type as 141 where the test did not occur at the hospital and instead was conducted at an independent lab. Dkt.688:81-82 (Tobin); Dkt.741:220 (Bobbitt).

Furthermore, every claim submitted represented that the testing was medically necessary. Dkt.746:63 (Kongstvedt). Accordingly, insurers considered false any claim for a medically unnecessary test. Dkt.739:49-50 (Shohan).

### H.    Defendants impeded investigations.

Even after insurers launched investigations of the hospitals' huge billing spikes, defendants benefited from insurers' reluctance to delay or halt reimbursements to financially vulnerable rural hospitals, which could interrupt critical access to care. Dkt.739:69-72. The conspirators impeded the investigations by delaying responses or giving incomplete or misleading information to queries regarding, for example, the place of service and the medical necessity of the testing, thereby prolonging the scheme. Dkt.744:50-76 (Byrns); Dkt.742:34-47, 117-120 (Balcom: unable to obtain records from Putnam documenting the medical necessity for definitive testing); GX.35M (defendants copied on emails involving Putnam's response); Dkt.737:219-231 (Mears: defendants aware of insurer requests for supporting records, but CGH did not respond with timely

17

or complete information); Dkt.684:138-151 (Tobin: describing attempts to get information from RGH and Putnam).

## I.     Defendants obtained large sums from the insurance companies.

Defendants' scheme resulted in securing enormous sums from the insurers.  For CGH, RGH, and Putnam combined, defendants billed $933 million for definitive testing, and insurers reimbursed $218 million.   For presumptive testing, defendants billed $41 million, and insurers reimbursed $10 million.  GX.25K.

Defendants' share of the proceeds was also large.  Jorge and Ricardo received over $10.6 million of the insurance reimbursement for urine tests billed from CGH, RGH, and Putnam through payments from the independent labs.  GX.8C.  They secured millions more in insurance proceeds based on Empower's 5-6.5% billing fee collected directly from the hospitals.  Dkt.746:265, 279 (Henderson); Dkt.745:217 (Byrns); *e.g.*, GX.28L.

## II.     Course of Proceedings

A grand jury in the Middle District of Florida charged Jorge, Ricardo, and eight coconspirators with various conspiracy, fraud, and money-laundering offenses. Dkt.180:1-28.  Jorge and Ricardo were charged with conspiring to commit health-care fraud and wire fraud, 18 U.S.C. § 1349 (Count 1); five counts of health-care fraud, 18 U.S.C. §§ 1347 & 2 (Counts 2-6); conspiring to commit money laundering, 18 U.S.C. § 1956(h) (Count 8); and multiple counts of money laundering, 18 U.S.C. § 1957. Dkt.180:21-28.

Codefendant Rojas as well as separately charged coconspirators Byrns, Michael Skeffington, and Kyle Marcotte pleaded guilty and testified at the joint jury trial of the Perezes and six codefendants (Durall, James Porter, Sean Porter, Fletcher, Neisha Zaffuto, and Alonzo) that began in May 2022. That jury found Jorge and Ricardo guilty of the fraud conspiracy, five counts of health-care fraud, and the money-laundering conspiracy. Dkt.768; Dkt.769. The jury failed to reach a verdict on the substantive money-laundering charges against Jorge and Ricardo as well as all the counts against the other codefendants. Dkt.768-Dkt.775.

Prior to the codefendants' second trial, the Porters pleaded guilty to Count 1. Dkt.910-Dkt.911. At the second trial, the jury acquitted Durall, Fletcher, Zaffuto, and Alonzo. Dkt.1005-Dkt.1008.

The district court sentenced Jorge to 100 months and Ricardo to 75 months of imprisonment, to be followed by three years' supervised release for each. Dkt.1185:1-3; Dkt.1187:1-3. It also imposed on both defendants over $40 million in restitution and a forfeiture order. Dkt.1185:6; Dkt.1187:6. The court dismissed the remaining charges. Dkt.1047.

## SUMMARY OF ARGUMENT

1. The evidence sufficiently supported defendants' convictions for scheming and conspiring to submit fraudulent insurance claims for urine testing and conspiring to launder the proceeds. Defendants, after taking control of the rural hospitals, billed insurance companies for thousands of urine tests, particularly expensive definitive tests,

19

that the hospitals could not and did not perform using, *inter alia*, the hospitals' NPI and Tax ID numbers, thereby making false representations to the insurers about where the testing occurred to obtain the higher reimbursement rates available under the hospitals' contracts. The jury was entitled to reject defendants' claim that they believed that the billing of testing performed by independent labs was proper as a reference-lab arrangement under Medicare guidelines for numerous reasons, including expert testimony that the Medicare guidelines were inapplicable to the facts here and abundant other evidence of defendants' fraudulent intent. The claims were also fraudulent because they were medically unnecessary. Even if physicians ordered the testing, that does not insulate defendants from liability for knowingly making claims for excessive testing.

2. The district court did not abuse its discretion in admitting the insurers' claims spreadsheets as business records under Federal Rule of Evidence 803(6). The insurer representatives' testimony established that the spreadsheets represented the claims data that the insurers handled as part of their regular business activities. Any differences between that data and the hospitals' original submissions implicates evidentiary weight, not admissibility.

3. No new evidence was elicited at the second trial warranting a new trial. Evidence at both trials established that defendants used the hospitals' credentials to bill for a vast amount of definitive testing that the hospitals could not and did not perform. The CPT codes submitted by the hospitals dictated whether a test was billed as a

20

definitive or presumptive test. That the insurers sometimes used the generic term "drug screening" to describe a CPT code for a definitive test does not change the nature of the test performed or billed. Defendants distort the record in asserting that witnesses testified falsely.

4. The district court did not abuse its discretion in declining to further investigate the claim that jurors were exposed to extrinsic information. Defendants fail to demonstrate that the court clearly erred in finding that defense counsel violated its local rule and order in questioning the jurors. The court therefore appropriately excluded the evidence supporting defendants' claim.

## ARGUMENT

### I.   The Evidence Was Sufficient.

Defendants challenge (Br.6-31) the sufficiency of the evidence supporting all their convictions, arguing that the evidence did not prove "any false statements or material omissions that defrauded the insurance companies and therefore there was insufficient proof of health care fraud, or the commission of any 'specified unlawful activity' to support the money laundering charges." Br.7. The evidence, however, was more than sufficient on all counts.

#### A.   Standard of Review

This Court reviews a sufficiency challenge de novo, viewing the evidence and making all reasonable inferences and credibility choices in the government's favor to

determine whether guilt was established beyond a reasonable doubt. *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013).

### B. Legal Principles

To support a conviction for health-care fraud under 18 U.S.C. § 1347, the government must prove that the defendant (1) knowingly and willfully executed, or attempted to execute, a scheme or artifice to (2) defraud a health-care benefit program or to obtain by false or fraudulent pretenses any money or property under the custody or control of a health-care benefit program (3) in connection with the delivery of or payment for health-care benefits, items, or services. *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015). For a Section 1347 offense, the government must prove that the defendant knew that the submitted claims were "false or fraudulent." *United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007). "A statement or representation may be 'false' or 'fraudulent' when it is a half truth, or effectively conceals a material fact, and is made with the intent to defraud." Dkt.795:25 (jury instructions); *see United States v. Bradley*, 644 F.3d 1213, 1247-48 (11th Cir. 2011).

