IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**APPEALS No. 24-13762-D and 24-13807-D**

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**
**v.**

**JORGE PEREZ and RICARDO PEREZ,**
**Defendants-Appellants.**

---

On Appeal from the United States District Court
For the Middle District of Florida
District Court No. 3-20-cr-00086-TJC-SJH-1

---

**APPELLANTS' REPLY BRIEFS**

---

THIS IS A DIRECT APPEAL FROM A FINAL JUDGMENT IN A CRIMINAL
CASE PURSUANT TO 28 U.S.C. §1291

---

DONALD F. SAMUEL
GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Ph: (404) 262-2225
Fax: (404) 365-5041

RONALD D. MARNEY II
MARNEY LAW, L.L.C.
920 W. 47th Street
Kansas City, Missouri 64112
Ph: (816) 221-6464
Fax: (816) 896-0633

ATTORNEYS FOR APPELLANTS
JORGE PEREZ AND RICARDO PEREZ

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,    )
                             )
    Plaintiff -Appellee,     )
                             )
    v.                       )         Appeal No. 24-13762-D
                             )
JORGE PEREZ,                 )         Appeal No. 24-13807-D
and                          )
RICARDO PEREZ               )
                             )
    Defendants-Appellants.   )

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 26.1-1, the undersigned Attorney for Appellant hereby certifies that the following is a list of persons and entities who may have an interest in the outcome of this case:

1. Michael A. Abel; Attorney for Movant Blue Cross Blue Shield of Florida, Inc., and for Movant Blue Shield of Georgia, Inc.

2. Aetna, Inc; Movant

3. Aaron Alonzo; Defendant

4. Thomas M. Bell; Attorney for Defendant Jorge Perez

5. Mark T. Blake; Interested Party

6. Anita M. Cream; Attorney for Plaintiff U.S.A.

7. Blue Cross Blue Shield of Florida, Inc.; Movant

8. Blue Cross Blue Shield of Georgia, Inc.; Movant

i

9.    Andrew Michael Bonderud; Attorney for Defendant Neisha Zaffuto

10.   Jared Joseph Burns; Attorney for Movant Blue Cross Blue Shield of Florida, Inc.

11.   Vincent Albert Citro; Attorney for Defendant Christian Fletcher

12.   Aaron Durall, Defendant

13.   Andrew Tysen Duva; Attorney for Plaintiff U.S.A.

14.   Robert J. Fogarty; Attorney for Movant Aetna, Inc.

15.   Irene Bassel Frick; Attorney for Movant United HealthCare, Inc.

16.   Darcy D. Galnor; Attorney for Defendant Neisha Zaffuto

17.   Seth Guterman; Defendant

18.   David L. Haas; Attorney for Defendant Neisha Zaffuto

19.   Jennifer Michele Harrington; Attorney for Plaintiff U.S.A.

20.   James V. Hayes; Attorney for Plaintiff U.S.A.

21.   Brendan I. Herbert; Attorney for Defendant Aaron Durall

22.   Arturo V. Hernandez; Attorney for Defendant Ricardo Perez

23.   Philip Robert Horowitz; Attorney for Defendant Nester Rojas

24.   Lindy Kathryn Keown; Attorney for Defendant Aaron Durall

25.   Richard Christian Komando; Attorney for Defendant Jorge Perez

26.   Richard J Landes; Attorney for Defendant Ricardo Perez

27.   Joshua Sabert Lowther; Attorney for Defendant Neisha Zaffuto

28.    Eugene Sean Medina; Attorney for Movant Aetna, Inc.

29.    Mario O. Marin; Attorney for Movant United HealthCare, Inc.

30.    Ronald D. Marney, II; Attorney for Defendant Jorge and Ricardo Perez

31.    Brian F. McEvoy; Attorney for Defendant Aaron Durall

32.    James A. Muench; Attorney for Plaintiff U.S.A.

33.    Carmen M. Ortega-Rivero; Attorney for Movant United HealthCare, Inc.

34.    Jorge Perez, Defendant

35.    Ricardo Perez; Defendant

36.    Gera R. Peoples; Attorney for Movant United HealthCare, Inc.

37.    James F. Porter, Jr.; Defendant

38.    Sean Porter, Defendant

39.    Putnam General Hospital, Victim

40.    Brian T. Rafferty; Attorney for Defendant Aaron Durall

41.    RightCHOICE Managed Care, Inc.; Movant

42.    Victor E. Rocha; Attorney for Defendant Neisha Zaffuto

43.    John Rockwell; Attorney for Defendant Ricardo Perez

44.    Nestor Rojas; Defendant, Pro Se

45.    Caleb D. Rowland; Attorney for Defendant Sean Porter

46.    Steven H. Sadow; Attorney for Defendant Christian Fletcher

47.    Donald Franklin Samuel; Attorney for Defendant Jorge Perez and Aaron Durall

48.    Seth Schwartz; Attorney for Defendant James F. Porter, Jr.

49.    Frank Martin Smith; Attorney for Defendant Jorge Perez

50.    Andrew Joshua Steif, Attorney for Movant Blue Cross Blue Shield of Florida, Inc.

51.    Ferdose al-Taie; Attorney for Movant United HealthCare, Inc.

52.    Albert Joseph Tasker, IV; Attorney for Defendant James F. Porter, Jr.

53.    Mai Tran; Attorney for Plaintiff U.S.A.

54.    United HealthCare, Inc., Movant

55.    U.S.A., Plaintiff

56.    Adam Walters; Interested Party

57.    Lee Dilly Wedekind, III; Attorney for Movant Blue Shield of Georgia, Inc., and for Movant RightCHOICE Managed Care, Inc.