A defendant violates the federal wire-fraud statute, 18 U.S.C. § 1343, if he (1) intentionally participates in a scheme to defraud a person of money or property, and (2) uses wire communications to further that scheme. *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997). To uphold a conspiracy conviction under Section 1349 based on health-care fraud or wire fraud, the government must prove that (1) an agreement to

22

violate the law existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it. *Moran*, 778 F.3d at 960.

To convict a defendant of money-laundering conspiracy, the government must prove an agreement to commit a money-laundering offense and knowing and voluntary participation in that agreement by the defendant. *United States v. Irele*, 977 F.3d 1155, 1174 (11th Cir. 2020). Here, the conspiratorial object was a violation of 18 U.S.C. § 1957, which prohibits "the use of a financial institution to conduct a monetary transaction involving more than $10,000 of illegally obtained funds*," id.* at 1173, with the illegal funds deriving from health-care fraud.

## C.    Evidence sufficiently proved defendants' offenses.

Ample evidence demonstrated that defendants engaged in a scheme and conspiracy to submit fraudulent claims for insurance reimbursement for urine testing and conspired to launder the insurance proceeds.[6] The evidence showed that defendants knowingly submitted and agreed to submit claims that were false and misleading in that they represented that the hospital had performed the tests that were

---

[6] Defendants recount (Br.9-13) their various pretrial arguments related to their motion to dismiss the indictment and for a bill of particulars, which the district court correctly denied (*e.g.*, Dkt.372; Dkt.514), but have not raised a variance or similar claim on appeal, and therefore we do not counter their assertions in detail. The government repeatedly stated pretrial that the hospitals had performed some tests, but that they had billed for a huge number of definitive tests that they did not perform and were medically unnecessary. *E.g.*, Dkt.224:4; Dkt.588:8-15; Dkt.660:13-14. The government also long stated that the claims were fraudulent in part because they used the hospitals' NPI and Tax ID numbers. Dkt.224:4; Dkt.477:2-8.

23

being billed and the tests were medically necessary, when, for many claims, particularly those for definitive testing, that was not true, and then they distributed the proceeds amongst the coconspirators. *See supra* pp. 3-18.

In challenging the evidentiary sufficiency, defendants make only narrow claims about the knowing falsity of the submissions and, even then, they ignore most of the trial evidence, which was vast and deep. They do not contest that they were in charge of the urine-testing and billing operations at CGH, RGH, and Putnam, as well as the distribution of the proceeds. Nor do they contest that they instituted the plan to bill urine specimens collected around the country through the rural hospitals to capture the hospitals' favorable insurance reimbursement rates. Dkt.738:90-91 (Jorge explained the plan to Rojas). Neither do they dispute that CGH and RGH never had the capacity to perform definitive tests or that Putnam did not have *any* capacity for urine testing before February 10, 2017, yet defendants used the hospitals' credentials to bill insurers for such testing.[7] Furthermore, they fail to directly address the conspiracy elements. Their primary claims are that they did not make fraudulent statements in the claims submissions by using the hospitals' credentials to bill for testing that occurred at outside labs and they did not know that the urine testing was medically unnecessary. But ample

---

[7] Defendants' assertion that the "vast majority of tests" were "screening" tests rather than definitive tests is apparently based on purported new evidence from the second trial. Br.10-11 & n.2. As we explain below (*infra* pp. 43-45), however, the post-trial evidence does not support that claim. Regardless, the unrefuted first-trial evidence was that the hospitals billed for vastly more definitive tests than presumptive tests. GX.25K; GX.48A.

evidence allowed the jury to conclude otherwise.  Moreover, sufficient evidence on either theory would support a fraud finding, which in turn would support the jury's general verdicts on all counts.  *United States v. Browne*, 505 F.3d 1229, 1261-62 (11th Cir. 2007).

### 1. Defendants fraudulently claimed that certain testing occurred at the hospitals.

#### a. The claims submissions were false and misleading.

Defendants made false and misleading representations in their claims submissions by using the hospitals' credentials to bill for urine tests that the hospital had not performed, including hundreds of millions of dollars for definitive tests when the hospitals did not have the capacity to perform definitive tests at all.  GX.25K.  Every claim submitted used the hospitals' NPI and Tax ID number.  *E.g.*, Dkt.684:57-61, 94-96 (Tobin); Dkt.688:127-128 (Rochay); GX.1A(1) (CGH's NPI number in column "AS" and Tax ID number in column "AL").

Multiple insurer representatives testified that the NPI and Tax ID numbers are the information that identifies the provider of the service.  Dkt.684:28-29 (Tobin); Dkt.688:127-128 (Rochay: NPI identifies the provider who rendered the service); Dkt.738:294 (Jackson: NPI and Tax ID identify "where th[e] services were located"); Dkt.739:117 (Shohan: use of Tax ID "[t]old me … [t]hey were the one performing the test"); Dkt.741:208 (Bobbitt: the NPI and Tax ID "identify which provider rendered that service").

Industry experts agreed that "using the hospital's NPI number and tax ID number in a claim that's submitted electronically" means "[t]hat the billing provider did the service." Dkt.746:46, 62 (Kongstvedt); *see* Dkt.742:230-231 (Waller). The jury could reasonably rely on such testimony from industry insiders and experts as to the significance of the NPI and Tax ID numbers, and that remains true even if defendants claimed conflicting expert testimony. *See Joseph*, 709 F.3d at 1097 ("it was for the jury to resolve the conflicting [expert] testimony" on standard of care).

In the same vein, the jury could reasonably rely on the evidence that defendants' use of the 141 code (signifying a "non-patient" has "a specimen that is submitted for analysis to a hospital," GX.57 at 11) conveyed false or misleading information. Industry expert Kongstvedt explained that using the 141 code requires that "the specimen be submitted to the hospital and the hospital performs the test." Dkt.746:97-98. In other words, submitting a type of bill "141" does not just mean a claim is being made for a lab test performed for a non-patient, but more specifically that the hospital has provided testing for a non-patient's specimen that was submitted to a hospital for testing. Here, however, the specimens were submitted to the independent labs in the first instance, not the hospitals, and in many instances, particularly for the definitive tests, the independent labs and not the hospitals performed the test. As stated by insurer representatives, it was "false" to classify a bill type as 141 where the test was conducted at an independent lab rather than the hospital. Dkt.688:81-82 (Tobin); Dkt.741:220 (Bobbitt).