58.    Gary A. Winters; Attorney for Plaintiff U.S.A.

59.    Chantel Christine Wonder; Attorney for Interested Party Adam Walters

60.    Neisha Zaffuto; Defendant

61.    Grace W. Zoller; Attorney for Defendant Aaron Durall

iv

This, the 14th day of November, 2025.

MARNEY LAW, L.L.C.

/S/ Ronald D. Marney II

RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Fax: (816) 896-0633
Email: marneyron2@gmail.com

## TABLE OF CONTENTS

| Section | Page |
| --- | --- |
| Certificate of Interested Persons | i |
| Table of Contents | vi |
| Table of Authorities | vii |
| Argument | 1 |
| Conclusion | 26 |
| Certificate of Compliance | 28 |
| Certificate of Service | 29 |

## TABLE OF AUTHORITY

**Cases**

*Brown v. United States*, 720 F.3d 1316, 1317 (11th Cir.2013) ...............................14

*Carlson v. FedEx Ground Package Systems, Inc.*, 787 F.3d 1313, 1319-20 (11th Cir.2015).................................................................................................................9

*Dunn v. United States,* 442 U.S. 100, 112 (1979) ........................................................6

*Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir.2008).......................12

*Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1120-1 (11th Cir.2011) ...........................................................................................................................8

*Mattox v. United States*, 146 U.S. 140, 149-150 (1892)...........................................16

*Remmer v. United States,* 347 U.S. 227 (1954) .........................................................17

*Turner v. Louisiana,* 379 U.S. 466 (1965)................................................................17

*United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir.2011)...........................21

*United States v. Browne*, 834 F.3d 403, 410-11 (3d Cir.2016) ................................21

*United States v. Bueno-Sierra*, 99 F.3d 375, 379 & n.10 (11th Cir.1996) ..............21

*United States v. Caldwell*, 776 F.2d 989 (11th Cir.1985).........................................16

*United States v. Cavallo*, 790 F.3d 1202, 1226-1229 (11th Cir.2015).....................14

*United States v. Chalker*, 966 F.3d 1177, 1185-6 (11th Cir.2020)...........................10

*United States v. Cuthel*, 903 F.2d 1381 (11th Cir.1990) ..........................................16

*United States v. Johnson*, 937 F.2d 392, 397 (8th Cir.1991)....................................10

*United States v. Khanani,* 502 F.3d 1281, 1291 (11th Cir.2007) .............................17

*United States v. Kimble*, 54 F.4th 538, 545 (8th Cir.2022) ......................................21

*United States v. Martinez,* 14 F.3d 543 (11th Cir.1994)...........................................17

*United States v. Orisnord*, 483 F.3d 1169, 1179-1181 (11th Cir.2027).................14

*United States v. Palin*, 874 F.3d 418, 421, 425 (4th Cir.2019) ...............................10

*United States v. Pessefall,* 27 F.3d 511 (11th Cir.1994)...........................................17

*United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) .............................................5

*United States v. Pirro*, 212 F.3d 86, 93 (2d Cir.2000) ..............................................5

*United States v. Tobin*, 676 F.3d 1264, 1296 (11th Cir.2012)..................................17

*United States v. Whiteside*, 285 F.3d 1345, 1351-2 (11th Cir.2002)........................13

**ARGUMENT**

**I.  INSUFFICIENT EVIDENCE OF DEFENDANTS' GUILT**

The government's brief is replete with inaccurate and misleading statements of asserted fact. So extensive are these false statements that responding to them all would exceed the word limitation in FRAP 32.1(a)(7)(B)(ii). These are some egregious examples: (a) describing several original defendants as coconspirators though they were acquitted in the second trial (*passim*); (b) falsely asserting that "Jorge Perez assumed control over three rural hospitals" (Govt.Br. p. 3) when he (*i*) purchased and controlled only RGH, (*ii*) was employed by the company that owned CGH and was its interim CEO for less than two months, and (*iii*) had no ownership of or control over Putnam at all; (c) mentioning Seth Guterman as a coconspirator (p. 7) who neither appeared at trial nor was convicted of any offense; and (d) suggesting that "the conspirators also paid kickbacks" (pp. 8, 34-5) when these defendants were never charged with that and no such evidence was adduced.

It argues the evidence of guilt was overwhelming, apparently hoping that Appellants' grounds for acquittal or for new trial will seem less persuasive. However, the trial court's view collides with that argument. From his vantage point on the bench in the courtroom, and after presiding over both trials, the judge observed at the sentencing hearing:

> I also want it to be said that this case was more nuanced and less black and white than the government's sentencing argument admits. And

1

there's a lot of reasons for this, in my view, but I think it's demonstrated by the fact that the first jury in the case was hung on some counts against the Perezes and all counts against the other defendants, and the jury in the second trial, hearing essentially the same evidence, found all the defendants not guilty. If I were to take an educated guess, that result might at least be in part attributable to the conundrum of whether the defendants exploited a legal loophole or committed a crime. (Dkt.1113:5-6).

From the time of indictment to the present, the government has _never_ cited any statute, rule, regulation, court decision, or other legal authority declaring Appellants' conduct illegal or improper or inherently wrong. In both trials, it endeavored to hide the inescapable fact that none exist. It was forced to abandon some theories and to push others hoping that something would stick. The government has not argued that, given the absence of statutory or other legal guidance, guardrails or barriers, relying on the Medicare Claims Processing Manual, Ch. 16, §40.1 (Dkt.809, #5, Exh.23, p.13) was objectively unreasonable. Instead, it suggests that CMS guidelines do not apply to private insurers, even though using the electronic CMS Form UB-04/837i for billing is mandatory among them all and its own expert (Dr. Kongstvedt) testified the health care industry "typically default[s] to the CMS guidelines" (Dkt.746:96, 746:134). *Nullum crimen sine lege*.