26

Defendants' suggestion (Br.16, 21-22) that the hospital submissions indicated that independent labs had performed the tests is incorrect.  Dkt.684:116-119 (Tobin: nothing on the claim submissions identified the independent labs as performing the tests).  Defendants rely on the patient-account field on the claim forms, which for example would state "34966RL."  GX.1A(1) (column AF).  The insurer representatives testified that the hospitals inserted the patient-account number to track its own patient accounts and it meant "[n]othing" to the insurer for the adjudication process, and moreover, only later, through investigation, did they learn that RL referred to Reliance Lab.  Dkt.688:86-88 (Tobin); Dkt.688:132-133 (Rochay).  On the other hand, the evidence showed that, in the type of electronic claims submissions defendants utilized, defendants easily could have identified the service provider if that provider were different from the billing provider.  *See* GX.70 at 22 (describing a code "[r]equired when the location of the health care service is different than [the billing provider]"); Dkt.749:88-91 (Arrigo).  Their failure to do that supports the misleading nature of their claims submissions.

Defendants' heavy reliance (*e.g.*, Br.14-15) on provisions in the Medicare Claims Processing Manual discussing reference-lab arrangements is unavailing.  For claims paid by Medicare, Medicare has defined a reference-lab arrangement whereby a "[r]eferring laboratory" that "receives a specimen to be tested" may refer the specimen to a "[r]eference laboratory" to actually perform the test.  FletcherDX.22 at 3.  When a rural hospital qualifies as the referring laboratory, Medicare directs that the rural hospital may

27

bill Medicare for the testing. FletcherDX.23 at 3 (Medicare manual, Part 40.1). However, as explained by industry insiders and experts—and consistent with the plain terms of the pertinent Medicare guidance—that description of a reference-lab arrangement, including how billing is to be handled, is specific to "Medicare beneficiaries" and does not govern private insurers' contracts with hospitals. Dkt.688:115 (Tobin); Dkt.746:75-76 (Kongstvedt: "Not all commercial payers" provide reimbursement for reference-lab arrangements.). The mere fact that private insurers sometimes follow Medicare guidelines on some matters does not mean that Medicare standards govern all billing by private insurers. Dkt.688:195 (Rochay: for "claims processing," Florida Blue follows its "internal guidelines" and Medicare guidelines would have "no role"). Here, the insurer contracts, which defendants completely ignore, provided that they would pay only for services rendered by the hospitals. *See supra* pp. 5-6. Moreover, one of the contracts specifically provided that "[r]eference laboratory services are not eligible for payment." GX.1DD, p.118 (RGH-Aetna contract).

Even aside from the fact that the claims here were to private insurers not Medicare, the circumstances did not qualify as a reference-lab arrangement. As industry expert Kongstvedt explained, where an independent lab received a urine specimen for testing, had the capability to perform all the testing required, but sent a portion of the specimen to the in-network hospital to run a presumptive test while the independent lab ran a definitive test, the independent lab would not qualify as "a reference lab" and

28

the rural hospital would not be a referring lab that could bill for the tests run by the independent lab. Dkt.746:84-87. Among other things, "the specimens were not sent to the rural hospital to begin with," and the hospital "didn't run what tests it could and then refer out the tests it couldn't do," which is "the opposite" of a reference-lab arrangement. Dkt.746:87-88 (Kongstvedt); *e.g.*, Dkt.736:177-182 (Dr. Solomon: provider ordered tests from LifeBrite). In that situation, Kongstvedt testified, "the hospital's identifiers and billing rates were being used inappropriately, according to the industry standard." Dkt.746:87.

Defendants also suggest (*e.g.*, Br.9, 17) that the insurers' addition in their claims data of the "22 code" for place of service and other additions somehow tainted the data. The evidence established that the insurers added the 22 code when hospitals submitted claims using the 141 code to signify for the insurers' own internal purposes that the service was provided at an outpatient location (as distinguished from inpatient). *E.g.*, Dkt.741:222-223 (Bobbitt: Anthem used it "to identify the benefits" that apply to the claim). The jury was well aware that the hospitals neither submitted the 22 code nor identified the patient as an "outpatient." Br.9, 17 (citing record). And more broadly, witnesses exhaustively testified about any differences between what the hospitals submitted through the 837I data and what the insurers recorded on their claims spreadsheets, as defendants admit (Br.41-42); *e.g.*, Dkt.684:205-211 (Tobin). Defendants' arguments on this score go to the weight of the evidence, not its

29

sufficiency.[8]  *See* Dkt.684:61 (Tobin) (essential claim information such as the NPI number, Tax ID, and CPT code passes unchanged from hospital's submission to insurer spreadsheet); Dkt.688:255-256 (Young) (clearinghouse only changes non-important information).

Defendants' argument (Br.21-31) that this case was merely a contract dispute ignores the evidence, including the expert testimony on industry standards, demonstrating that defendants made fraudulent misrepresentations that the hospital had provided the services when in fact the services were provided elsewhere and would not have been reimbursable under the contracts.  Furthermore, a reasonable jury could conclude that neither the insurer-hospital contracts—which through many provisions stated that the insurers would reimburse only for services provided by the hospital or at the hospital, *supra* pp. 5-6—nor the Medicare provisions on reference-lab arrangements were ambiguous or vague, particularly given that the express terms of the Medicare provisions do not apply to private insurers and at least one hospital contract expressly stated that "[r]eference laboratory services are not eligible for payment." GX.1DD, p.118.  Unlike *United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002), the only ambiguity here has been manufactured by defendants, who insist they could not have made false statements unless the contracts contained far more detailed rules about

---

[8]  The trial evidence included representative 837I claims data.  Dkt.747:153-156. Moreover, defendants obtained from their own billing company, Empower, the raw data and could have presented it to the jury.  Dkt.440:50.

what the insurers would reimburse, but the law requires only that there be evidence that the defendant's statement "is not true under a reasonable interpretation of" the law or contract. *Id.* at 1351.

### b.    The evidence proved defendants' fraudulent intent.

The evidence established that defendants acted with fraudulent intent when submitting the claims falsely indicating that the hospitals had performed the urine testing. Expert Kongstvedt specified that any individual running a lab or hospital billing entity would know the industry standard that "[t]he provider that performs the service is the one that bills for it." Dkt.746:105-107 ("It's not a coding nuance. It's basic and fundamental."). Jorge was in control of the hospitals and made agreements with the independent lab owners, and Ricardo oversaw a sophisticated insurance billing operation. Defendants' leadership roles and status as industry insiders permitted the jury to infer their knowledge that using the hospital's NPI and Tax ID numbers and the 141 code to bill constituted a false representation that the hospital provided the service. *See Bradley*, 644 F.3d at 1243, 1246 (jury could infer that defendants as experienced industry professionals had same knowledge "as the industry insiders who testified at trial").

The jury could also infer defendants' fraudulent intent from the "disproportionate profits" they realized from running the billing through the rural hospitals. *See Bradley*, 644 F.3d at 1247. Likewise, the jury could base a finding of fraudulent intent on the evidence that defendants continued their scheme at new

31

hospitals when insurers alerted them that their billing was illegitimate, *see supra* pp. 10-11; *e.g.*, GX.30E (Florida Blue alert); impeded insurers' investigations by giving delayed, incomplete, or misleading information in response to queries, *supra* pp. 17-18 and encouraged medically unnecessary testing through payment of kickbacks, *see infra* pp. 34-35.