Fraud requires a false or deceptive statement, so the theories it advanced are insufficient and unproven:

1. It is not fraudulent nor a crime for a rural hospital to perform testing it is

2

equipped to do on urine specimens provided to it, and to refer out part of the same specimen to an independent lab for the sophisticated testing. Contrary to the government's argument (Gov. Br., pages 5-6), the patient's urine specimen *is* his/her "connection" with the rural hospital (*see* fn. 1 *infra*). This same arrangement is commonly followed throughout the health care field when hospitals send specimens to Labcorp or Quest or other independent reference labs, according to government witness Gayle Pickens, CEO of Putnam (Dkt.744:23).

2. It is not fraudulent nor a crime for a hospital to bill for *all* the testing that a reference lab performs in accordance with CMS Manual, §40.1, as Pickens also admitted (Dkt.744:23). The notion that "you only bill for what you do" (Gov't Br. pages 15, 28) is not literally correct in all situations.

3. It is not fraudulent nor a crime for a Critical Access Hospital to launch an outreach program to expand the number of physicians and "sober homes" who supply urine samples for testing, and thereby generate revenue in order to stay open and build up its own lab.

4. It is not fraudulent nor a crime for a hospital to use its own NPI and tax ID numbers when submitting a claim (Gov't Br. pages 15-16), and not to identify the reference lab on the UB-04/837i – the very practice Pickens described (Dkt.744:27-38) – because CMS *requires* the UB-04 be completed exactly that way. Chapter 25, §70.1 of the Medicare Claims Processing Manual (available at

CMS.gov, Chapter 25) first notes that the UB-04 and Form CMS-1450 are identical and that it is "a uniform institutional provider bill suitable for use in billing multiple third party payers." Sec. 75 reads, "This section contains Medicare requirements for use of codes maintained by the NUBC that are needed in completion of the Form CMS-1450." All four insurers in this case accepted the UB-04/837i form for billing. The Manual then directs (in Ch. 25, §75) that the identity of the "Billing Provider" – *i.e.,* the hospital – must be listed on Line 1 (FL01) of that form. Ch. 25, §75 also requires that Line 56 (FL56) on the UB-04 shall contain the "National Provider Identifier (NPI) – *Billing Provider.*" There are 81 boxes on the UB-04; not one allows or requires the name of a reference lab. *See* sample UB-04 Form at 6/27/22 Dkt.809-#3. In other words, regardless of any contrary trial testimony from government witnesses who evidently were unfamiliar with Ch. 25 of the Claims Processing Manual, that form does not ask *where* or *by whom* the testing was done; it only asks, in two separate places, *who* is billing for the tests (Dkt.741:239-240). Using the NPI and tax ID of some other person or entity on this form *would* be a false statement and contrary to the Manual.

5. It is not fraudulent nor a crime for a hospital to place "141" in the box beneath Line 4 "Type of Bill." (Gov't Br. page 16). Ch. 25, §75 requires that the "Type of Bill" be listed on Line 4 (FL04). Where the specimen was given by a non-patient, *only* the code "141" could have been used because the urine specimen

4

did not come from an inpatient or an outpatient (Dkt.684:100-101; Dkt.819, #306, GExh. 57[1]). But the "Type of Bill" field does not signify where the <u>testing</u> was done, only where the <u>patient</u> was. To use code "111" (for inpatient) or "131" (for outpatient) *would* have been false and inaccurate.

6. It is not fraudulent nor a crime to submit a UB-04/837i form that omits mention of the place(s) where the urine testing was performed. (Gov't Br. pages 25-27). Of the 81 boxes or lines on that form, Ch. 25, §75 specifies none where the biller must indicate "Place of Service," "Service Provider Name," "Rendering Provider" or "Performing Provider" – headings that appeared on one or more of the various spreadsheets because they were added later by the clearinghouses or the insurance companies. "Only the omission of facts required to be reported constitutes a material falsehood." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir.2000).

7. It is not fraudulent nor a crime that a business model "makes no sense" (Gov't Br. page 13) to a government expert (Dkt.746:82-88) – a model by which a patient's specimen is sent by his physician first to an independent lab, which then splits the specimen and sends part to a rural hospital where a screening test is performed. If the screen is positive, the hospital then notifies the independent lab to

---

[1] This is the CMS Manual System Pub. 100-04, Medicare Claims Processing, p. 9, which states: "A non-patient is defined as a beneficiary that is neither an inpatient nor an outpatient of a hospital but *that has a specimen that is submitted for analysis to a hospital* and the beneficiary is not physically present at the hospital."

perform a confirmation test on the retained sample. This method is governed by a written agreement between the hospital and lab. Regardless of the specific route taken by the specimen, the hospital screens it and the reference lab performs a confirmation, and it is properly billed.

"[F]undamental principles of due process ... mandate that no individual be forced to speculate, at the peril of indictment, whether his conduct is prohibited.... Thus, ... courts must decline to impose punishment for actions that are not 'plainly and unmistakably' proscribed." *Dunn v. United States,* 442 U.S. 100, 112 (1979). Here, no legal authority prohibits or addresses the propriety of that business model. Nothing in CMS guidelines specifies the manner or method by which urine samples are to be furnished to the hospital labs. The government tied this theory exclusively to the insurance contracts (Dkt.766:162-178, 188-190), but nothing in those contracts delineates how or when or by what route a specimen is to be submitted to a hospital lab for analysis.