Defendants appear to rely on the Medicare reference-lab provisions to argue that they lacked intent to defraud, Br.16, but the jury was entitled to conclude otherwise, particularly considering that the Medicare provisions did not apply to the circumstances here by their express terms and in light of the abundant other evidence of defendants' fraudulent intent. Indeed, the jury could reasonably have regarded the hospital-lab contracts—such as CGH and RGH's contracts with LifeBrite and Pinnacle (GX.26C-D, 26G-I) that stated that the hospitals would collect specimens, determine medical necessity, and "deliver" specimens to the labs—as shams that demonstrated that defendants knew exactly what qualified as an appropriate reference-lab arrangement and that their scheme did not qualify.

### 2. Defendants knowingly submitted medically unnecessary claims.

"A person makes a false claim if the treatments that were billed were not medically necessary … ." *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) (quotation marks omitted). A defendant's knowledge that services or products are medically unnecessary may be established by circumstantial evidence. *United States v.*

*Chalker*, 966 F.3d 1177, 1185-87 (11th Cir. 2020) (pharmacist's knowledge proved by his awareness of numerous red flags regarding unnecessary prescriptions). A doctor's orders do not insulate non-doctors from findings of fraudulent intent. *See United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017) (in upholding lab owners' convictions for fraudulent urine testing, rejecting defense that "their Lab was bound to perform drug screens ordered by referring physicians").

Defendants do not dispute that the tests were in fact medically unnecessary. They contend (Br.18-20) only that the evidence insufficiently demonstrated their knowledge that the tests were medically unnecessary. The jury, however, could infer knowledge from the numerous red flags signifying excessive testing.

As Dr. Waller testified, "the clear majority of these tests were not medically necessary" and were merely to generate revenue. Dkt.742:256 (Waller). Definitive testing should be relatively rare compared to presumptive testing, but instead CGH, RGH, and Putnam billed a much higher quantity of definitive tests than presumptive tests, demonstrating no "medical justification." Dkt.742:221-222; GX.48A (CGH, RGH, and Putnam billed 3.7 million definitive tests compared to less than 81,000 presumptive tests); GX.25K (CGH, RGH, and Putnam billed $933 million for definitive testing, and $41 million for presumptive testing). Moreover, defendants billed a huge number of tests per patient, "overtesting to the max." Dkt.742:235-238; *e.g.*, GX.48H (for one patient in less than a year, CGH billed 2213 definitive tests and 65 presumptive tests on 122 distinct claims; reimbursed $288,077.40). And the pattern of multiple

providers from all over the country ordering excessive testing in a similar pattern was another obvious red flag. Dkt.742:179-180. At a minimum, given their management roles in hospital operations and billing, defendants were aware of the volume and frequency of the testing on a macro level, and that was so extreme that the jury could reasonably conclude that defendants knew that it was medically unnecessary. Dkt.742:310 (the claims "easily" established "a pattern in a disproportionate utilization of tests and it was so disproportionate that it would be medically unnecessary at scale").

The jury also could reasonably conclude that defendants knew that the testing was medically unnecessary given the delays in timely processing of the specimens inherent in their scheme, which depended on shipping urine specimens all around the country—sometimes for testing and other times simply to be accessioned and sent right back to the independent lab—despite Dr. Waller's testimony that doctors need the test results more quickly to serve a valid clinical purpose. Dkt.742:154-155, 190 (3-day wait for presumptive test and 30-day wait for definitive test renders results useless). That defendants ran a scheme where specimens sometimes were not tested at all or not tested for more than 30 days bolstered the evidence that they knew the testing was medically unnecessary. Dkt.737:60, 86-87 (Ayres).

Finally, the evidence that defendants engaged recruiters who paid kickbacks to the providers to encourage the collection of more urine specimens for testing was powerful evidence of their fraudulent intent. *Gonzalez*, 834 F.3d at 1215 (jury may rely on payment of kickbacks to patients to infer fraudulent intent); *see United States v.*

*Martinez*, 921 F.3d 452, 471 (5th Cir. 2019) (paying kickbacks "is clearly a possible indicator of health care fraud").

Defendants ignore all this evidence and argue only that they lacked knowledge that the tests were unnecessary given they were "ordered by various physicians." Br.18. But this Court has repeatedly rejected that simplistic defense, noting that "[a] doctor's prescription is not a get-out-of-jail-free card." *United States v. Grow*, 977 F.3d 1310, 1321-22 (11th Cir. 2020). A government agency's straightforward guidance statement that a lab does not "treat patients or make medical necessity determinations" (Br.19 (citing 63 Fed. Reg. 45076-3, 45079 (Aug. 24, 1998))) is not to the contrary. That guidance also states that labs must take "all reasonable steps to ensure" that its services are "reasonable and necessary." 63 Fed. Reg. 45079. Dr. Waller likewise testified that labs and billing companies are responsible for monitoring for excessive testing. Dkt.742:208-209. Moreover, defendants' assertion that they did not "encourage[] or persuade[]" the providers to order tests, Br.18, ignores that part of their scheme involved the payment of kickbacks to do just that. Dkt.740:167 (Skeffington: Jorge urged recruiters that he wanted "[a]s much volume as we could give him").

## II. The District Court Did Not Abuse Its Discretion in Admitting the Claims Spreadsheets.

Defendants claim (Br.37-43) that the insurers' claims spreadsheets were inadmissible as business records and unreliable. That claim is meritless.

## A.     Background

The Perezes medical billing company Empower submitted the insurance claims electronically on behalf of the rural hospitals.  The claims first went to one or more clearinghouses and then to the insurance companies.  Dkt.688:119-122 (Rochay).  The insurer maintained the claims information in a "data warehouse," along with millions of other claims submitted daily.  Dkt.684:58 (Tobin).  In adjudicating a claim, the insurer added certain pieces of information, such as information about the policy holder and the amount paid on the claim, and stored that as well.  Dkt.684:58, 122 (Tobin).

Defendants objected that the insurers' claims spreadsheets (GX.1-F, H-M) were inadmissible.  *E.g.*, Dkt.567; Dkt.617; Dkt.684:71-72.  After each insurer laid a foundation, *e.g.*, Dkt.684:57-71 (Tobin); Dkt.688:117-125 (Rochay), the court overruled the objection, finding that the spreadsheets qualified as business records under Federal Rule of Evidence 803(6).  Dkt.684:72-74, 108-110; Dkt.688:125-126; Dkt.738:289; Dkt.741:213-214.

## B.     Standard of Review

Evidentiary rulings are reviewed for abuse of discretion.  *United States v. Clotaire*, 963 F.3d 1288, 1292 (11th Cir. 2020).