Here, all but one of the contracts at issue that the government offered into evidence are silent on this subject.[2] More importantly, all six of the relevant contracts in evidence contain a provision that allows the hospitals to act as "independent contractors" and beyond the control of the insurance company. The

---

[2] Only the contract between Aetna and RGH (Dkt.817, #8, Exh.1DD) addressed this issue: "Reference laboratory services are not eligible for payment." Aetna denied claims from RGH involving reference labs; see ¶10 below. However, Aetna paid claims for reference lab services submitted by CGH and Putnam according to their contracts.

Aetna-CGH contract (Dkt.817, #7, Exh.1CC, p. 16 of 59) reads:

> 7.1 <u>Independent Contractor Status</u>. The relationship between Company and Hospital, as well as their respective employees and agents, is that of independent contractors … *Company and Hospital will each be solely liable for its own activities and those of its agents and employees, and neither Company nor Hospital will be liable in any way for the activities of the other Party or the other Party's agents or employees arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement….*

The Aetna-Putnam contract (Dkt.817, #11, Exh.1GG, p. 9 of 22) states:

> 9.1 <u>Independent Contractor Status</u>. The relationship between Company and Hospital, as well as their respective employees and agents, is that of independent contractors.… *Company and Hospital will each be solely liable for its own activities and those of its agents and employees, and neither Company nor Hospital will be liable for the activities of the other Party or the other Party's agents or employees, including, without limitation, any liabilities, losses, damages, injunctions, suits, actions, fines, penalties, claims or demands of any kind or nature by or on behalf of any person, party or governmental authority, arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement….*

The UHC-Putnam contract (Dkt.817, #6, Exh.1BB, p. 3 of 16) states:

> 3.5 **Health Care**. Facility acknowledges that *this Agreement and Customer Benefit Plans do not dictate the health care provided by Facility, or govern Facility's determination of what care to provide its patients, even if those patients are Customers. The decision regarding what care is to be provided remains with Facility and with Customers and their physicians, and not with United or any Payer.*

The RightCHOICE-Putnam contract (Dkt.817, #18, Exh.1LL, p. 4) reads:

> 2.3 <u>Control of Care</u>. *Nothing in this Agreement interferes, or is to be construed to interfere, with Hospital's control of care and the delivery*

7

*of services related to and supporting the treatment and medical care provided to a Covered Person*, and the nature and scope of Hospital Services provide by Hospital from time to time to its patients, including Covered Persons. *Hospital is solely responsible for the treatment and care provided to a Covered Person and the delivery of services related to and supporting the treatment and medical care provided to a Covered Person.*

The Blue Cross and Blue Shield of Florida-CGH contract (Dkt.817, #13, Exh.1II, p. 3) states:

3.1 BLUE CROSS AND BLUE SHIELD and HOSPITAL are independent entities. Nothing in this Agreement shall be construed or be deemed to create a relationship other than that of *independent parties contracting with each other solely for the purpose of carrying out the provisions of this Agreement.*

Part 3.1 of the Blue Cross and Blue Shield of Florida-RGH contract (Dkt.817, #15, Exh.1JJ, p. 3) is identical to part 3.1 of the BCBS-CGH language.

The relevant contracts in evidence do not "plainly and unmistakably" prohibit the conduct of the Appellants; instead the evidence actually *precludes* a conviction for fraud on the government's theory. Whether these hospitals were independent contractors is not at issue; all agreed they were. An independent contractor is "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1120-1 (11th Cir.2011) (quoting Restatement (Second) of Agency §2(3) (1958)). An independent contractor is

8

"merely subject to the control or direction of the owner as to the *result* to be obtained," but not as to "the *means* to be employed." *Carlson v. FedEx Ground Package Systems, Inc.,* 787 F.3d 1313, 1319-20 (11th Cir.2015) (applying Florida law) (emphasis added). The hospitals here were free to select the methods and details by which the agreed-upon goal would be accomplished, including choosing the routing of the specimens.

8. It is not fraudulent nor a crime to deviate from "industry standards" that were mentioned by government experts (Gov't Br. 13-14). Those lack the force of law and are subject to disagreement. *Contrast* Kongstvedt (Dkt.746:82-89) with Arrigo (Dkt.749:44-53) as to whether the defendants' business model met industry standards. What infallible source must Appellants have located and consulted to ascertain definitively what those standards declare?

9. It is not fraudulent nor a crime for the hospital to rely on the statements of treating physicians that the tests they ordered are "medically necessary." (Gov't Br. 13-14). The co-branded requisition forms submitted by those physicians here contain that explicit statement (*see, e.g.*, Dkt.809, #10, Fletcher Exh. 33; Dkt.819, #322, #323, #324, #325, GExh. 67N in four parts). The physician's statement in Fletcher Exh. 33 reads: "I understand and acknowledge that I am ordering tests that I believe are medically necessary for my patients to monitor their drug compliance." The statement in GExh. 67N reads: "Urine drug testing is medically

9

necessary for diagnostic, clinical and therapeutic purposes, to detect the use of prescription medications and illegal substances." The billing statements were merely conduits.