## C.     The claims spreadsheets were admissible business records.

Under Rule 803(6), a business record is admissible when: (A) "the record was made at or near the time by—or from information transmitted by—someone with knowledge," (B) "the record was kept in the course of a regularly conducted activity of

36

a business," (C) "making the record was a regular practice of that activity," (D) a "qualified witness" testifies to these conditions; and (E) the opponent does not show "a lack of trustworthiness" in the information. Fed. R. Evid. 803(6). As the district court concluded, the claims spreadsheets satisfied all these criteria because the insurer representatives established that the spreadsheets represented the claims data that the insurers received, handled, stored, and retrieved as part of the insurers' regular business activities. Dkt.684:72-74.[9]

In challenging the admissibility of the spreadsheets, defendants assume that the spreadsheets are the pertinent "record." Br.40. But the claims data is the business record. Because the claims data is both electronic and vast, the spreadsheets are merely the means to "access[]" the business record. Dkt.684:73; *see Clotaire*, 963 F.3d at 1293-94. Accordingly, that the spreadsheets themselves were created several years after the claims were submitted is immaterial. "The temporal focus for assessment of whether records meet the Rule 803(6) conditions is the time at which the data were recorded, rather than the time at which they were received or printed." *United States v. Conde*, 134 F.4th 82, 89-90 (2d Cir. 2025). Similarly, defendants' assertion that "[i]t was not the insurers' regularly conducted activity to create or keep such spreadsheets," Br.40, is beside the point; the insurers regularly recorded claims data, the relevant business record. Regardless, the insurer representatives testified that they regularly created

---

[9] Contrary to defendants' assertion (Br.37), the court admitted the spreadsheets as business records, not summary charts (Fed. R. Evid. 1006).

spreadsheets to review claims data in a readable form.   Dkt.684:63-64 (Tobin); Dkt.688:123-124 (Rochay).

Nor is there any merit to defendants' claim (Br.40-41) that the spreadsheets are inadmissible because they were created in anticipation of litigation.  "That argument misconstrues the essence of the business records rule: so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice, the fact that the hard copy offered as evidence was printed for purposes of litigation does not affect its admissibility."  *Clotaire*, 963 F.3d at 1293 (quotation marks omitted); *see Conde*, 134 F.4th at 90-91 (collecting cases); *United States v. Warner*, 638 F. App'x 961, 964 (11th Cir. 2016) (computer spreadsheets "formatted to be easier to understand and printed for litigation" admissible as business records).

Defendants' contention (Br.37-39, 41-43) that the claims spreadsheets were unreliable is also without merit.  The differences between the 837I data and the insurers' spreadsheets was the subject of exhaustive testimony on both direct and cross-examination, as defendants admit (Br.42).  The essential claim information such as the NPI and Tax ID numbers, the identity of the patient, the CPT code for the service provided, and the claim amount, passed through to the insurer unchanged and was stored as a business record.  Dkt.684:61 (Tobin).[10]  While any differences between the

---

[10]    The abbreviations defendants submitted in the patient-account field, which defendants suggest provided notice of the outside lab's involvement (Br.38) but were meaningless to the insurers (*supra* p. 27), were reflected on the spreadsheets, undercutting defendants' claim that the spreadsheets misleadingly omitted information.

insurers' claims spreadsheet and the 837I data that defendants submitted for the hospitals were "fair game" for cross-examination and argument as to the weight to be accorded the spreadsheets, the district court correctly concluded that such differences did not render the spreadsheets untrustworthy as an insurer business record. Dkt.684:110.[11]

Finally, any possible error in the admission of the claims spreadsheets was harmless given the "overwhelming" evidence of defendants' guilt. *United States v. Lewis*, 40 F.4th 1229, 1245 (11th Cir. 2022). As noted, that evidence included coconspirator testimony describing the urine-testing billing scheme, the money transfers, and the hospitals' lack of testing capacity; corroboration of that by hospital, lab, and billing company employees; insurer testimony describing the contracts and false statements; expert testimony describing industry billing standards and the excessiveness of the claims; Government Exhibits 2-6 documenting the patient claims underlying the substantive fraud counts; and other documentary evidence including hospital-insurer contracts and representative 837I data. *See supra* pp. 3-18.

---

[11] Defendants' claim (Br.39, 41 & n.10) that the government has admitted that the spreadsheets were materially inaccurate distorts the record. The hospitals sought reimbursement by listing the CPT code for the medical procedure they claimed was performed. The spreadsheets accurately documented the CPT codes the hospitals submitted. *See infra* pp. 43-45.

## III.   The District Court Did Not Abuse Its Discretion in Denying Defendants' New Trial Motion.

Defendants claim (Br.43-54) that the district court abused its discretion in denying their new trial motion. They assert that testimony at the retrial of their codefendants constitutes newly discovered evidence that would result in a different outcome. Their claim is meritless.

### A.   Background

Kelly Tobin, a UHC investigator, testified in both trials about the claims data showing the tests the hospitals billed to UHC. When a hospital submits a claim, it submits the CPT code describing the service for which it is claiming reimbursement; UHC uses the CPT code to adjudicate the claim and determine the reimbursement owed. Dkt.684:26-28 (trial 1); Dkt.985:115-116 (trial 2). Using excerpts from the full claims spreadsheets (GX.1A(1) (CGH); GX.1B(1) (RGH); GX.1D(1) (Putnam)), Tobin testified that Column J contains the CPT code and Column K contains the insurer's written-out description of the CPT code. Dkt.684:88, 91 (trial 1); Dkt.984:173 (trial 2).

In both trials, Tobin testified that based on her investigation and review of the full claims spreadsheet for CGH, she found that the majority of the CPT codes billed were for definitive testing. Dkt.684:90-91; Dkt.984:193. That testimony was consistent with the testimony of government expert Melissa Parks at the first trial, who grouped the CPT claims in the spreadsheets and determined that the billed and paid amounts for CPT codes representing definitive testing far exceeded the amounts for presumptive

testing for CGH, RGH, and Putnam.    GX.25E(1) (CGH); GX.25F(1) (RGH); GX.25G(1) (Putnam); GX.25K (summary chart: excluding Chestatee, billed/paid for definitive testing was $933 million/$218 million, while billed/paid for presumptive testing was $41 million/$10 million).  The government's expert in the second trial, Kara McVey, reviewed Parks' classifications also using the CPT codes and arrived at virtually the same numbers.  Dkt.1151-1:5-6.  Government expert Waller, who testified at both trials that the extreme volume of definitive testing showed that many claims were medically unnecessary, also used the CPT codes submitted by the hospitals to categorize the tests for his analysis.  Dkt.742:280-283 (trial 1); Dkt.996:186, 210-212 (trial 2).

Throughout both trials, the parties and witnesses used various words to describe presumptive and definitive testing, with the word "screening" often used to describe a presumptive test.  *E.g.,* Dkt.684:124-125.  However, the industry also uses "drug screening" to generally refer to any kind of drug test, including a definitive test.  *See* Dkt.1111:75 (McVey: "commonly I do see definitive codes called drug screening").

In the second trial, Durall's counsel on cross-examination showed Tobin that, on the claims excerpts for CGH and RGH, many of the descriptions that UHC inserted in Column K used the word "screen."  Dkt.985:21-34; *e.g.,* GX.1A(1) (cell K5: "DRUG SCREEN QUANT AMPHETAMINES 1 OR 2").  Tobin agreed that the spreadsheets used that term.  *E.g.,* Dkt.985:25 ("It does say that.  That's correct.").  She also stated that she used the CPT code, not information in Column K, to determine whether the hospital billed for a presumptive or definitive test, Dkt.985:30-31, and on redirect she

41

agreed that UHC may have "use[d] the term screening as a generic term to refer to tests," Dkt.985:114.  Similar testimony at the second trial was elicited from Aetna investigator Teresa Jackson.  *Compare* Dkt.990:64-74 (agreeing on cross-examination that certain CPT codes are "drug screening codes"), *with* Dkt.990:87-91 (agreeing that Aetna sometimes uses the term "drug screen" to refer to both presumptive and definitive testing).