Even without such language, a physician's signature on a requisition form by itself should be viewed as a representation of medical necessity. The hospital and reference labs made no representations in their separate capacity. Merely submitting claims to the insurers cannot reasonably be considered as their own distinct endorsements, approval or acceptance of the doctor's declarations, nor warrant a reasonable inference to that effect. *United States v. Johnson*, 937 F.2d 392, 397 (8th Cir.1991). Consistent with that is the 1998 DHHS Office of Inspector General's Compliance Program Guidance: "We recognize that laboratories do not and cannot treat patients or make medical necessity determinations." 63 F.R. 45076.

The government's cases are readily distinguishable. In *United States v. Chalker*, 966 F.3d 1177, 1185-6 (11th Cir.2020), a pharmacy "filled medically unnecessary prescriptions for patients who neither wanted nor needed them" and submitted reimbursement claims "for a very surprising mix of drugs" in large quantities at prohibitively high prices. The pharmacy *itself* represented the prescriptions were medically necessary. In *United States v. Palin*, 874 F.3d 418, 421, 425 (4th Cir.2019), the defendants *themselves* represented that the drug

testing was medically necessary: "Although referring doctors ordered their patients to undergo drug tests, the doctors did not specify the type of test. Palin and Webb made that decision... Palin and Webb knew the second tests – the sophisticated tests – were not medically necessary but ordered them anyway. Palin and Webb (not the referring doctors) decided that the insured patients would receive both the basic and the sophisticated tests while uninsured patients would receive only the basic test." Here, the government does not dispute that doctors (or nurse practitioners) ordered all tests.

10. It is not fraudulent nor a crime to submit claims that insurers determine are not covered and refuse to pay. Thousands of such claims are submitted and rejected each day. Moreover, there was no evidence showing the number of specimens that were tested but never billed. There was no evidence that the hospitals billed for samples that were not tested and had to be destroyed. On the contrary, there was evidence that the insurers refused to pay the full amounts billed. For example, the government introduced a spreadsheet of 4,302 lines of claims data from RGH to Aetna (Dkt.817, GExh.1K), that shows RGH billed $3,580,800 on claims for all services, but Aetna paid only $125,208 (about 3.5%). Of all those claims, RGH billed $1,736,754.25 in toxicology claims but Aetna paid only $65,858.52 (3.79%). The insurers always had the right to deny claims, and did so prolifically.

11

11. It is not fraudulent nor a crime to breach a contract, whether it is clear and specific or ambiguous (Opening Br. pp. 24-32). Yet this ill-conceived prosecution relies predominantly on the private insurance contracts (Govt.Br. pp. 5-6, 7, 10, 20, 28, 30-1, and 39). Accordingly, if that were allowed, the contracts must be free of ambiguity. A contract is ambiguous if it "is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract." *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir.2008). However, "[a]n interpretation is not reasonable if it requires rewriting the contract to add language that a party omitted and in order to impose an obligation on the other party that was not in the original bargain." *John M. Floyd & Assocs., Inc. v. First Fla. Credit Union*, 443 F.App'x 396, 399 (11th Cir.2011).

In addition to the "independent contractor" provisions recognizing the hospitals' right to control the method, manner and route by which each specimen is "submitted for analysis to a hospital," those other contracts (except Aetna-RGH, GExh.1DD) are silent on this subject – a silence that creates ambiguity that can be summed up thus: Does the contract disallow what is not expressly authorized therein? Or does the contract allow what is not expressly prohibited? The government argues the former, but Appellants followed the latter. Their choice was reasonable. Since the insurance companies drafted the contracts, they could have included prohibitory language covering reference labs or the routing of specimens

12

if that was truly intended. But the silence must be construed against them. Even in cases involving government contracts, ambiguity precludes conviction where defendants acted pursuant to reasonable interpretation of uncertain provisions. When a contract is ambiguous, the government bears the burden of proving beyond a reasonable doubt the falsity of the statement as well as the defendant's knowing and willful submission. *United States v. Whiteside*, 285 F.3d 1345, 1351-2 (11th Cir.2002). It must also negate any reasonable interpretations that would make the defendant's statement literally true. *Id*. (citations omitted). *Whiteside* added that the government could not meet its burden because "no Medicare regulation, administrative ruling, or judicial decision exists that clearly requires" the reporting of certain information on a cost report submitted for Medicare/Medicaid reimbursement. *Id*. at 1352.

In all of these respects, the government's argument on these points that Appellants' actual practice constituted "false and misleading claims submissions" (Gov't Br. page 15-16) is completely groundless, false in itself, misleading to the trial court and jury, and cannot support a conviction.

## II. THE TRIAL COURT ERRED IN FAILING TO PURSUE AN INQUIRY INTO THE ISSUE OF JUROR MISCONDUCT

The government recognizes essentially no problem with the fact that jurors were aware of information – inaccurate information – from extra-judicial sources.

The government then pays virtually no attention to the fact that even the government advocated for an evidentiary hearing to determine whether the extra-judicial investigation by the jury was prejudicial. Finally, the government finds no trouble with the fact that the AUSA's failure to abide by the Local Rule prohibiting contact with a jury was what triggered the problem that ended, ironically, with the defense being prohibited from inquiring into the scope of the jurors' misconduct.

In fact, the government learned about matters that are absolutely prohibited by Rule 606 and the Local Rule (that is, the actual discussions among the jurors during the deliberations, including possible racial bias, Dkt.804).