Thereafter, defendants filed a new trial motion, Dkt.1149, claiming that witness testimony at the second trial was newly discovered evidence establishing that the majority of tests billed by multiple hospitals were presumptive rather than definitive tests, which they claimed established that they did not fraudulently bill for tests that the hospitals could not perform.  In opposing, the government, *inter alia*, submitted expert McVey's affidavit attesting to the "bedrock principle of medical coding and billing" that CPT codes govern insurance reimbursement and confirming her conclusion that CGH, RGH, and Putnam billed for far more definitive tests than presumptive tests.  Dkt.1151-1:3-6.

The district court summarily denied the new trial motion.  Dkt.1163.

## B.    Standard of Review

The denial of a new trial motion is reviewed for abuse of discretion.  *United States v. Thompson*, 422 F.3d 1285, 1294-95 (11th Cir. 2005).

42

### C.    Defendants did not establish newly discovered evidence warranting a new trial.

A district court may grant a new trial based on newly discovered evidence only if "(1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result." *Thompson*, 422 F.3d at 1294 (quotation marks omitted); *see* Fed. R. Crim. P. 33.

The district court correctly denied defendants' new trial motion because their argument lacks merit. Defendants argue that newly discovered evidence establishes that most of the rural hospitals' urine drug testing consisted of presumptive rather than definitive testing, which the evidence showed that all the hospitals had some capacity to perform at certain times. From that faulty characterization of the evidence at the retrial, defendants leap to the conclusion that one of the government's fraud theories— that defendants fraudulently submitted claims through CGH, RGH, and Putnam for urine testing that the hospitals could not or did not perform—collapses. Both defendants' premise and conclusion, however, are flawed.

Definitive urine tests and presumptive urine tests use different technology. Dkt.1151-4 (CPT manual). Whether a test is billed as a presumptive or definitive test is defined by the CPT code. Dkt.744:149-150 (Parks: no single code can be both presumptive and definitive). As government expert McVey averred: "It is a bedrock

43

principle of medical coding and billing that the CPT code is the operative piece of information that informs the insurer of what test or procedure was performed and enables the insurer to determine whether and how much to pay pursuant to the claimant's insurance coverage." Dkt.1151-1:6.

Defendants make no claim that the insurer spreadsheets inaccurately recorded the CPT codes defendants submitted for the hospitals, and it was the CPT codes that witnesses used in testifying that CGH, RGH, and Putnam billed for vastly more definitive than presumptive tests. *E.g.*, Dkt.742:280-282 (Waller trial 1); Dkt.744:149-150 (Parks); Dkt.684:26-28 (Tobin trial 1); Dkt.985:115-116 (Tobin trial 2).

Although defendants contend that new evidence demonstrates that the rural hospitals billed mostly for presumptive rather than definitive tests (Br.47-50), the evidence on which they rely is neither new, material, or likely to result in a different outcome. An insurer's use of the word "screen" in the Column K descriptors—which were available to defendants at the first trial—cannot change the meaning of the CPT codes transmitted by defendants, and it is the CPT codes that are the basis for billing and insurance reimbursement. Moreover, Tobin did not "recant[]" (Br.49) her testimony that CGH billed for many more definitive than presumptive tests when she merely agreed that Column K used the words "drug screen," Dkt.985:113-114, which in context merely meant a drug test of any kind, Dkt.1111:75-76 (McVey). For similar reasons, Jackson's testimony at the second trial likewise did not prove the falsity of any evidence in the first trial.

44

If defendants had a reasonable basis for arguing that the CPT codes that the insurers' spreadsheets described as "drug screens" represented presumptive rather than definitive tests, they could have provided an expert declaration to that effect, but they did not.  In contrast, government expert McVey both attested that the CPT codes showed that CGH, RGH, and Putnam billed for far more definitive tests than presumptive tests, Dkt.1151-1:5-6, and she specifically confirmed that "[m]ost" of the CPT codes on the claims excerpts on which Tobin was cross-examined, GX.1A(1) and 1B(1), represented definitive drug testing, Dkt.1151-1:4; Dkt.1151-4 (CPT manual listing definitive testing codes).[12]

Furthermore, defendants' apparent assumption that proof that they billed for presumptive rather than definitive tests would exonerate them (Br.50) is incorrect.  Most significantly, defendants ignore Putnam, which had no capacity to perform *any* urine testing before February 10, 2017.  Dkt.745:62 (Byrns).  Nonetheless, defendants had Putnam bill $68.7 million for urine drug testing   prior to that date.  GX.25G(10).  Those claims were manifestly fraudulent.  Likewise, defendants submitted fraudulent claims by using a hospital's credentials to bill for urine specimens that the independent labs sent the hospitals solely to be accessioned (*i.e.*, prepared for billing), after which they were sent back to the labs for testing; in that scenario, regardless of the CPT code

---

[12]    Defendants' argument (Br.50-54) that government experts Waller and Parks provided false testimony at the first trial depends entirely on their inaccurate claims about the significance of Tobin's and Jackson's testimony and therefore fails for the same reasons.

used, defendants falsely represented that the hospital performed tests that it had not. *See supra* p. 9.

Defendants' reliance (Br.53) on McVey's sentencing testimony is unavailing. Defendants' five substantive fraud convictions were partly based on their using CGH's credentials to submit a claim using CPT codes for definitive tests, even though CGH could not perform definitive testing. GX.2-5, 6. Defendants had McVey examine the underlying lab results associated with Counts 2, 5, and 6, which showed that presumptive tests were performed, but defendants billed them as definitive tests. Dkt.1111:64-75; Dkt.1090-1. That testimony is incriminating, not exculpatory. It proves that defendants used CGH's credentials to seek reimbursement for expensive definitive tests that the hospital did not perform, *i.e.*, the core of the charged fraud.

Finally, the court did not err in ruling without an evidentiary hearing. Because "the record contained all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial," *United States v. Scrushy*, 721 F.3d 1288, 1305 n.30 (11th Cir. 2013), a hearing was unnecessary.

## IV. The District Court Did Not Abuse Its Discretion in Declining to Further Investigate the Claim of Juror Exposure to Extrinsic Information.

Contrary to defendants' claim (Br.31-36), the district court did not abuse its discretion in declining to further investigate the claim that the jury was exposed to extrinsic information from the internet. The court's finding that defense counsel violated the court's order and a local rule regarding the scope of juror interviews was

46

not clearly erroneous, and therefore the court appropriately excluded the evidence underlying defendants' claim.