The Local Rule in the Middle District of Florida has been enforced in several cases in this Court, but never before in the situation that arose in this case. This is not a case in which the defense unilaterally decided to start investigating jurors with the hope of finding a basis for setting aside the verdict. *See*, *e.g.*, *United States v. Cavallo*, 790 F.3d 1202, 1226-1229 (11th Cir.2015) (the defendant personally contacted a juror after the trial, without any court approval or knowledge that the contact was to occur, and the defendant himself questioned the juror about the deliberations); *United States v. Venske*, 296 F.3d 1284, 1289 (11th Cir.2002) (without the knowledge of the court or the prosecution, the defense hired private investigators to question jurors and did so "knowingly and intentionally in a scheme to defy the law precluding post-verdict juror interviews"); *Brown v.*

14

*United States*, 720 F.3d 1316, 1317 (11th Cir.2013) (defense counsel hired investigators to question jurors post-trial despite failing to ask the court's permission, which led to the defense attorney being charged with contempt of court); *United States v. Orisnord*, 483 F.3d 1169, 1179-1181 (11th Cir.2027) (defense attorney was denied permission to interview a juror).

In this case, the government engaged in the first contact with a juror and listened to the juror describe his observations about the trial *and* the deliberations and racial issues that apparently arose during the deliberations (Dkt.777 and 855). The trial court, which was alerted to this inappropriate contact – a contact that the AUSA in the Middle District of Florida recklessly participated in – tried to balance the situation by allowing the defense to have limited contact with jurors, but only to find out about matters *other than* what the AUSA had learned about. The defense attorneys were only permitted to ask about the jurors' assessment of the attorneys' behavior and skills. No such limit was placed on the prosecution – because the prosecutors engaged in the jury contact without any prior approval – nor was there any meaningful condemnation of the prosecutor's conduct.

Moreover, what the defense learned through a limited inquiry was that jurors became aware of newspaper coverage of the trial that included inaccurate and prejudicial information about Jorge Perez (*id.*). This extra-judicial information was learned by the juror during the trial, not during the sanctity of the deliberations.

The lawyer who was interviewing the jurors – interviews that were approved by the trial court – never expressly asked about jury deliberations; the lawyer did ask about any extraneous information that the juror learned (*See* Dkt. 865, page 9 and Dkt. 842, attached affidavit of counsel). Had the information about the jury misconduct been learned during trial, it would have necessitated immediate remedial measures and further inquiry. *Mattox v. United States*, 146 U.S. 140, 149-150 (1892); *United States v. Cuthel*, 903 F.2d 1381 (11th Cir.1990); *United States v. Caldwell*, 776 F.2d 989 (11th Cir.1985). The fact that this information was learned during a court-approved interview of the jury (albeit the scope of the topics for discussion were limited), does not in any way detract from the harm suffered by the Perez brothers – and certainly Jorge Perez – about whom the jury learned *false* prejudicial information.

There was no reason for the judge to take a "see no evil; hear no evil" attitude to this problem. As the prosecution suggested, an inquiry into the scope of the problem and the possible prejudicial impact the improper jurors' research had on the defense (Dkt.864:5) was the least the trial court could have done (and this Court can now insist), to determine the scope of the problem. Even if the Court were to find that the attorney's interview of the juror was outside the boundary of the permissible inquiry, Jorge Perez and Ricardo Perez were not at fault and their right to a fair trial with an impartial jury should not be the victim of their attorneys'

16

allegedly errant interview of the jury.

What matters is the fair determination of whether the defendants were denied a fair trial with an impartial jury. A hearing was needed to fully explore what was improperly reviewed by the jurors prior to their deliberations and whether this inappropriate review of extraneous (and inaccurate) newspaper coverage prejudiced the defense.

In *Turner v. Louisiana,* 379 U.S. 466 (1965), the Supreme Court wrote, "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472-473. In *Remmer v. United States,* 347 U.S. 227 (1954), a juror was approached by an unknown person who told him that he would profit from returning a verdict in favor of the defendant. The juror told the judge, who had the FBI investigate. The defense was not told about this contact. The Supreme Court wrote, "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial…."

Once a defendant establishes that the jury had an extrinsic contact the burden shifted to the government to demonstrate that the consideration of the

extrinsic evidence was harmless. *United States v. Tobin*, 676 F.3d 1264, 1296 (11th Cir.2012); *United States v. Khanani,* 502 F.3d 1281, 1291 (11th Cir.2007); *United States v. Pessefall,* 27 F.3d 511 (11th Cir.1994). Prejudice is presumed the moment the defendant establishes that extrinsic contact with the jury did in fact occur. *United States v. Martinez,* 14 F.3d 543 (11th Cir.1994). The AUSA in this case correctly recognized that the burden was on the government to prove a lack of prejudice. The AUSA was correct and the trial court erred in declining the AUSA's and the defense attorney's request to conduct an evidentiary hearing to determine the scope of the prejudice.

### III. THE GOVERNMENT FAILED TO ESTABLISH THE PREREQUISITES FOR THE ADMISSIBILITY OF THE SPREADSHEETS PURSUANT TO THE BUSINESS RECORDS EXCEPTION TO THE HEARSAY RULE

The government's response to the inadequacies of the proof to support the introduction of the spreadsheets pursuant to FRE 803(6) overlooks the fundamental problems with the information in the spreadsheets. The spreadsheets were prepared by the insurance companies (that is, the information in their computers was transferred to a spreadsheet format), but virtually all the information on the spreadsheets was initially supplied electronically to the insurance companies by other people and companies (Dkt.684:57, 70-72; Dkt.688:120-121, verifying that the spreadsheets were summaries of what the clearinghouses supplied to the

insurance companies).