### A.    Background

A local district court rule prohibits parties and their counsel from communicating with a juror except as permitted by the court.  M.D. Fla. L.R. 5.02(d).  After the jury returned mixed verdicts, all the trial defendants faced possible retrial, including the Perezes.  Two days post-trial, Fletcher's counsel moved for permission to speak with the jurors "to learn more about his own case, the strengths and weaknesses of his arguments and styles, and the effectiveness of how his case was presented."  Dkt.777:1; *see* Dkt.879:2-4.  The motion stated its purpose was "not to challenge the validity of the verdicts against Jorge Perez and Ricardo Perez" or "fish[] for evidence of misconduct."  Dkt.777:1, 4 (emphasis omitted).

The next day, a juror contacted the government, and two prosecutors talked with him on the mistaken belief that the juror's outreach made the conversation permissible.  Dkt.854:25-26, 29-30.  The government informed the court the contact had occurred the same day.  Dkt.879:4-5; Dkt.792-1.

After a hearing, the court, *inter alia*, granted Fletcher's motion to communicate with the jurors as applied to all defendants.  Dkt.879:6.  At the same time, the court "identified specific limitations on any communications with jurors and stated at length the scope of permissible and impermissible contact."  Dkt.879:7.

The court specified:

> I think the purpose of the interview or the discussion would be to find out what their impressions were, what they thought was important or not important or what they would have liked to have seen for themselves or not seen, but … *it's not designed to investigate deliberations or to create a basis for post-trial motions or anything like that.*

Dkt.854:35-36 (emphasis added). The court reiterated similar parameters at various points, *e.g.*, Dkt.854:36, emphasizing that, "if I get any wind that it's being abused or that these folks are being put to any task or investigated or anything like that, I'm not going to like it one bit," Dkt.854:43.

The court concluded by stating that it would "issue a brief order that says for the reasons stated on the record, the motions are ruled on as I ruled on them." Dkt.854:51. It further ordered that "[t]he transcript of the hearing today … will be the record of my rulings and why." Dkt.854:51.

The court then issued a written order that expressly "incorporated" the hearing record. Dkt.800:1. It again specified that "[d]efense counsel may communicate with a juror about his or her individual impressions of the proceedings and the evidence" but "may *not* speak with any juror about the jury's deliberation process or internal discussions." Dkt.800:2; Dkt.804:2.

Thereafter, the Perezes filed a motion seeking an evidentiary hearing on juror misconduct, claiming, *inter alia*, that the interviews revealed that some jurors were exposed to extraneous information from the internet. Dkt.824:1-6. A supporting affidavit signed by Jorge's counsel and Ricardo's counsel stated:

48

During the interview of Juror 10, someone asked the juror something to the effect of whether he/she had done any outside research on the case or any of the defendants.  Juror number 10 said no.  Juror 10 was then asked if he/she was aware of any other members of the jury who had done outside research during the case.  Juror number 10 stated, in sum, at one point during the case he/she walked in a room and overheard two other jurors talking.  One juror told the other, his wife had googled Jorge Perez and learned he had been affiliated with 16 or 17 hospitals.  The two other jurors stopped talking about it soon after Juror number 10 entered the room.

Dkt.842:10.

The affidavit also stated that, when Juror 29 was interviewed following "the same" "protocol," that juror "denied having done any outside research," but "volunteered that during deliberations one of the other jurors stated that Jorge Perez was connected to multiple other hospitals (16 or 17)."  Dkt.842:10-11; *see* Dkt.857:52 (Jorge's counsel: all nine interviewed jurors were "asked questions relative to extrinsic conduct").

The court scheduled a hearing to explore its concern that "defense counsel procured the jurors' statements in violation of Local Rule 5.02 and the Court's Order." Dkt.879:11-12.  At the hearing, Jorge's counsel "admitted there was conflict among defense counsel about whether the questions were permissible at all."  Dkt.879:12.  He stated that "there was some internal dispute about the scope of the Court's order, as to whether this was a permissible line of inquiry" and "rather than seek guidance from the Court, I opted to elect that it was reasonably permitted by the Court's order."

Dkt.857:18; *see also* Dkt.857:20, 52 (agreeing that some defense lawyers believed the questions "went beyond what [the court] was envisioning").

Jorge's counsel also stated that other counsel approached the questioning as the Court "outlined" but, as to the Perezes' counsel, "whether we went beyond the scope of that, because we felt as an obligation to our client that this was just an opportunity that—that—that we felt we had to explore, I will accept responsibility of that, in terms of doing what I think was necessary for my client under the circumstances." Dkt.857:20.

In response to the court's inquiry as to why counsel did not consult with the court about any purported ambiguity, Jorge's counsel responded, "I should have, Judge. But now we're here." Dkt.857:20-21. In addition, "neither counsel refuted that it was previously represented to the Court that the juror interviews would not be used to create bases for new trials." Dkt.879:14.

After supplemental briefing, Dkt.864-865, the district court issued a lengthy written order finding that defense counsel "violated Local Rule 5.02(d) and the Court's Order." Dkt.879:18-19.[13] The court explained that the questions about whether jurors performed outside research were "inherently … designed to elicit evidence of juror misconduct, which exceeds the scope of the Court's Order," and that the follow-up

---

[13] At the outset, the court noted that "the jurors' alleged statements did not seem overly concerning or prejudicial given that multiple references were made throughout trial to Jorge Perez's involvement in other hospitals." Dkt.879:10 (citing record); *see* Dkt.1198:11-12.

question about what research other jurors performed additionally "invaded the internal communications of the jury—as there is no other way a juror would know what research another juror did—which the Court expressly forbade." Dkt.879:20. The court therefore excluded the juror statements and, "absent admissible allegations of juror misconduct," denied the Perezes' motion for further investigation. Dkt.879:22-23.

### B.     Standard of Review

"A district court has broad discretion in deciding whether to interrogate jurors regarding alleged misconduct." *United States v. Ifediba*, 46 F.4th 1225, 1238 (11th Cir. 2022) (quotation marks omitted). Whether defense counsel violated a district court's rule prohibiting juror contact is a factual finding reviewed only for clear error. *United States v. Cavallo*, 790 F.3d 1202, 1227 (11th Cir. 2015).

### C.     The district court did not clearly err in finding that defense counsel violated its order and the local rule.

Because courts presume that the jury has been impartial, "[a] defendant who alleges denial of [the right to an impartial jury] resulting from juror exposure to extraneous information has the burden of making a colorable showing that the exposure has, in fact, occurred." *United States v. Siegelman*, 640 F.3d 1159, 1182 (11th Cir. 2011). If the defendant satisfies that burden, prejudice is presumed, and the government must show that the jurors' consideration of extrinsic evidence "was harmless to the defendant." *Remmer v. United States*, 347 U.S. 227, 229 (1954). Here, the district court did not clearly err in finding that defense counsel violated its order regarding juror

contact, and it therefore permissibly excluded the evidence derived from the violation. *See Cavallo*, 790 F.3d at 1228; *United States v. Venske*, 296 F.3d 1284, 1291-92 (11th Cir. 2002); *see generally* Fed. R. Evid. 606(b). In the absence of the juror statements, no evidence of the jury's potential exposure to extraneous material existed, and therefore the district court did not abuse its discretion in declining any further investigation.