In some instances, there was more than one clearinghouse through which the data passed before it reached the insurance company (Dkt.688:121). The government argues that having received the information from an outside source (over which the insurance company had no control), the insurance companies simply used that information to make decisions about the tests that were performed, the location at which tests were performed, and the billing that was processed based on that information. But the government pays no attention to the fact that the incoming information was not necessarily accurate. Simply stated, the government ignores the principle "garbage in / garbage out" and ignores that the spreadsheets reflected the "garbage out" and should not have been introduced in evidence for the truth of the matter asserted.

Indeed, the insurance companies conceded, and their knowledgeable experts agreed, that the spreadsheets contained inaccuracies, caused by inaccurate processing of the original claims submissions by the clearinghouses, inaccurate information about the place of service and inaccurate descriptions of the type of tests that were performed (screening versus confirmation). Moreover, there was no evidence to verify the accuracy of any of the information supplied to the clearinghouses even before the electronic data was received by the clearinghouses. (Dkt.744:150-155; 157; Dkt.742:103-106). For example, one insurance expert

19

acknowledged that reliance on the CPT code to determine whether a test was a screening test or a confirmation test is not reliable, because some CPT codes are used for either (or both) type of tests (Dkt.744:157), and over the years, the CPT codes have changed regarding the test that was performed (Dkt.744:158-159). At sentencing, another expert acknowledged that what was described in the spreadsheet as confirmatory tests in several instances, actually were screening tests. (Dkt.1111:64-75 and Dkt.1091).[3] Another government expert acknowledged that there was data missing for many of the tests that were included in the spreadsheets. (Dkt.742:292-294).

No witness testified at trial (or in any preliminary hearing regarding the admissibility of the spreadsheets) about the accuracy of the clearinghouse data that was submitted to the insurance company. It is the reliability of that information – the information supplied by the clearinghouses – that was never shown. In fact, one of the insurance company representatives acknowledged that the insurance company has no way to verify the accuracy of the information:

> Q.: If the claims are auto-adjudicated, how does Anthem know that the information that's being submitted in these claims is truthful and accurate?
> A.: It doesn't.  It has to rely on the provider being truthful and

---

[3] The government contends in its brief (Govt.Br. p. 46), that the expert's testimony actually revealed that the claim was nevertheless fraudulent. Maybe so, maybe not. But the point is this: the spreadsheets were positively, undeniably inaccurate, according to the government's expert. The tests that were the basis for several of the substantive counts were portrayed in the spreadsheet as confirmatory, but when the expert at sentencing examined the actual test results from the testing equipment, she acknowledged that the tests were clearly screening tests.

accurate. (Dkt.749:201).

The commentary to FRE 803(6) explains the significance of proving the accuracy of the information in the insurance company's records:

> Sources of information presented no substantial problem with ordinary business records. All participants, including the observer or participant furnishing the information to be recorded, were acting routinely, under a duty of accuracy, with employer reliance on the result, or in short "in the regular course of business." If, however, the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.

FRE 803(6); 1972 Notes.

In *United States v. Kimble*, 54 F.4th 538, 545 (8th Cir.2022); *United States v. Browne*, 834 F.3d 403, 410-11 (3d Cir.2016); *United States v. Santos*, 201 F.3d 953, 963 (7th Cir.2000), and *United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir.2011), the appellate courts emphasized that the key issue in determining the admissibility of a business record is providing proof of the reliability of *the source* of the information, not the reliability of the person, or entity that accesses the information. The Eleventh Circuit has endorsed this view as well:

> We note that Rule 803(6) does not eliminate double hearsay problems. Rather, it commands that each link in the chain of possession must satisfy the requirements of the business records exception or some other exception to the hearsay rule. *See* 4 *Weinstein's Evidence,* 803(6) [04], at 803-210 to 803-212 (Jack B. Weinstein et al. eds., 1996).

*United States v. Bueno-Sierra*, 99 F.3d 375, 379 & n.10 (11th Cir.1996).

21

In this case, the insurance company representatives who testified about the information in the data base provided no information about the original source – or reliability – of the information stored in the insurance company's vast computers. All that the insurance company representatives could verify is that the information was supplied by the clearinghouses.

And no witness from the clearinghouse ever testified at trial.

The initial motion to exclude the evidence (a motion adopted by Appellants), argued that (1) the underlying data was not furnished to the defense as required for any evidence offered as a summary of voluminous data; (2) the spreadsheets were not admissible pursuant to FRE 803(6) because of the failure to establish *any* of the four required elements of the hearsay exception; and (3) the FRE 403 balancing test did not weigh in favor of the introduction of the inaccurate and misleading spreadsheets. Dkt.567.

The government, as pointed out in Appellants' Opening Brief, insisted that some of the information and coding was inaccurate. Proving the *inaccuracy* of the spreadsheet in certain particulars was essential for the government, because the majority of entries on the spreadsheet showed that the tests were "screening" tests which was the opposite of what the government was trying to prove at trial. The government (and the insurance companies) cannot simultaneously argue that the spreadsheets were reliable documentation of the events and certain other

information on the spreadsheets and should be accepted for the truth of the matter asserted, and at the same time argue that the information on the spreadsheets was inaccurate because of alterations by the clearinghouses that supplied the data to the insurance companies (and perhaps by the insurance company individuals who added data to the claims data submitted by the clearinghouses). If one material part of any spreadsheet is inaccurate, it cannot be considered "trustworthy."

There is no dispute about the legal standard that applies when gauging the admissibility of a business record pursuant to Rule 803(6), and Appellants acknowledge that the abuse of discretion standard applies when considering the ruling by the trial judge. But in this case, the trial judge focused on the insurance companies' collection of the data but failed to address the erroneous data submitted by the clearinghouses and, perhaps in some cases, by the hospitals (*see* Opening Brief, pp. 37-38, reciting the erroneous information on the data supplied to the insurance company from the clearinghouse, and the erroneous information added to the spreadsheets by the insurance companies).