Rules regulating contact with jurors and requiring prior court approval advance the "strong interest in protecting jurors from threats and needless harassment from unsuccessful parties" and "preserving the finality of the jury's verdict." *Venske*, 296 F.3d at 1291-92; *see Cavallo*, 790 F.3d at 1228. Accordingly, this Court has long held that "district courts have the power to make rules and issue orders prohibiting attorneys and parties from contacting jurors, whether directly or indirectly, absent prior court approval." *Venske*, 296 F.3d at 1291; *see Pena-Rodriguez v. Colorado*, 580 U.S. 206, 226 (2017) ("[t]he practical mechanics of acquiring and presenting" juror statements to impeach a verdict "will no doubt be shaped and guided" by "local court rules" that "often limit counsel's post-trial contact with jurors"). This Court has repeatedly held that a court may enforce such rules "by excluding the evidence wrongfully obtained." *Venske*, 296 F.3d at 1291; *see Cavallo*, 790 F.3d at 1228; *see also Tanner v. United States*, 483 U.S. 107, 126 (1987) (district court would have acted within its discretion in disregarding juror affidavit alleging juror misconduct because affidavit was obtained in violation of court order and local rule prohibiting juror interviews).

52

A local court rule prohibited contact with jurors without court approval. M.D. Fla. L.R. 5.02(d). Although the district court allowed defense counsel to contact the jurors, the rule required counsel to "abide" by the limits the court placed on the "scope" of the interviews. *Id.* 5.02(d)(3)(C).

The district court here did not clearly err in finding that defense counsel exceeded the scope of the authorized contact, particularly given that this Court "accord[s] substantial deference" to a judge's interpretation of "alleged ambiguities" in his own order. *Stansell v. Revolutionary Armed Forces of Colombia*, 120 F.4th 754, 766 (11th Cir. 2024) (quotation marks omitted). As the district court explained, it "authorized juror contact" only "after receiving assurance that the communication would not be used to challenge the validity of the verdicts nor fish for misconduct," and the court repeatedly emphasized that limitation at the hearing authorizing the juror contact. Dkt.879:19. Moreover, the written order, which specifically incorporated the hearing record, expressly "allowed communication only about the juror's 'individual impressions of the proceedings and the evidence'" and "forbade communication 'about the jury's deliberation process or internal discussions.'" Dkt.879:19.

Under those circumstances, the district court did not clearly err in finding that the question asking whether a juror personally performed outside research "was not a question about the jurors' 'individual impressions of the proceedings and the evidence'" but instead was "designed to elicit evidence of juror misconduct, which exceeds the scope of the Court's Order." Dkt.879:20. Likewise, the district court did not clearly

53

err in finding that asking each juror whether *other* jurors had engaged in outside research, which triggered the statements at issue, inherently sought information about the jurors' "internal communications." Dkt.879:20. Furthermore, defendants are ill-placed to contend that the district court clearly erred in finding a violation when some defense counsel even at the time of the interviews believed that the questions would violate the court's order, but the inquiry was pursued anyway without first consulting the court. As the Perezes' counsel admitted, while other defense counsel adhered to what the court had "outlined," they consciously decided to take advantage of the "opportunity" presented. Dkt.857:20.

In asserting that they did not violate the district court's order, defendants narrowly argue only that they did not violate the court's "written order," which they claim "supersedes" any oral statements made at the hearing. Br.35-36. Even assuming that the written order would control in some circumstances, that argument fails on multiple fronts.

First, the written order expressly incorporated the hearing record, Dkt.800:1, which in turn specified that the hearing transcript represented "the record of [the court's] rulings and why," Dkt.854:51. Accordingly, the written order itself included all the court's statements and surrounding context from the hearing. Because defendants offer no argument that their conduct complied with the court's directives as stated at the hearing, this Court can affirm the district court's finding of a violation on that basis

54

alone, given that any contrary claim is waived and may not be raised in a reply brief. *See United States v. Levy*, 379 F.3d 1241, 1242-44 (11th Cir. 2004).

Second, even setting aside the hearing transcript, the district court did not clearly err in finding defendants violated its written order by asking whether other jurors performed outside research, "as there is no other way a juror would know what research another juror did" except by revealing "internal communications," which the written order prohibited. Dkt.879:20. That the order did not expressly prohibit "seeking evidence of 'extraneous influences,'" Br.36, is therefore irrelevant because what the order did expressly proscribe encompassed the question that directly precipitated the juror statements at issue.

Because the district court did not clearly err in finding defense counsel violated its order, it permissibly excluded the juror statements, leaving no basis for further investigation. *See Cavallo*, 790 F.3d at 1228; *Venske*, 296 F.3d at 1291-92. That the government had earlier suggested further investigation as an option, in part so that the court could alternatively reject defendants' claim based on a finding of no prejudice, Dkt.864:4-5, does not demonstrate the court clearly erred in exercising its wide discretion to interpret its own order on the existing record. That is particularly true given, as the court observed, "unnecessarily questioning the jurors goes against the

strong policy interests in protecting jurors and the judicial process identified in *Venske* and *Cavallo.*"  Dkt.879:22.[14]

## CONCLUSION

For the foregoing reasons, this Court should affirm defendants' convictions.

Respectfully submitted,

| | |
|---|---|
| GREGORY W. KEHOE | MATTHEW R. GALEOTTI |
| United States Attorney | Acting Assistant Attorney General |
| | |
| ANDREW TYSEN DUVA | /s/  Sangita K. Rao |
| Assistant United States Attorney | SANGITA K. RAO |
| Middle District of Florida | Attorney, Appellate Section, |
| | Criminal Division |
| GARY A. WINTERS | U.S. Department of Justice |
| Deputy Chief, Fraud Section | 950 Pennsylvania Ave., N.W., Rm. 1248 |
| | Washington, D.C. 20530 |
| JAMES V. HAYES | (202) 305-3607 |
| Trial Attorney, Fraud Section | Sangita.Rao@usdoj.gov |
| Criminal Division | |
| U.S. Department of Justice | |

---

[14]  In a footnote, defendants argue that, *if* this matter is remanded on the extraneous influence allegation, the Court should allow inquiry into a juror's comment to prosecutors that two jurors were *unwilling* to convict certain codefendants because of their race.  Br.34 n.7.  That claim is doubly waived.  First, in the district court, defendants filed a pro se motion raising this issue, after their initial defense attorneys "squarely refused," Dkt.886:1, but then, after obtaining new counsel, withdrew the motion, Dkt.918-919, thereby demonstrating a knowing relinquishment.  *See United States v. Olano*, 507 U.S. 725, 733 (1993).  Second, defendants again waived this claim by raising it only perfunctorily in a footnote in their opening brief.  *See Associacion de Empleados del Area Canalera v. Panama Canal Comm'n*, 453 F.3d 1309, 1316 n.7 (11th Cir. 2006).

## CERTIFICATE OF COMPLIANCE AND SERVICE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Garamond 14-point font.

3.      On August 25, 2025, this brief was uploaded to the Court's website using the CM/ECF system, which automatically sends notification to the parties and counsel of record.

s/ Sangita K. Rao
SANGITA K. RAO
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave., NW, Rm. 1248
Washington, DC 20530
TEL 202.305.3607/FAX 202.305.2121
sangita.rao@usdoj.gov