## IV. THE TRIAL COURT ERRED IN REFUSING TO CONDUCT AN EVIDENTIARY HEARING ON THE MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

The government's theory at the Perez trial, repeated in its brief (Govt.Br., p. 3) was that "[a]lthough the hospital labs performed some of the less sophisticated 'presumptive' testing [*i.e.*, screens], nearly all of the higher-reimbursing

'definitive' testing [*i.e.*, confirms] took place at out-of-network independent labs." At trial the government used the term "vast majority" in referring to the number of confirms, based on the testimony of witnesses Tobin, Shohan, Parks, and Waller in opining on what the spreadsheets purported to show.

Appellants' Motion for New Trial Based on Newly Discovered Evidence (Dkt.1149), their own affidavits attached thereto, and their Opening Brief (pp. 43-54) all set out in detail, with specific references to the transcript, how Tobin, Jackson, and Shohan recanted and substantially changed their testimony. They admitted that "many," or "the majority," or "the vast majority" of tests they had identified as confirms were, in fact, screens.

In the face of this new evidence, the government *now* seeks to change the meaning of the term "drug screen" so that it becomes a generic term, like *Kleenex* or *Coke*, that covers "any kind of drug test, including a definitive test" (Govt.Br. pp. 41-3).

That proposition might remind this Court of this literary gem from Lewis Carroll: "'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean – neither more nor less.'" *Through the Looking Glass*.

If given any credence at all, this means that, after eight years of litigation in a toxicology case, no one can confidently venture a definition of "drug screen."

24

Thus the spreadsheets have been further exposed as incapable of assisting the jury, and all of the testimony about them must be disregarded. If crucial government witnesses during the Perez trial were guessing as to its true meaning, they did not provide competent and substantial evidence that proved Appellants' guilt beyond a reasonable doubt.

Furthermore, if the government is correct here, then the government is not merely conceding but rather contending that the spreadsheets are inaccurate, deceptive and lack trustworthiness required by FRE 803(6)(E).

Conclusive evidence on this issue was and is available. Appellants had requested a hearing at which they would demonstrate indisputably the kinds of tests run at the hospitals, the exact machine, and the operator's identity as to every specimen tested. This could be done by an analysis of the Laboratory Information System (LIS), as explained in their affidavits (Dkt.1149; Ricardo Perez affid., ¶¶11, 17, 18). That would prove that every test the hospitals performed was a screen, not a confirmation, and that the vast majority of *billing claims* involved screening tests done at the hospitals, not confirmations performed at the outside labs. Their request was denied.

But this issue was addressed at the sentencing hearing during the cross-examination of the government's expert, Kara McVey (Dkt.1111:61-76). The salient points of her testimony are brought out in the Opening Brief (pp. 53-4) and

25

show why she ultimately agreed that the CPT codes on GExh.1A may be "wrong" (Dkt.1111:64); that "looking at codes is not the way to figure out where a test was performed … [y]ou need to look at the lab results" – *i.e.*, the lab report and the LIS system – to determine where the testing was done and consequently if it was a screen or confirm (*id*. pp. 67-8); and "The bottom line is, the spreadsheets are just not much help at all … because we don't know if the codes are accurate" (*id*. p. 76). This prosecution relied heavily on the supposed accuracy of the CPT codes entered onto the spreadsheets, particularly in the testimony of Jackson, Tobin, Shohan, Parks and Waller. McVey's testimony bears out the need for and importance of the hearing Appellants had requested 13 months earlier.

## CONCLUSION

For the foregoing reasons, Appellants Jorge Perez and Ricardo Perez urge this Court to reverse their convictions.

This, the 14th day of November, 2025.

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

/S/ Donald F. Samuel

DONALD F. SAMUEL, ESQ.
Georgia State Bar Number 624475
Attorney for Appellant Jorge Perez

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Tel.: 404-262-2225

26

Fax: 404-365-5041
Email: dfs@gsllaw.com

MARNEY LAW, L.L.C.

/s/ Ronald D. Marney II
RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Fax: (816) 896-0633
Email: marneyron2@gmail.com

27

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No. 24-13762-D |
| | ) | |
| JORGE PEREZ, | ) | Appeal No. 24-13807-D |
| and | ) | |
| RICARDO PEREZ | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that **APPELLANTS' REPLY BRIEFS** are in 14-point

Times New Roman type and contains 6,413 words.

This, the 14th day of November, 2025.

RESPECTFULLY SUBMITTED,

MARNEY LAW, L.L.C.

/S/ Ronald D. Marney II
RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Fax: (816) 896-0633
Email: marneyron2@gmail.com

28

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No. 24-13762-D |
| | ) | |
| JORGE PEREZ, | ) | Appeal No. 24-13807-D |
| and | ) | |
| RICARDO PEREZ | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the within and foregoing

**APPELLANTS' REPLY BRIEFS** with the Clerk of Court using the CM/ECF

system which will automatically send email notification of such filing to the

attorneys of record.

This, the 14th day of November, 2025.

RESPECTFULLY SUBMITTED,

MARNEY LAW, L.L.C.
/S/ Ronald D. Marney II
RONALD D. MARNEY, II
Missouri State Bar Number 47141
Attorney for Appellant Ricardo Perez

920 W. 47th Street
Kansas City, MO 64112
Tel.: (816) 221-6464
Fax: (816) 896-0633
Email: marneyron2@gmail.com